**Pages 1 - 73**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Rodriguez Gonzalez, Judge

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
VS. ) **NO. 4:25-CR-00003-YGR-1-4**
)
SHENG THAO, ANDRE JONES, DAVID )
TRUNG DUONG AND ANDY HUNG )
DUONG, )
)
Defendants. )
)

Oakland, California
Thursday, March 5, 2026

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
CRAIG H. MISSAKIAN
United States Attorney
450 Golden Gate Avenue
San Francisco, California 94102
**BY: ABRAHAM H. FINE**
**LLOYD A. FARNHAM**
**MOLLY PRIEDEMAN**
**ASSISTANT UNITED STATES ATTORNEYS**

For Defendant Thao:
DLA PIPER, LLP (US)
555 Mission Street, Suite 2400
San Francisco, CA 94105
**BY: JEFFREY E. TSAI, ATTORNEY AT LAW**

(Appearances continued on following page.)

Reported Remotely By: Stephen W. Franklin, RMR, CRR, CPE
Official United States Reporter

**APPEARANCES (CONT.'D):**

For Defendant Thao (Cont.'d):

DLA PIPER, LLP (US)
650 South Exeter Street, Suite 1100
Baltimore, MD 21202
**BY: DARRYL L. TARVER, ATTORNEY AT LAW**

For Defendant Jones:

LAW OFFICES OF MARK S. GOLDROSEN
255 Kansas Street, Suite 340
San Francisco, CA 94103
**BY: MARK S. GOLDROSEN, ATTORNEY AT LAW**

LAW OFFICES OF SHAWN HALBERT
217 Leidesdorff Street
San Francisco, CA 94111
**BY: SHAWN HALBERT, ATTORNEY AT LAW**

For Defendant David Trung Duong:

SWANSON & MCNAMARA, LLP
300 Montgomery Street, Suite 1100
San Francisco, CA 94104
**BY: AUGUST P. GUGLEMANN, ATTORNEY AT LAW**

SWANSON & MCNAMARA, LLP
300 Montgomery Street, Suite 1100
San Francisco, CA 94104
**BY: EDWARD S. SWANSON, ATTORNEY AT LAW**

JONES DAY
1755 Embarcadero Road
Palo Alto, CA 94303
**BY: NEAL J. STEPHENS, ATTORNEY AT LAW**
**JEFFREY B. SCHENK, ATTORNEY AT LAW**

For Defendant Andy Hung Duong:

GIBSON, DUNN & CRUTCHER, LLP
One Embarcadero Center, Suite 2600
San Francisco, CA 94111
**BY: WINSTON Y. CHAN, ATTORNEY AT LAW**

COVINGTON & BURLING, LLP
415 Mission Street, Suite 5400
San Francisco, CA 94105
**BY: WILLIAM D. SPRAGUE, ATTORNEY AT LAW**

LAW OFFICES OF ERIK BABCOCK
717 Washington Street, 2d Floor
Oakland, CA 94607
**BY: ERIK G. BABCOCK, ATTORNEY AT LAW**

**Thursday - March 5, 2026** **10:04 a.m.**

**P R O C E E D I N G S**

---o0o---

(Defendants present out of custody.)

**THE COURTROOM DEPUTY:** Calling the criminal matters 25-CR-3-YGR-1-2-3-4, United States of America versus Sheng Thao, Andre Jones, David Trung Duong and Andy Hung Duong. Parties please state your appearances for the record starting with the government.

**MR. FINE:** Good morning, Your Honor. Abe Fine with the United States. I'm joined by my colleagues, Molly Priedeman and Lloyd Farnham.

**THE COURT:** Good morning.

**MR. TSAI:** Good morning, Your Honor. Jeffrey Tsai and Darryl Tarver on behalf of defendant Sheng Thao, who is present before the Court.

**THE COURT:** Good morning.

**MR. GUGLEMANN:** Good morning, Your Honor. August Gugelmann, Ed Swanson, Neal Stephens and Jeffrey Schenk for Mr. David Duong, who is present.

**THE COURT:** Good morning.

**MS. HALBERT:** Good morning, Your Honor. Shawn Halbert and Mark Goldrosen on behalf of Andre Jones, who is present.

**THE COURT:** Good morning.

**MR. CHAN:** Good morning. Winston Chan, Doug Sprague and Erik Babcock for Mr. Andy Duong, who's present, Your Honor.

**THE COURT:** Good morning. So everybody can be seated who's not arguing.

We're here on a set of motions. I understand that Mr. David Duong's counsel would like to take the lead on arguing; is that correct?

**MR. GUGLEMANN:** That's correct, Your Honor. We discussed among the defendants, and since is Mr. David Duong filed the motions, we thought that was the best way to proceed.

**THE COURT:** Well, and then I take it you'll be, Mr. Fine, arguing for the government?

**MR. FINE:** Yes, Your Honor.

(Reporter clarification.)

**MR. GUGLEMANN:** My apologies. August Guglemann for Mr. David Duong.

**THE COURT:** And as you can see, we don't have our court reporter in the courtroom. So it is important for you all to identify yourselves when you come to the microphone.

All right. Well, Mr. Guglemann, I'll have you start. I'll say as we start that I appreciated people from both sides of the aisle coming to our event yesterday on the origin of the Criminal Justice Act. That is always good to have our history and know our history, so I'm glad you were there. If you couldn't make it, it is recorded, and so you can see it later.

And I heard a lot of stories about defense motions and how judges in the old days reacted. I now know I am a much kinder judge than I thought I was. But in any event, I think your motion is a stretch. You should know that going in. I try to be transparent.

**MR. GUGLEMANN:** Thank you, Your Honor. I appreciate that.

**THE COURT:** You may begin.

**MR. GUGLEMANN:** I think as the Court knows, our position here is that the affidavit included false information or admitted relevant information in two respects. There are questions that I think we'll get to about the legal standard, whether it's about what the affiant knew or what he should have known, but there's also plenty that's undisputed about both categories that I'd like to touch on before we get to that.

First, on the shooting, it's undisputed that what the affidavit said happened was wrong. This was not a targeted attempt on co-conspirator 1's life orchestrated by the Duongs. I think it's also undisputed that co-conspirator 1 didn't tell the truth about what happened that night.

**THE COURT:** Do you agree?

**MR. FINE:** I would agree that there were inconsistent statements, yes, Your Honor. And I'm happy to get into more details there when the time comes whenever Your Honor wants to hear it.

**THE COURT:** Okay. Go ahead.

**MR. GUGLEMANN:** I think it's also, and this was disputed somewhat in the papers, but I think it's not reasonably in dispute that the allegation of this shooting was central to the search warrant affidavit application. The, you know, government's opposition papers say that this was provided for context and background, but what we have is a search warrant affidavit that said co-conspirator 1 was a cooperating witness, and there's probable cause to believe that the Duongs tried to kill him for it, and the affidavit goes to great lengths to try to connect the Duongs to this individual who at the time they appeared to suspect might be part of the shooting. That's about, I think, as serious and incendiary allegation that you can make in the search warrant affidavit, that we need to get into this person's house because we believe there's been attempts to kill a government witness, and I think any magistrate judge would want to know whether there was evidence that pointed in the other direction.

I think it's also undisputed here that there was evidence that pointed in the other direction that --

**THE COURT:** Including all of the criminal activity that he had been charged with that was part of the affidavit?

**MR. GUGLEMANN:** I include that in this respect, Your Honor. I think with respect to the shooting --

(Simultaneous crosstalk.)

**THE COURT:** -- (inaudible) say, that criminal activity or allegations of criminal activity seem to be much more important than civil lawsuits.

**MR. GUGLEMANN:** I agree as a general matter. I think in this case the civil lawsuits reveal a pattern that is also evident in the allegations of criminal activity against co-conspirator 1 --

**THE COURT:** Okay.

**MS. HALBERT:** -- which is that in business disputes -- that co-conspirator 1 had a pattern of getting into business disputes with his partners, stealing money from them, and then when they complained about it, retaliating in various ways: Filing presentence reports that appear to be false, filing court documents that appear to falsely accuse them or their attorneys of misconduct.

On the shooting, the reason I think that's relevant and the two are very connected is that the government did have evidence pointing in the other direction, that what happened, that what co-conspirator 1 said happened that night in the shooting didn't happen. There's some question, I think, as to whether the affiant himself had that evidence or whether the government had it, and that's certainly something we would want to explore in a *Franks* motion, but our position is that when the government is in possession of that sort of evidence and the affiant doesn't conduct the kind of investigation that

would reveal that before he submits an affidavit saying there was a targeted attempt to kill a goverment witness, that that is reckless.

**THE COURT:** All right. A response on that point.

**MR. FINE:** Yes, Your Honor. So let me talk about what happened with the shooting.

So the first time that the government spoke with co-conspirator 1 was on June 6th of 2024. On the night of June 9th of 2024, there was a shooting at his house. The FBI learned about that shooting the following morning, on June 10th. And what we knew at the time was what co-conspirator 1 told the FBI, and that was that assailants came to his house and that they shot first and he returned fire. And at the time of the affidavit, the FBI put in the affidavit everything that they knew at the time. The purpose of putting that in the affidavit was to say, this happened, this is potentially relevant, and here's what we know right now about what happened; this is what co-conspirator 1 told us.

And then later, several months later, after doing more investigation, after analyzing -- talking to witnesses, looking at surveillance footage, looking at the ShotSpotter data, it appeared that maybe there was a discrepancy in what co-conspirator 1 had told the FBI. And so the FBI interviewed co-conspirator 1 again, and co-conspirator 1 said, what happened is someone pointed a gun at me, I shot first, then I

hid, then a couple minutes later they came back and they shot up my house.

So we would agree that what was reported in the affidavit is not consistent with what co-conspirator 1 later said, but at the time of the affidavit there was no reason for Special Agent Haunold, who was the affiant on this affidavit which was issued on June 14th, only four days after he learned of the shooting, that there was, you know, any reason to doubt what co-conspirator 1 had relayed about the shooting. And so what was put in the affidavit was what we knew at the time.

The defense points a lot to the ShotSpotter data, which, as an initial matter I don't know if the government even received until the day after the affidavit warrant was signed. But even that just showed that there was a burst of four shots and then a burst of nine shots. Kind of doing this post hoc analysis suggesting that the government should have realized what happened in this very short period of time is simply not what *Franks* is about.

**THE COURT:** All right. You can continue.

**MR. GUGLEMANN:** Your Honor, just to speak to those points briefly.

What the government knew at the time it submitted the affidavit was that witnesses had reported four shots fired; that all four shots appeared to have come from co-conspirator 1's gun based on the shell casings that were found;

that witnesses had also reported that there were a couple people who had been hanging out in the neighborhood, a high-crime neighborhood, who were seen breaking into co-conspirator 1's car.

I understand the government is saying those are pieces that Agent Haunold did not assemble until later, maybe in light of the ShotSpotter data that had --

**THE COURT:** Did he assemble them before the 14th?

**MR. GUGLEMANN:** I think the question is should he have assembled them before the 14th, and --

**THE COURT:** I'm not sure that is the question.

My first question to you is: Did he?

**MR. GUGLEMANN:** Not that we're aware of. As far as we know, he did not.

**THE COURT:** And who was -- and who was in -- who held that information? The ShotSpotter data is held by the county, isn't it?

**MR. GUGLEMANN:** And the Shot -- correct. That's correct. And the ShotSpotter data, we agree, does not come in until after this warrant affidavit is submitted. It does come in before the rollover warrant was submitted, which doesn't update the story to reflect that, but --

**THE COURT:** Who held -- when did the county give the FBI the data?

**MR. GUGLEMANN:** The ShotSpotter data the county did

not give until I believe it's June 15th, after this warrant was submitted.

The other data as far as I know --

**THE COURT:** That wasn't my question. My question is: When did they?

**MR. GUGLEMANN:** June 15th as to the ShotSpotter data. Eyewitness data, witness interview data, as we understand it, was available earlier.

**THE COURT:** When you say "is available," what do you mean by that? It's a passive reference.

**MR. GUGLEMANN:** Meaning that those -- that investigation was conducted immediately at the time of the shooting, June 9th, so five days before the affidavit was submitted, and --

**THE COURT:** By the FBI?

**MR. GUGLEMANN:** By the OPD and FBI, as we understand it.

And so while it may be that one individual inspector, Special Agent Haunold, had not put those pieces together. Those pieces were all available to the government at the time.

And the case law that we cited -- and this gets to the standard that the Court is going to be -- is going to need to apply here, *Chesher*, the Ninth Circuit case, *Tanguay* -- that's C-h-e-s-h-e-r, *Chesher*, *Tanguay*, T-a-n-g-u-a-y, out of the Third Circuit, what that case law says is that when there is

reason for an agent to do more investigation, they are required to do that. It's not enough to say, well, this agent personally didn't know this fact, and so therefore it's not part of the analysis.

*Chesher*, as the Court knows, was about the FBI, the search warrant affidavit that said the defendant was a Hell's Angel. The agent there recklessly failed to uncover a report that said he wasn't one. And the Court said it's not enough for the agent to just say, well, I didn't know that. The Court did an analysis and said, based on the course of the investigation that information was available to you, and it was reckless that you didn't collect it.

Similarly, in *Tanguay* the agent had all sorts of reasons to distrust the -- a cooperating witness, or an informant, rather, didn't do the additional search that would have turned up convictions having to do with fraud, and the Court said, given everything that you knew, that was reckless.

**THE COURT:** Response.

**MR. FINE:** Yes, Your Honor. I want to make two points about this, this whole thing. I want to start and respond directly to what Mr. Guglemann said about the cases, and then I also want to talk about materiality to the extent Your Honor wants to hear about that.

But I'll start with *Chesher*. So *Chesher* is a Ninth Circuit case where there was an affidavit that had an explicit

false statement. It said that the target of the search warrant was a member of the Hell's Angels in 1979, when the affidavit was sworn out. In fact, the person had been expelled from the Hell's Angels four years earlier, in 1975. And what the Court said in that case is there was a lot of evidence suggesting that the affiant actually knew that to be false. And what that evidence was was that the -- there was a law enforcement officer who had authored a report saying that in 1975, that that person had been expelled, and that this agent had had several conversations with that law enforcement official who authored that report.

So that's one.

Two, the Ninth Circuit decision also said that they shared an informant, and it was likely that the informant, who had told the state law enforcement officer that the target, Chesher, had been expelled in 1975, had also spoken with the same FBI agent and then had also said that this FBI agent had been investigating the Hell's Angels for 12 years in an undercover capacity in some respects, had been to conferences, and that there's no way it's credible that someone who had had that knowledge of the Hell's Angels would not know that this person had been expelled four years earlier.

Now, in our case the shooting happened four days before the affidavit was sworn out. So not the 12-year investigation that was going on in *Chesher*, when there were actual facts

suggesting that the agent was not telling the truth. That's where this case is completely distinguishable.

*Tanguay*, which is the other case Mr. Guglemann cited, is from the First Circuit, not from the Third Circuit, I believe, but it had to do with a child pornography case. And what happened there is that the affiant knew that the tipper, who said this person had had child pornography, was what they described as like a police groupy, that someone who hung around the police and made people very uncomfortable and was a very strange person, and that they should have run a rap sheet on that person to determine that they had a conviction for filing a false police report, which obviously is something that is pretty important to leave out of an affidavit. And so not only is that case obviously from a different circuit, but the facts are far afield from what we have here.

So just in response to the cases that Mr. Guglemann's talking about here, they're completely distinguishable.

And then just on materiality I'll just make a broader point. And obviously we made this in our brief, but the vast majority of the affidavit related to the public corruption scheme. And so this whole discussion about the shooting I think is somewhat of a red herring. Even if all of the stuff about the shooting was excised from the warrant affidavit, there is so much there about public corruption that would have provided probable cause for these searches.

**THE COURT:** All right. Anything else?

**MR. GUGLEMANN:** Yes, Your Honor.

I think the Court can read the cases. Both of those cases stand for the proposition that courts should look at the facts, look at the specific circumstance of an investigation and determine whether the agent should have taken additional steps. Here we also have an explicit false statement or a false allegation in the affidavit related to this shooting. We also have circumstances that should have caused the agents to question the credibility of co-conspirator 1 far more than they did.

And just to speak briefly to that, because I think this is another point where the known/should-have-known question doesn't enter into the analysis. I'd like to point the Court to the police report that counsel for Mr. Jones filed recently that was referenced in the search warrant affidavit in a really oblique way and in a way that I think is significant to the Court.

What the search warrant affidavit in its disclosure about co-conspirator 1 said was, I reviewed a police report where an allegation was made that he took out a $250,000 loan and didn't repay it and said he wouldn't repay it. No criminal case has been filed. The actual police report that he reviewed that we now have says a lot more than that. It says that co-conspirator 1 inflated the value of his house something like

five times to take out -- or property -- to take out more than $3 million-worth of loans, defaulted on those loans, refused for two years to pay, and when the victim started complaining, threatened the victim with blackmail, showed up at the victim's wife's business to harass and threaten her, sent more than a hundred text messages to the victim threatening him with various repercussions if he went to the police, and all of that gets condensed in the search warrant affidavit to, he said he wasn't going to pay back a loan.

The reason this is so significant is that if the agent had done the minimal additional work required to uncover co-conspirator 1's litigation history, he would have seen that this fits into a pattern that's repeated over and over again that I alluded to before: Business disputes that turn into false accusations of criminal activity that turn into threats. In that context an informant, where even by the government's -- even on the face of the search warrant there's a full page of disclosures of reasons not to trust this person; that the government would not give the full details of the criminal allegations in that police report to a magistrate and would not question the statement of this untrustworthy person that he had been the target of a shooting, rises to the level of recklessness.

On the materiality point, as to --

**THE COURT:** So, and with respect to that, to be

clear, there is so much evidence, documentary references in the warrant at issue, that even if I agreed with you and excised the entirety of it, it still seems to me there would be probable cause.

**MR. GUGLEMANN:** We disagree on that, Your Honor.

**THE COURT:** Well, obviously.

**MR. GUGLEMANN:** As to David Duong we understand, of course, probable cause is not a very high standard for the government to meet, but it's not nothing, and it can't be a hunch. It has to be based on actual evidence.

**THE COURT:** So do you -- are you arguing that there is plenty of other evidence with respect to the other three defendants, but that your client is singularly different?

**MR. GUGLEMANN:** No, Your Honor, but we're only taking a position as to David Duong, because the quantum of evidence in the search warrant affidavit is different as to every defendant.

As to David Duong, what you have is, I think, a hunch that he was involved in a scheme. Built on top of that hunch there are two categories of evidence. There are documents that are facially neutral: The existence of a meeting, their investment, David Duong's investment in a housing company, the hiring of Mr. Jones to work for that investment company. All of those things are neutral. It's only if you start from the assumption that there was an illegal scheme that those

become --

**THE COURT:** It's circumstantial evidence. Most cases are built on circumstantial evidence.

**MR. GUGLEMANN:** It's not a question in my mind of whether it's circumstantial or not. It's a question of whether that evidence, divorced from the assumption that there was a scheme underneath it, shows probable cause, and it doesn't as to Mr. Duong, David Duong.

**THE COURT:** Well, I don't think I agree with you.

Response.

**MR. FINE:** Certainly, Your Honor. So let me talk about some of that evidence. Now, for right now I'll stick to just David Duong, because that's what we're talking about.

So the warrant lays out in October and November of 2022, you know, all of the meetings, the phone calls, the text messages with Sheng Thao and Andre Jones and Andy Duong, like clear -- very explicitly laying out this scheme. And then the affidavit goes into March of 2023, and this is when it really gets into David Duong's involvement.

So on March 7th, co-conspirator 1 sends Mr. Jones a draft letter purportedly from Thao to David Duong committing to purchase the units from Evolutionary Homes, and that mirrors the correct agreement, and then he texts Jones and said: "David Duong called Sheng three times without a return call, is she okay."

So then there's more about the March 9th meeting at Skates by the Bay, but March 26th is where it really --

(Reporter clarification.)

**MR. FINE:** Sure. I'm sorry about that.

March 26th is where it really becomes clear what's going on, and there is a long text chain between co-conspirator 1 and Andy Duong where they're very upset that David Duong is meeting with Andre Jones, and they're saying that Andre Jones is meeting with David Duong because he wants direct access to the money. And co-conspirator 1 says he's sure that David will back them up.

Andy Duong says: "Ain't nothing free or front, because we did all that to help her ass win," clearly referring to Ms. Thao, and they talk about communication assignments. And then co-conspirator 1 sends Andy Duong an explicit summary of the deal saying, we did all these things and they're giving us all of these things, as explicit as anyone could ever see in a corruption case, a quid pro quo. This literally says "for" in the middle of the summary.

And then he asked Andy Duong: "Am I missing anything?" Andy Duong says: "No, it's all right, you're not missing anything." Co-conspirator said: "Should we share with David?" And Andy Duong says: "I've shared with David numerous times, so he knows what's going on." That's from Andy Duong, not co-conspirator 1. And then a month later you have discussions

about Andre Jones getting paid, he gets checks. And then on April 18th, David Duong --

**THE COURT:** Slow down.

**MR. FINE:** I apologize, Your Honor.

David Duong -- so again, this is directly from David Duong -- texts co-conspirator 1 and says, they've decided to give -- he says, co-conspirator 1: "Please call AJ," Andre Jones. "Tell him we just finished our meeting, and we decided to give him what he asks for, but he needs to sign before funding."

Then on April 26th co-conspirator 1 has lunch with Andre Jones, and the same day, co-conspirator 1 texts David Duong and says: "AJ signed, and that he will 109 percent deliver." And then two days later, Andre Jones deposits a $35,000 check from Evolutionary Homes, again, the company for which David Duong is the listed president.

So this is clearly probable cause, Your Honor. It goes well beyond probable cause but clearly meets that threshold.

**THE COURT:** Any response?

**MR. GUGLEMANN:** Just briefly, Your Honor.

I think all of the evidence that the government cited speaks for itself, and I think the number of times that the government in its recitation here said names other than David Duong is significant.

And the other thing I would point out is in this exchange

that the government cited, two things the government I think highlighted. One is that this text from co-conspirator 1, should we share with David, if anything, indicates that he believed David Duong was not in the loop of whatever they were talking about. And the response that the government devoted from Andy Duong, the government only quoted half of it. There's actually a contradictory response there, where he both says, we'll share it later, and we've already shared it. And we know that the part that says we've already shared it can't be true, because the "it" is a document that was only created moments before.

So I think stripped of the sort of connective tissue that co-conspirator 1 provides to connect all of these otherwise facially neutral points of data around David Duong, there is no probable cause as to him.

**THE COURT:** All right. I would not stop prepping for trial if I were you.

Do you want to be heard on any other topic with respect to this issue?

**MR. GUGLEMANN:** No, Your Honor. I think I would submit there are obviously other points at issue in the motion, but I understand counsel for co-defendants will be addressing those.

**THE COURT:** Okay. Who else wants to be heard?

**MR. TSAI:** Thank you, Your Honor. Jeffrey Tsai again

on behalf of Ms. Thao.

There are essentially in our motion that we have filed, which is independently a motion to suppress, along with a joinder as to Mr. Duong's motion as to the arguments that Mr. Guglemann made, there are, to summarize as an overview, three primary challenges that we make to the June 2024 warrant. The first of which I just mentioned relates to statements, or rather, omissions by the case agent in this case that warrant, in our view, a *Franks* hearing.

The two, however, that I'm going to focus on for this argument relate specifically to Ms. Thao, the first of which is even in a world in which there were not material omissions by Agent Haunold, the affidavit itself still failed to establish any factual nexus between this, again, evidence that's cited in the affidavit and the residence of Ms. Thao that was subsequently searched. So I'll address that in a moment.

The second primary argument that I'll address today is the fundamental notion that, again, as very specifically to Ms. Thao, there is an absence of probable cause that she engaged in the conduct that's described, and more specifically, the offenses that's enumerated in the affidavit itself; and that because of that absence of probable cause, a *Franks* hearing is warranted, and more importantly, the exception under *Leon* does not apply.

But first, Your Honor, if I may, I want to address the

issue which is one of the two pieces for us, and that relates to the alleged factual nexus, the evidentiary nexus between what they claim in the affidavit and Ms. Thao's residence. And I think it's important to start with the first principles the Court knows very well, better than most, which is: Number one, that the government must offer these facts that are sufficient to justify a conclusion that the evidence or contraband will probably be found at the residence itself. That's, of course, the animating factor. And then the second, which is the more general proposition the Court knows well, which is that the home itself is pretty unique in the pantheon, as courts have described it, of constitutional rights.

Very specifically, the government relies on three major factors to justify that there would be evidence or contraband, what the government calls relevant evidence, that would probably be found at her residence, the first of which is, as they lay out in their motion specifically, Your Honor, at page 32, they say there's evidence of computers and evidence therein at the residence; number two, they say mobile phones; and number three, they rely on the notion, as the Court knows, on of training and experience. And I want to address each of those because I think they're important, the first of which is the justification related to computers.

What the government lays out in its opposition on page 32 in particular --

**THE COURT:** Are you suggesting that she -- that -- it strains credulity that people do not communicate throughout without computers and cellphones. Perhaps Elon Musk. I've read that he doesn't use a computer. But otherwise that's what people use.

So I don't even understand the basic premise of your argument.

**MR. TSAI:** The premise of the argument is not based on the idea of whether or not Ms. Thao used computers or phones. In fact, there are --

**THE COURT:** You would agree, right, then, that most people do. That is a reasonable thing for a magistrate judge or any judge to believe, that there is the use of computers and cellphones to communicate. You would agree with that basic proposition, wouldn't you?

**MR. TSAI:** I would.

**THE COURT:** Okay.

**MR. TSAI:** But Your Honor, it is only half of the proposition.

The other half of the proposition is what is the subject of this motion, which is whether that has a nexus to the house. To only address half the proposition is not to address what the central problem is, because in this case as it relates to the issue of computers, first, as outlined in the government's opposition and the affidavit, they say two things, one of which

the Court just addressed. In the case of computers they say computers are used to generate documents, but then they say in the affidavit: "Thus, there's reason to believe that there's a computer system in the house." That sentence, singular sentence, in the affidavit is the only justification the government posits as to how there could be probably a computer in the house.

**THE COURT:** Just because something is straightforward and obvious and simple, simply stated, doesn't make it not acceptable.

**MR. TSAI:** I agree with that statement, Your Honor, except as it relates to this analysis, there is not a single statement that would explain how it is that even if a computer were used to generate documents, number one, that Ms. Thao generated any documents. There's not a single allegation of that, Your Honor, in the affidavit. Number two, that the computer was used at a house. It is the absence of any evidence as to those two things that makes what otherwise as you said, a straightforward proposition, not applicable to this analysis.

**THE COURT:** Response.

**MR. FINE:** Yes, Your Honor. Completely misstates what's in the affidavit.

So the affidavit talks about how there were ping warrants up on Ms. Thao's phone, and Ms. Thao's phone was pinging at her

house in the days leading up to the execution of the search warrant. Earlier in the affidavit, the affidavit cites numerous text messages that Ms. Thao sent presumably from that same phone that was pinging in her house in the days leading up to the search warrant, which presumably, or at least there's probable cause to believe would have evidence of the text messages that were earlier described in the affidavit.

So, you know, the affidavit also describes that their cars were there. They received mail there. The agent's training and experience that people who commit these types of crimes typically have financial documents, phones, computers, all kinds of stuff that would seem to have relevant evidence at their homes. And the Ninth Circuit has explicitly said that magistrate judges can rely on an agent's training and experience for that kind of thing.

And then of course there is the deferential standard that we're evaluating this nexus argument under. All of the cases say that this is not a de novo review. This is a highly deferential review of the magistrate judge's finding. Judge Westmore found that there was probable cause to search this home. And then on top of that it's really doubly deferential, because then you have the good-faith exception, which, you know, clearly says that even if the magistrate judge was wrong, if the agents believed, relied in good faith on the warrant, which they clearly did here, then they can execute that

warrant.

So I think, yeah, I'm happy to go on, Your Honor, but I think that addresses everything.

**THE COURT:** You don't dispute the standard, do you?

**MR. TSAI:** Jeffrey Tsai on behalf of Ms. Thao.

No, I don't dispute the standard. However, I absolutely dispute that the government cannot meet the standard, number one.

Number two --

**THE COURT:** Okay. Your next issue.

**MR. TSAI:** The next issue actually relates to what the government just did, which was distort exactly what we're talking about the first argument just made related to computers. I'll address now the second, which is the basis on which the government relies, which is the idea of mobile phones being at the house itself. And there are four primary points that we'd urge the Court to consider, the first of which is this oblique reference that Mr. Fine makes to numerous instances of text messages. We should be very clear exactly what we're talking about. There are exactly in the affidavit four references to text messages, so four text messages that are allegedly made involving Ms. Thao, and there are three phone calls allegedly involving Ms. Thao.

There is, number one, a problem with staleness as it relates to establishing a nexus to the house with respect to

the utilization of the phones. All of the conduct that's described in the four text messages, three phone calls occur in 2022 and 2023, which is at the outside about two years prior to them finding -- them searching -- applying for the search warrant.

The second issue is that there is no alleged, even, link between the phones that Mr. Fine is referring to and the actual texts and phone calls. In other words, Mr. Fine makes reference to this idea that there is geolocating pinging that's occurring with the phones at her house. There is not a single allegation in the affidavit indicating that it is the same phone that was making text messages and calls from 2022 and 2023.

The third issue is that the text messages and the phone calls themselves have no independent incriminating value. The Court made mention during the colloquy with Mr. Guglemann about this idea of circumstantial evidence. Circumstantial evidence, as the Court well knows, is fine. The problem is even circumstantially, the existence of phone calls and the existence of text messages which themselves, when the Court rereads them, are anodyne at best, do not have any incriminating value unless and until the Court is to utilize that evidence through the lens of the primary cooperator in this case.

The third basis, Your Honor, that the government utilizes

to justify this factual nexus is that training and experience point that Mr. Fine briefly made mention to. And what the Court has seen in the affidavit is there is replete throughout the affidavit reference to training and experience based on what Agent Haunold knows from individuals like the defendants. But there isn't any specific reference to Ms. Thao that was otherwise, again, tie this evidence to her particular residence.

The government primarily revolves around an argument they set forth and summarized in their opposition for this kind of basic notion, as the government calls it, in white collar cases. It is essentially presumed that there's going to be contraband in a residence, and they rely on cases that the Court knows, like *United States against Kvashuk* for that proposition. The problem is that is itself a gross distortion of the law. There is in fact no Ninth Circuit law that stands for the proposition that if there is a white collar case, a corruption case, it therefore is the case that contraband will be found in the house. That missing part, that missing link is any kind of evidence that would establish any kind of nexus to be able to get into the house itself.

**THE COURT:** Do you want to respond?

**MR. FINE:** Certainly, Your Honor. I'll talk about the case law. You know, I think I already addressed the factual allegations in the affidavit.

The cases that the defendants rely on, their big name cases is the *Hove* case from the Ninth Circuit, and what happened in that case is the Ninth Circuit determined that the affidavit failed to establish a nexus between the crimes committed and the residence, because the whole section of the affidavit describing nexus was not sent to the magistrate judge due to a stenographer's error. That's their main case that they rely on.

The second case that they rely on is the *Grant* case from the Ninth Circuit, and that related to a search of a person's home for a murder weapon because the police suspected that the person's son maybe had a connection to the murder, but not at all that that person who actually resided and owned the house had any connection. Of course here we've established a clear connection between the target of the investigation and the house.

And then they rely a lot on this case, *Weber*, from the Ninth Circuit, W-e-b-e-r, but it's not a nexus case. The word "nexus" doesn't even appear. It's about probable cause in a child pornography sting operation. I could go into the facts. It's completely distinguishable from our case. But I'll just reiterate the facts in the affidavit I cited before, the incredibly deferential standard and the complete lack of case law on the other side.

**THE COURT:** Can you tell me what time the search was

executed? I don't see it in the briefing.

**MR. FINE:** I believe it was about just after 6:00 a.m., about 6:30.

**THE COURT:** And the defendants were there?

**MR. FINE:** Yes, Your Honor.

**THE COURT:** And because it was at 6:00 a.m., I take it because they were at 6:00 a.m. and they were there, the cellphones were found?

**MR. FINE:** Yes, Your Honor.

**THE COURT:** All right. Makes sense.

Next issue.

**MR. TSAI:** The next issue pertains, Your Honor, to the fundamental issue of probable cause.

I will note before I start that even as to the last issue of *United States against Weber*, that case is important for the Court to consider by virtue of the fact that the primary problem in *Weber* was that the affidavit was drafted in a manner, as the Court called it, without the particular defendant in mind, and that is I think the cap to the argument as it pertains to the factual nexus.

As it relates to probable cause, which is the other primary argument we have in our motion, the Court --

**THE COURT:** But you two would agree, right, that the probable cause standard is low. It's not a very high burden. There is a burden, but it's not, certainly not that high.

**MR. TSAI:** It certainly is not a reasonable doubt standard. It's a 50.1 percent standard. Yes, Your Honor, I do agree with that. But even as a 50.1 standard they still must meet it, and the government fundamentally has not.

The Court made reference in the earlier colloquy to the idea that there is, in the Court's words, so much evidence, and that is I think the primary problem with the evidence as to Ms. Thao specifically. The Court used the phrase is it the position of the defense that the evidence is not sufficient, or that, rather, the defendant is singularly different, the Court said. And the answer to that question, although not originally directed to us, is, yes, Ms. Thao is singularly different than the other defendants.

**THE COURT:** And you also are arguing that somehow the magistrate judge should not have considered the connection between Ms. Thao and her boyfriend, who is also a defendant, Mr. Jones.

**MR. TSAI:** That is fundamentally correct, Your Honor. As it --

**THE COURT:** So that is also a stretch.

**MR. TSAI:** We disa' --

**THE COURT:** They are living together and he is acting -- well, go ahead.

**MR. TSAI:** No, I understand where the Court is -- I think I understand where the Court is going with the comment

the Court just made, and I would like to address it, which is to say the sheer fact of a couple that is married, or domestic partners, whatever the case may be --

(Simultaneous crosstalk.)

**THE COURT:** And (indiscernible) being transferred from one entity or person to another where there are connections, and you expect a magistrate judge to just ignore all of that?

**MR. TSAI:** Yes, because that allegation itself is not grounded in any evidence. What the Court obliquely made reference to I believe is the idea as the government recounted a moment ago, that there was allegedly money that went from one or more of the Duongs to Mr. Jones, but that is where the evidence ends. There is no evidence either in the form of communications or bank records that demonstrate money went from Mr. Jones to Ms. Thao. And that is important, because to just make the general idea, well, these two people lived together, which is not the Court's words, that could not be sufficient for probable cause. And I think that's part of the problem, because Ms. Thao, by virtue of how the government constructed its warrant and application, has essentially kind of been lost in the wash, and that's why in this argument as it relates to probable cause, if the Court is to --

**THE COURT:** What's lost in the wash?

**MR. TSAI:** Yes. In other words, in the cascading --

**THE COURT:** How much did they allegedly spend to get her elected? How much?

**MR. FINE:** So for the mailers it was $75,000, and then there were $95,000 in payments afterwards, with the promise of up to $3 million in payments.

**THE COURT:** Go ahead.

**MR. TSAI:** Your Honor, I think the missing piece from even the nature of the question the Court just asked is a presupposition that Ms. Thao was somehow in agreement or otherwise assented to whatever was --

**THE COURT:** We are talking about probable cause. We are not talking about the resolution of the allegations and the charges against her. Entirely different. It is an entirely different standard.

**MR. TSAI:** It is entirely different, but the government must still meet that standard.

**THE COURT:** That's what I'm talking about. What you want to argue is you want to give your closing argument. That's not my concern right now.

**MR. TSAI:** Respectfully, no, Your Honor. The government still must meet the probable cause standard in the --

**THE COURT:** I would move on if I were you.

**MR. TSAI:** So as it relates to the probable cause issue, it is important for the Court to analyze exactly to this

point of whether it can achieve the probable cause standard, exactly what is the --

**THE COURT:** I said the next point. I -- move past probable cause, because I've heard what you have to say.

**MR. TSAI:** Even, Your Honor, were there probable cause, or, rather, even in the event the government had any kind of evidence, there is of course the *Leon* analysis, which we think will bear importantly for the Court in its analysis. And we do want to make sure to note the argument as it relates to Leon, because the exception could not and would not apply here. The Court knows well the *Leon* exception standard, and in this particular case the primary problem that we have that could not allow for the exception to apply is that there is conduct that in this particular case the agent engaged in that we think would prevent it.

Number one is not the least of which are the arguments made by Mr. Guglemann as it relates to the material omissions, and there is one --

**THE COURT:** And you're not claiming that he was dishonest. You're claiming that he was reckless?

**MR. TSAI:** We are claiming that there is dishonesty, Your Honor, and to the extent the Court is using that term as --

**THE COURT:** I'm looking at the standard, and it says: Dishonest or reckless.

**MR. TSAI:** Yes, and the case -- yes.

**THE COURT:** And I understood the argument to be that, from Mr. Guglemann, was that he was proceeding on a reckless standard, not dishonesty.

**MR. TSAI:** For Ms. Thao and her motion which we argue in the motion papers itself, we absolutely argue both, which is to say at a minimum the agent's conduct was reckless, but in addition to that, it is also intentional or dishonest, as the Court noted, and here is why.

What we argue specifically in the motion and we point out as cited in the affidavit is an intentional omission that Agent Haunold made with respect to one of the text messages that involved the chief cooperator, as well as one of the other co-defendants, and in that text message, Agent Haunold intentionally omitted language that he knew would demonstrate something, a negative about the credibility of the chief cooperator, and that is, Your Honor, as Your Honor already knows, paragraph 88 of the affidavit itself. And that is where Agent Haunold, by his own admission subsequent to our motion, acknowledged that he deleted two specific lines in the middle of a text message in which the chief cooperator referred to Andre Jones, obviously one of the defendants, as "stupid black shit." That omission itself the agent described and the government attempted to explain in its opposition as merely their effort to "focus," I think is the word they used, Judge

Westmore. But that intentionality is important, because it squarely goes to the issue of the chief cooperator's credibility.

And as the Court already knows well, in the Ninth Circuit, racial bias and evidence of racial bias is plainly a factor as to a declarant's credibility. That's cases like *Okada against Whitehead*, which itself demonstrate that that kind of information that bears upon credibility is important, and in a case, to the very issue we just talked about, where probable cause standard is itself already low, the fact-finder, in this case Judge Westmore, was entitled and needed the information that bore upon the chief cooperator in order to assess that credibility.

Those two reasons negate the application of the good faith exception, Your Honor, and that is why we think a *Franks* hearing would then be warranted.

**THE COURT:** Response.

**MR. FINE:** Thank you, Your Honor. Yes, I would like to address that.

So I think where to start is in the February 2024 iCloud warrant, and that was targeting co-conspirator 1's iCloud. And in that warrant there was a text chain quoted between Andy Duong and co-conspirator 1, and those two lines that Ms. Thao's counsel talked about were omitted, and among many other lines that were omitted. And certainly those lines were charged.

But the reason they were omitted, and I think it was because if we had put them in and co-conspirator 1 had fought his case, I think we would be here on a separate motion basically saying that, you know, we were intentionally trying to show that he had, you know, racial bias. And then those text chains were copied and pasted into the subsequent warrants.

And so I think what that demonstrates is there wasn't any intent to somehow bolster co-conspirator 1's credibility in the later June warrant by excising those lines. I don't think they went to his credibility. But I think really more importantly from a materiality standpoint, if those lines had been included in the affidavit, I don't think it would have changed anything given all of the other probable cause that was in the affidavit, all of the other disclosures about co-conspirator 1 that are described ad nauseam in the brief.

And I'll briefly just talk about the case law on this, and again, because it's the defendant's burden here, and they have to show that there are cases that support their position. The one case Mr. Tsai talked about, the *Okada* case, it's an unpublished case from the Ninth Circuit. It's a civil case, a breach of contract case. And what the Ninth Circuit said there, it affirmed the district judge's decision to allow cross-examination on the topic of racial animus of a witness, when that racial animus had made explicitly racist statements about the other side. Again, civil case. Nothing to do with

*Franks* whatsoever, a breach of contract case.

The other case they cite seemingly to support their argument is a Seventh Circuit case called *Glover*. The case had nothing to do with racial animus. It was about the inclusion of statements from a six-year-old informant who had 14 convictions that were not included in the affidavit, including four while that person was working as an informant.

All that is to say no case law supports this position, and from a materiality standpoint it would not have affected the probable cause.

**THE COURT:** Any other issue?

**MR. TSAI:** Yes, Your Honor. If I may briefly respond to that case law point.

*Okada* is a principle of law that talks about the fact that racial bias is, in fact, probative of credibility. Whether or not it is in a civil or criminal context, the rules don't change at least in reference to the criminal conduct for the cred --

**THE COURT:** Can you agree, though, that this was originally raised in the February 26, 2024, warrant? Correct?

**MR. TSAI:** I apologize. That what was raised in the February 2024?

**THE COURT:** This issue, the -- his recitation of when the lines from the iCloud account were put in originally in the warrant. Because most of these warrants were successive

warrants.

**MR. TSAI:** There were -- sitting here right now, I don't know if those specific lines were included or not. I, just sitting here right now, don't know, Your Honor. But the problem is on the June warrant it certainly was not. And so it's not as if suddenly even --

**THE COURT:** So Judge Westmore issued the February 2024 warrant. I'll go back and check, but if he's accurate, that's an important piece of the puzzle.

All right. Next. Any other defendant wish to be heard?

**MS. HALBERT:** Good morning, Your Honor. Shawn Halbert on behalf of Andre Jones.

Your Honor, I'm going to address issues that are specific to Mr. Jones, but I do want to address a couple of points that came up during the last two arguments.

The first is that as to -- and obviously the racial issue pertains to Mr. Jones primarily. The statement "stupid black [expletive] don't think how things done," was literally excised, in other words, to get the quote on the top.

**THE COURT:** The answer to my question?

**MS. HALBERT:** And Your Honor, here's what I would say is that the government is testifying. The government is giving you an explanation, the Court, an explanation as to how it was done; that it was first done in the February warrant, and that's --

**THE COURT:** Well, was it or not? Do you know?

**MS. HALBERT:** Your Honor, I was just -- because it just came up I had just started to check it. I'm sure someone on the teams can check it.

But the point is we don't know because unless we have a hearing, we don't know who decided to take it out. And also furthermore, the June warrant was very different. This was no longer targeting the informant. It was targeting the defendants at this table, including Mr. Jones.

**THE COURT:** The February 2024 warrant was targeting all of them, not just co-conspirator 1.

**MS. HALBERT:** But Your Honor, the government's explanation for this, which was -- is that if they had included it in the warrant in February, that would have opened them up to a charge by the informant's lawyer that they were deliberately including information in the affidavit that would prejudice the informant, and that could have been a grounds to challenge the warrant against the informant.

When you get to June that's no longer an issue. The informant is cooperating. This idea that -- the government is basically, Mr. Fine is testifying that it was a mistake or omission, it had been done in the February warrant, it was a cut and paste issue. That is -- it's Agent Duncan's affidavit. If he wants to testify that he forgot there had been this racially charged information, he had taken it out so as not to

prejudice the informant, that would be for him to testify to. But that is evidence that the government is trying to present, I would say, in the form of an argument.

As to the shooting, the government argued that months later they learned more, but as of June 14th there was no reason to know differently. That is directly contradicted by the record. We cited the Court, this was on page 11 of our opening brief, to Exhibit 20 to Mr. Stephens' declaration. It states that: "On June 13th" -- so this is the day before the warrant, the affidavit was signed -- "OPD Officer Jaeger met with CID Captain Daza-Quiroz and Acting Lieutenant Garcia and FBI agent Ethan Quinn, who requested that the case be transferred to Officer Jaeger due to his status as a TFO with the FBI."

What you have here is a meeting between the FBI and the people who are investigating the case, the shooting. You also have the FBI agent present at that meeting, and you have a cross-designated officer. The Court of course knows what a cross-designated officer is. What that means is is it is incorrect that the government did not have access to that information, and we pointed out totally separate from the ShotSpotter three huge red flags that the government knew or should have known about:

The first is that the informant gave completely different and incompatible versions of the shooting to OPD and the FBI

within hours of each other. That included whether he contacted the FBI, how many shots he fired, whether 10 minutes went by. And so that's the first thing.

The second thing is that what was known the morning of was that the ballistics did not match with his story to the FBI.

And the third thing is that he, when confronted with the fact that he would have to turn over his gun, the informant changed his story about what gun he used.

Those were all known.

**THE COURT:** And didn't the affidavit indicate that he gave inconsistent statements?

**MS. HALBERT:** No, it did not. It just stated what his statement to the FBI was.

And, Your Honor, the Court asked about the -- when the warrant was executed. I think that the -- even though the government shifts to this being a fraud case, that's not what -- the warrant focused heavily on the shooting. This was a warrant executed at Mr. Jones and Ms. Thao's home at 6:00 a.m. with military equipment, AR-15s, battering rams. Mr. Jones was not clothed. This was being treated as a very serious matter when the search was started.

I want to ...

**MR. FINE:** Your Honor, may I have a chance to respond to some of that?

**THE COURT:** Go ahead.

**MR. FINE:** I'll start with the February warrant. It's paragraph 72. This is Exhibit 1 to the Fine declaration. Paragraph 72, the exact same two lines are omitted from that February warrant. And again, that with that warrant that was targeting co-conspirator 1. So the idea that the reason those two lines were omitted was to somehow bolster his credibility I think is disproven by that.

And then as to the shooting, you know, we've talked about this earlier with the other co-defendants. If Your Honor has specific questions about it I'm of course happy to address those, but I think we've made our record on that. There absolutely is no basis for a *Franks* hearing on that for multiple reasons, both because of the timing and, you know, even if Your Honor wants to get into the weeds of the shooting, it is, from a materiality standpoint it is just not relevant from a *Franks* perspective given all of the other probable cause that's in the warrant relating to the corruption scheme.

**MS. HALBERT:** Your Honor, the only thing I would briefly say to that is that we believe it is highly material that the informant would lie to the FBI and the OPD about such a serious matter.

Moving on to Mr. Jones in particular. It's the -- we want to focus on the totality of what Agent Haunold did in his affidavit which warrants a *Franks* hearing. And as to Mr. Jones specifically, it's not only that the agent failed to include

information relevant to the credibility of the informant, but it's how he mischaracterized documentary evidence and told the magistrate court it could draw improper and unwarranted conclusions based on, and this is that very critical phrase the government identified, the agent's knowledge and experience. Sometimes that related to the informant and sometimes it didn't.

So there are two buckets of information as to Mr. Jones. The first was the mailers, and those -- just pointing out there's no evidence in the affidavit that Mr. Jones knew anything about any funding by the Duongs. That's not contested. And then as to the content of the mailer, the -- as the Court saw, but just to -- it's important. Mr. Jones texted the informant he couldn't talk to him anymore. He wasn't supposed to. The informant should find someone else to talk to.

Agent Haunold told the magistrate court that based on his training and experience -- and keep in mind he had only been an agent for three years, so this is very specific -- the Court should assume the opposite, that when Mr. Jones texted, he did not want to do campaign coordination and text messages. He was just trying to basically mislead anyone who might look at his texts in the future. This theory that Mr. Jones texted the informant that he would not coordinate was just a trick, was actually based on Agent Haunold's misreading of phone records.

And the Court may say maybe it was a lucky error to not look at the time zone. Again, we don't know why he made that very basic error, but the fact that he was arguing that based on his knowledge and experience the magistrate court should assume that when Mr. Jones said, I won't coordinate, he really meant, I will coordinate, that went beyond what the agent's knowledge and experience would legitimately encompasses.

The second bucket is the alleged bribe. No dispute that the affidavit establishes probable cause that Mr. Jones received money. So the question is what was in the affidavit indicating that it was elicit. As the Court knows, just as Mr. Jones said "no" to coordinating on the mailer, the evidence is that when the informant told Mr. Duong he sent Mr. Jones this letter of intent that Ms. Thao was wanted -- they wanted her to sign, it wasn't signed. There was no reply from Mr. Jones, and that letter was never signed.

There's also a contract in that the affidavit has to acknowledge that there is a contract between Mr. Jones and Evolutionary Homes that accounts for all of the money that he received. The affidavit also makes it clear that when Evolutionary Homes met with the mayor two months later, after -- in June, there was very little interest in Evolutionary Homes, and of course the affidavit also had to acknowledge that none of the promises were delivered and that there was nothing actually elicit about Mr. Jones'

communications.

The government says that the Court can just excise anything the informant may have said, but there are two big problems with that. The first is that the informant's prior written statements have the same credibility issues as his oral statements to the government. His history of fraud shows that his written representations are not reliable.

And so, for example, and I just want to -- because I think when the Court asked is this reckless or dishonest, obviously until Mr. -- until Agent Haunold was on the stand and the Court heard his testimony it couldn't make a determination, but we would submit that summarizing that police report that the Court has and can review as simply an unpaid loan is grossly reckless, if not dishonest. And the fact is that the informant, his written statements to Mr. Chen that the property was secured by a loan, his written statements to the other lender for a $3 million loan, those are not -- what the evidence shows is that's not -- that he lies as much in writing as he does orally.

Second, and I really want to emphasize this because it's particular to Mr. Jones. In the affidavit, Agent Haunold directed the magistrate court to interpret the informant's written statements differently than they are written based on not only the informant's debriefing with the government, but on Haunold's theory of the case. And so one example we give in

our briefing is actually the one that Mr. -- that the government referred to as being crystal clear, and that was the informant's note on his iCloud that says what the bribe is going to be and what they're going to get in exchange for the bribe. And when Haunold gets to that and describes it for the magistrate court he says, the first part is the informant's list of what the informant and the Duongs would do for Ms. Thao and Mr. Jones, and the second part is the benefits the informant and Duongs receive. But there was a problem, because the reference to Mr. Jones getting paid $300,000 and getting a contract was in the wrong place for that theory. Agent Haunold just then said, the placement of the statement about Mr. Jones, which is the gravamen of the allegation against Mr. Jones, was a mistake. It was a mistake by the informant, and Agent Haunold said: "Based on my training and experience and knowledge of the investigation and statements made by the informant during the June 6 interview, I believe this is likely a mistake and is supposed to be listed as one of the benefits Thao and Jones would receive."

So, in other words, Agent Haunold is saying that his knowledge and experience enable him to instruct the magistrate court because --

**THE COURT:** You really think that Judge Westmore is going to be instructed?

**MS. HALBERT:** Your Honor, the Court -- the government

said the agent's knowledge and experience is supposed to be given consideration by the Court. So I think the Court -- the Court has to rely on that knowledge and experience, and so --

**THE COURT:** So you don't think she's doing an independent analysis and review?

**MS. HALBERT:** Your Honor, what would have to be excised, then, is -- first of all, then, what it means is the documentary evidence didn't support the claim that Mr. Jones was being bribed.

**THE COURT:** What I'm asking you is, don't you think that Magistrate Judge Westmore and Chief Magistrate Judge Ryu at the time, that they wouldn't take and evaluate the totality of what's in front of them to make an independent determination, which is their constitutional charge? That they would somehow just assume everything in front of them? Of course he's going to say that, but that doesn't mean that they aren't doing their duty to do an analysis and an evaluation of what is in front of them.

**MS. HALBERT:** Well, this is where the agent's credibil' -- the materiality of the agent's -- excuse me, the informant's credibility comes into it, because Agent Haunold says, I know that the statement about Mr. Jones is in the wrong place. To support our theory it should be in the other place. But based on my knowledge and experience and what the informant told me, I believe this was a mistake, and the Court should

interpret this phrase as belonging in the bribery --

(Simultaneous crosstalk.)

**THE COURT:** -- they didn't. That's my point. It's not as if he hid it. He said that this is what it is, so they can consider that. And then they said -- he said, well, we think it should be different. That doesn't mean they have to accept it. I don't have a written decision with all of their analysis. I expect that the magistrate judges are doing an evaluation. That is their job.

**MS. HALBERT:** It is, but what -- if the law is that the Court is supposed to give weight to the agent's knowledge and experience, maybe they -- maybe the Court -- I mean, the problem is we don't know. And so we cannot -- I think we cannot assume, this Court cannot assume --

**THE COURT:** Well, what we know is that they issued the warrants, and what we know is that I will sit here and I will go back and evaluate the warrants in light of your arguments.

**MS. HALBERT:** Okay.

**THE COURT:** But, no, we don't have a written decision from each of those judges as to their decision-making process, but we do know that they issued the warrants and that they ultimately decided based upon everything that was in front of them, including the explicit statements about the inconsistencies, and they still issued the warrants to which

some deference is afforded under the right circumstances.

All right. What else?

**MS. HALBERT:** Your Honor, that's all I have.

**THE COURT:** Thank you.

**MS. HALBERT:** Thank you.

**THE COURT:** Next. Anybody? Or do you want to respond?

**MR. FINE:** Your Honor, there's a lot I could respond to there. I think the brunt of the argument was that the warrant didn't establish probable cause as to Mr. Jones, and there's tons of probable cause about Mr. Jones in that warrant that I could go through line by line. I'm not sure that's productive at this point.

I'll just say as an initial matter, co-conspirator 1 described Mr. Jones' involvement in the scheme explicitly. To the extent for the sake of argument we're excising those statements, which, again, I don't think there is any basis to given the disclosures and the warrant affidavit, I think those statements should being considered. But in case we're doing that for the sake of argument, there is so much other documentary evidence tying Mr. Jones to the scheme, including that he was the one receiving the money and meeting and texting with co-conspirator 1 and all of the other items.

Again, if Your Honor has questions I'm happy to go line by line. I've got a whole timeline I can go through. But the

warrant itself makes exceptionally clear that, one, when you include co-conspirator 1's statements saying that, I discussed this with him at various meetings, then clearly there's probable cause. And even if you excise all of that, all of the documentary evidence makes abundantly clear that there's probable cause as to Mr. Jones.

**MS. HALBERT:** Your Honor, there are no texts between the informant and Mr. Jones about any illicit activity, so the Court will, I understand, review the record.

The other thing I just forgot to say is with regard to the Stewart Chen, the fraudulently induced loan, the -- I also want to direct the Court that the FBI, as of May 2023, was investigating the informant's receipt of that money as possible money laundering. So not only did Agent Haunold have the police report from OPD, but there was that 2023 FBI report.

Thank you.

**THE COURT:** Thank you.

**MR. CHAN:** Hi, Your Honor. Winston Chan for Andy Duong. I'd like to amplify on a couple of points the other counsel have talked about but spend most of my time talking about the independent issues we raise in our own brief, if that's okay.

To amplify a few things, I think to directly answer the Court's question about intentional omissions versus reckless omissions, we do argue that there were intentional omissions,

and a number of them in this case. And to just list them out for the Court again, there were intentional omissions by the agent about conflicting accounts of how the shooting and assaults that were alleged to have happened, happened. Number two, there was the intentional omission of a prior federal investigation for money laundering of the informant. Number three, an intentional omission of this police report that the other counsel have talked about. I think that police report is especially important, because it is dated one day before the alleged assault in this case, and so it is a very recent example of a criminal allegation against the informant that the agent, for whatever reason, chose intentionally not to include.

And I think those three things tie together, because the question to ask is why exclude it, and actually why exclude --

(Simultaneous crosstalk.)

**THE COURT:** -- OPD report?

**MR. CHAN:** OPD report shared with the FBI.

**MR. FINE:** And Your Honor, that OPD report was referenced in the affidavit. What Mr. Chan just said is completely untrue.

**MR. CHAN:** I'm sorry, I misspoke. That -- although that was extremely minimized in the affidavit.

And in addition to that there was --

**THE COURT:** And by "minimized," you mean it was

included, but what?

**MR. CHAN:** But it was only described as a dispute about a debt, rather than all of the litany of allegations that were in the police report, including the threat to go to law enforcement to deal with that property dispute. But the question again is why exclude it, except the only reason to exclude it --

**THE COURT:** It's not as if -- I just, I fail to understand. Well, actually, I don't fail to understand. I know why you are all arguing what you're arguing.

There was a considerable amount of information given about this co-conspirator that was not -- that did not bear in a positive way on his credibility, and I'm not going to ignore that. Now, was it perfect? No. Were there other things they could have said? Yes. Was there a considerable amount that would give any judge pause? Yes.

**MR. CHAN:** Yes, Your Honor.

And I don't mean to reargue this point that we've gone over with the other counsel. My only point in reraising this is that --

**THE COURT:** But you are reraising it. You just said you're reraising it.

**MR. CHAN:** I'll just say one last thing is to the extent our position is that we should at least get a *Franks* hearing, I think that --

**THE COURT:** You don't just get depositions in -- and that's effectively what you're asking for. Most of you on this side are civil litigators. You're used to depositions, I understand that. You don't get them in criminal court.

**MR. CHAN:** I'm not a civil litigator, so I don't get them that often, and I would welcome the chance here.

But moving beyond that point. The other thing that I want to amplify is the home nexus argument. I understand the Court's point about if there is evidence about computers, if there is evidence about phones, that can create a nexus to search a defendant's home. But I think what's important here is that the only evidence of the use of computers, at least, that the government proffered in the affidavit, was the use of computers by the informant, not by any of the defendants.

**THE COURT:** Okay. That argument really does not sway. Try another one.

**MR. CHAN:** Okay. Even though that the government -- even though the government included in its affidavit that our client did not use, or that the informant had never seen our client use a computer before, I think that's --

**THE COURT:** Really? Really? That's the argument you want to make, that your -- that these people are not using computers?

**MR. CHAN:** In furtherance of this conspiracy.

**THE COURT:** Anybody in the audience, you think

anybody's going to believe that argument?

**MR. CHAN:** It has to be in furtherance of the actual charged conduct, though, and I don't think that the government has alleged that the conduct in question involved the use of computers.

**THE COURT:** We don't have to -- we don't have to divorce ourself from reality when we look at these warrants.

**MR. CHAN:** That's true, Your Honor. But I think the reality is also there needs to be a requirement, that the reason to go in the house is reasonable relative to what the facts about the allegation --

**THE COURT:** I asked what time it was done. It was done at 6:00 a.m. in the morning. If it was done in the middle of the workday perhaps you're right.

**MR. CHAN:** Okay. But even then, Your Honor, the government did not only seek permission to seize computers and a cellphone. The government sought a complete rummaging search of the homes of the defendants. So they didn't say, okay, we have PC about computers and we have PC about phones, we should get the computers and phones. I mean, as the Court pointed out, the defendants were home. They just, they were able to just take the phones. What was in it -- what was in the affidavit that allowed the government to go and search the home for everything that they wanted to search for?

**THE COURT:** Why don't you respond.

**MR. FINE:** I don't know exactly to what Mr. Chan is referring to. I'm going to respond to what he raised in his brief. To the extent he's making some new argument about what the government shouldn't have seized outside of phones now, I don't really know what he's talking about. I'm happy to respond.

**THE COURT:** Why don't you respond.

**MR. CHAN:** Yeah. The affidavit authorized the government to seize more than just devices. It authorized the government to seize any and all documents, any and all items relating to a slew of topics. And in fact, the government in this case seized more than devices from our clients.

**MR. FINE:** Your Honor, what Mr. Chan raised in his brief were one specific part of Attachment B, which was communications between California Waste Solutions employees and public officials. If he's making the argument now that he didn't make in his brief that Attachment B is somehow broader, was too broad, I'm happy to respond to that argument, but I don't think we -- I don't think he should be able to do it now for the first time at the hearing.

But to the extent he's talking about that specific part of Attachment B about communications between California Waste Solutions employees and public officials, the affidavit laid out lots of instances in which Andy Duong, a California Waste Solutions employee, was having conversations with of an illicit

nature with people from the city of Oakland from people from Alameda County, and what the affidavit makes very clear is that Andy Duong, and co-conspirator 1, and David Duong, and Evolutionary Homes and California Waste Solutions were clearly talking to blocks of public officials about potential bribery.

And the reason that those conversations are relevant are both if they were of a bribery nature, they're clearly relevant. But even if they're not, they're still relevant to the scheme described in the affidavit, because if Andy Duong was having one type of conversation with some public officials but a different kind of conversations with people from Oakland that he was trying to bribe, that is of course relevant to the scheme.

So, again, I'm not exactly sure what argument Mr. Chan is making, whether it's something off the cuff or whether it's the specific argument he laid out in his brief. Either way, it's completely wrong based on the affidavit. And again, we would be at the highly deferential standard given this warrant was issued by the magistrates, and there are good-faith exception applies at all of the levels of deference that we've discussed so far today.

**THE COURT:** Mr. Chan, anything else?

**MR. CHAN:** Yes, Your Honor.

That's actually a separate argument which I -- one of the dependent arguments that I did want to get to. But the reason

that I was raising the nexus point was that that goes to the overall point about a nexus, Your Honor. Your Honor asked if there was reason to -- if the reason to search the home was related to the use of computers and phones. I would argue even if that were so, the scope of the warrant should be limited to seizing the computers and phones, not to seize anything else beyond that.

But moving to the more specific point about the overbreadth argument that we make in our brief. The over' -- we make two overbreadth arguments. The first is that the affidavit sought permission to seize any communications between CWS and its employees and any politician. Our argument is that the most that the affidavit showed was that there was a particular alleged scheme involving a particular bribe involving a particular group of politicians. And so to ask for communications with any politicians regardless of topic, regardless of criminality, regardless of geography was overbroad in relation to the PC set forth in that affidavit.

**THE COURT:** Even if you're right, how does that impact this case?

**MR. CHAN:** We don't know, because we don't know what the government intends to use that evidence.

**THE COURT:** Well, what evidence was there that you're seeking to suppress?

**MR. CHAN:** We don't -- well, they seized all of our

clients' communications.

**THE COURT:** You have all this evidence, right?

**MR. CHAN:** Correct.

**THE COURT:** So what evidence are you seeking to suppress?

**MR. CHAN:** There are communications with politicians outside of the co-defendant mayor, outside of the individuals named in the affidavit, outside of Alameda County that the government seized as part of what it took, because the government seized our client's work computer.

**THE COURT:** Okay. And so you're talking about suppressing information that isn't relevant to this case, or that you're concerned is relevant to some other investigation?

**MR. CHAN:** I think that could be part of it, but we also don't know what the government's going to --

**THE COURT:** What could be part of it? Those are two different questions.

**MR. CHAN:** I think that there are communications with other politicians that the government may take the position now in this case as relevant conduct that they may seek to bring in under 404(b). We don't know that, because they haven't disclosed what they intend to do yet.

**THE COURT:** But you have it.

**MR. CHAN:** We have it in the sense that we have all of his data, yes. The ...

**THE COURT:** That was -- all right. So any communications between CWS and its employees and/or politicians. Those are two topics?

**MR. CHAN:** One topic, yeah.

**THE COURT:** All right. What's the second one?

**MR. CHAN:** The second is a temporal one.

The government in its affidavit in the warrant sought communications in the February and March 2024 affidavit -- warrants going back to June 2019 in one and January 2020 in another, when the conduct that's alleged does not even begin until 2022. We would concede that the earliest instance of an act related to that conduct is December of 2021. That's set forth in those two affidavits. But that's well before the sought after start date of January 2019 in one affidavit and January 2020 in the other.

**THE COURT:** Okay. And once again, you're concerned that this evidence is going to be used for 404(b) evidence?

**MR. CHAN:** At a minimum, yes. Or that the government may take the position that those earlier communications are somehow direct evidence for one reason or another.

**THE COURT:** So none of this goes to the *Franks* hearing. This is a separate and independent request to suppress evidence.

**MR. CHAN:** Correct, Your Honor. In our motion we raised these overbreadth challenges.

**THE COURT:** Response.

**MR. FINE:** Yes, Your Honor.

So I'll start just again where we are with the standard. It's highly deferential, good-faith exception applies, nothing to do with the *Franks* part of it. And so it is a very, very highly deferential standard for both of these categories of evidence the defendant seeks to suppress.

I'll start with the communications between CWS employees and other politicians. I addressed that a little bit earlier. But the affidavit describes in depth, you know, these communications, illicit communications, with people from the City of Oakland, people from Alameda County. It describes the Port of Oakland and employment at the Port of Oakland as something that's involved in the bribery scheme.

So certainly it clearly covers anyone in the City of Oakland, anyone in Alameda County without a doubt. I think given what is described in the affidavit, and it's pretty clear that they were probably trying in other places to, but clearly it covers Oakland and Alameda County, and I think given the deference and the good-faith exception it should stand.

As to the date range, we disagree with Mr. Chan's sort of characterization. As we said in our affidavit, or, sorry, in our brief, the affidavit describes a July 2021 city council vote about CWS's Army-based project. That CWS Army-based project was explicitly included as part of the bribery scheme

as described in the affidavit, and Ms. Thao was a member of the city council who voted on that Army base project in July of 2021. So I think any communications going back to that date range, certainly at least July 2021, are clearly fair game. And then when you add in the good-faith exception, I think we get the whole date range.

And I did cite a case really on point with this. Of course, it's a district court case. It's from the Northern District. It's Judge Alsup, where the government sought a date range of 2009 to 2017. This is the *Lamb* case, by the way. And the defense came and said, no, you should only get between 2013 and 2015, because that's when the trade secret theft at issue took place. And Judge Alsup looked at it and said, well, there is one e-mail dating back to 2009. It's pretty innocuous, but there is a very highly deferential standard, and given the good-faith exception I think the government gets the whole date range. And so I think it's pretty similar here.

**MR. CHAN:** Just on that last point. That, at best, gets you to July 2021. It still doesn't get you to January 2019.

**MR. FINE:** So I'm disagreeing with -- the case actually says the exact opposite. The case says that the earliest that they have is August of 2009, and so what the decision said is that if you were looking just as probable cause you would get to August 2009, but because of the

good-faith exception, I'm going to give you all the way back to January 1, 2009, which was the full date range. So the Court explicitly said that the good-faith exception extended the date range for the government's whole date range.

**MR. CHAN:** I would -- you know, I'm sure the Court will read that decision. I think that decision was rooted in the Court's view, number one, that the relationship between the parties was relevant, and so going back a little bit earlier in time was useful for that purpose. And the -- there were a number of allegations in the affidavit about this continuing relationship between the parties that the Court found sufficed for good faith purposes even though there was not probable cause.

I think here, if we're talking about the fact that the initial approval of the CWS contract went back to July 2021, I think maybe that's an argument that falls under that because it gives some background, even though there's no allegation by the government whatsoever that that contract was begun in any manner that was inappropriate. But to go all the way back to January 2019, the government has not alleged how that is relevant to show a continuing and in-depth relationship between the parties in this alleged conspiracy that didn't even start until 2022 because Evolutionary Homes did not even exist until 2022.

**MR. FINE:** Your Honor, I would just say the bribery

scheme involved both Evolutionary Homes and California Waste Solutions, and the earlier parts relate to California Waste Solutions.

Ms. Priedeman also reminded me that on the first point the affidavit talks a lot about the DA race, and it talks a lot about the county, it talks a lot about the city of Oakland. So in terms of CWS' conversations with politicians, I think given the breadth of the different, you know, elected and municipal bodies it talks about, that there's probable cause for that item of Attachment B.

**THE COURT:** All right.

**MR. CHAN:** And my last issue, Your Honor, that I'll bring up today relates to the rollover warrant which we have not spent much time on today. The same arguments as to *Franks* and omissions and lack of probable cause apply there. I'll just point out a couple of things that are important about the rollover warrant.

Even if the Court is inclined to find that there was sufficient independent evidence under the first warrant that does not get you all the way on the rollover warrant, because there were items seized under the rollover warrant that had -- that were new and not covered under the first warrant. And the main thing that I'm talking about were pieces of evidence that were seized pursuant to the allegation in the rollover warrant relating to a straw donor, an alleged straw donor scheme. But

the government's evidence of that in the rollover warrant was extremely conclusory and limited. It included only a statement, a conclusory statement by the agent, that there are allegations. It didn't enumerate what those allegations were. It didn't tie those allegations to the house in this case, so that goes back to our nexus argument. But I think that even if the Court were to find that the first warrant survives, you would still have to do an independent analysis of the items seized under the rollover warrant that are separate from the offenses listed in the first warrant.

And the other point I'll make about the rollover warrant is that it had, in and of itself, an additional intentional omission related to the shooting. In the rollover warrant there was permission sought to seize a BB gun. In the rollover warrant the agent set forth that the serial number on this BB gun was, quote, connected to criminal activity in Gilroy. What was intentionally omitted from that rollover warrant was the fact that that same serial number, in the very report run by the agent that the agent received, had a dozen other hits across the country, including for hits that said that that firearm had been destroyed.

And so clearly the allegation that this particular BB gun was connected to criminal activity would have been undermined if the agent had included the entire report in his affidavit.

**THE COURT:** Anything?

**MR. FINE:** Your Honor, I don't know about the BB gun. I don't think that was something that was described, again, in Mr. Chan's brief.

As to the rollover warrant, I believe most of their briefing was discussing the significant number of firearms and the chain and the watch that had been stolen from co-conspirator 1 a month earlier. That was found in Andy Duong's house, and there's lots in the rollover warrant describing the relevance of that evidence, and I think that's really what the focus of the rollover warrant was.

**THE COURT:** Okay.

**MR. CHAN:** Thank you, Your Honor.

**THE COURT:** I don't understand why any of the information that was submitted to me at this point should be sealed. The defendant sealed a considerable amount, and perhaps you're required to under the protective order, but why should any of this be sealed?

**MR. FINE:** Yes, Your Honor.

I would talk about the search warrant affidavits. I think we think should be sealed, because they do talk about in some ways investigations that are ongoing. They name people that have not been publicly named that are, you know, have connections to our investigations. They describe different law enforcement methods and items of that nature. And so our position would be that the search warrant affidavits at least

should remain sealed.

**MR. GUGLEMANN:** August Guglemann for David Duong.

We don't disagree with that, Your Honor, under the terms of the protective order and for the reasons that the government has described.

**THE COURT:** Okay. But what about your briefs?

**MR. GUGLEMANN:** As to David Duong, there's no portion I believe of our brief that was submitted under seal, so I'll defer to counsel for other defendants on that.

**THE COURT:** Well, okay. Who is doing your filing?

**MR. GUGLEMANN:** Sorry?

**THE COURT:** Who is doing your filing of documents?

The defendants filed everything twice, and I'm not exactly sure why. So typically you would file your documents. To the extent you wanted something sealed, the portion which you wanted sealed would be filed separately on a separate docket number, rather than everything being filed a separate time.

**MR. GUGLEMANN:** I can only speak to how we filed for David Duong. My understanding is that the sealing rules currently for ECF require submission of a under-seal request to seal, an under-seal version of the unsealed document, and an under-seal version of the portions that are to be redacted from the sealed document, if the Court -- if I -- if the Court follows.

So as to David Duong, what we filed under seal was the

request to seal and the search warrant affidavits that we attached as sealed exhibits to our -- and the additional sealed exhibits are our motions. Those were then not filed a second time in the public docket.

**THE COURT:** So in 119 you have the brief, in 120 you have all the unsealed exhibits, and in 121 you have all of the exhibits, including the unsealed exhibits filed again a second time. It just, this docket is -- I just want to make sure that it is -- remains manageable.

**MR. GUGLEMANN:** Your Honor, we will take a look back at that and see how we did it. I don't have all of those filings in front of me, so I'm afraid I can't answer a specific question about those.

**THE COURT:** And then in Thao, at Docket 137 you had both redacted and unredacted exhibits, but everything filed under seal.

**MR. TSAI:** Your Honor, we will take -- Jeffrey Tsai on behalf of Ms. Thao. We will take a look at that. We did not file a redacted version of our brief, which I believe is 136. I'll take a look at the specific point the Court raised.

There is a sealed portion we filed that pertains to the text message that was provided to the Court in unredacted form, and that's because it contains the name of the cooperator. However, as we noted in a footnote in our brief, we agree with the Court, there is no basis to seal that information. We only

did so because the government has continued to take the position that the cooperator's name should remain sealed, but our view as we set forth in the footnote is that it should not be, and under the protective order it should not be sealed.

**THE COURT:** At this point, I mean, there's a news article today. So I don't see why I should enforce a sealing at this point. And perhaps you cannot confirm or deny, I know, but --

**MR. FINE:** Certainly, Your Honor.

Look, we live in the real world. We see what's reported in the news. I think our office's position is that we don't name our cooperators typically in public filings. And so that would be our preference, but of course we understand the Court's position.

**THE COURT:** All right. So at Docket 164 and 165, which is, Mr. Chan, you're at 164. Ms. Halbert, you're at 165. Is there anything -- so if I just issued the order that only the search warrants need be sealed, everything else the request to seal is denied. Is that right?

**MR. FINE:** Your Honor, I would ask also that Special Agent Haunold's declaration be sealed for the same reason, that it does describe other investigatory sensitive items. And if you would just give me a minute, Your Honor, to confer with my colleagues to see if there's anything else.

**THE COURT:** Well, what I --

**MR. CHAN:** And our items under 164 and 165 are the government's documents. So I think that's up to them.

**THE COURT:** So this is what I would like to do. That -- there are, I don't know, a dozen of these sealing requests, maybe 10. What I would like you all to do with that order, right, the search warrants, the affidavit is fine. Nothing else -- unless somebody raises it right now for me, nothing else should be sealed at this point. What I'd like you to do is go through yourselves, meet and confer, send me a proposed form of order so I can issue that order. And then you all can do what you need to do to unseal all of these documents. I think that's the main thing. But I -- look, I will take what you've had to say under submission. I'll issue a written order.

In the unlikely event that I grant a *Franks* hearing, then we'll contact you to schedule that. That will happen -- I will give you very few options for when that hearing will happen, and it's not because I want to be disrespectful of your time. It is because my time is quite limited. So I'll let you know.

Mr. Guglemann.

**MR. GUGLEMANN:** Thank you, Your Honor. August Guglemann for David Duong.

I just wanted to get back to the sealing question, because I took a look at our filings and I want to be sure what the Court understands what the rationale there was.

What we submitted, redacted in the public docket and then full and unredacted under seal, were documents that contain co-conspirator 1's name. And so even if the search warrant were to remain sealed, if we were to unseal those documents, that identity would be then in a public filing. So that's something we can meet and confer with the government about, but I just wanted to make sure that it was clear to the Court that that was the --

**THE COURT:** At this point I don't think there's a basis for keeping the name of co-conspirator 1 under seal. So the government can make its objections, but their objections would be overruled.

Okay. Is there anything else while I have you here that you wish to discuss?

**MR. FINE:** Not from the government, Your Honor.

**MR. GUGLEMANN:** August Guglemann for David Duong. Nothing on behalf of Mr. Duong.

**MS. HALBERT:** Shawn Halbert for Mr. Jones. Nothing, thank you.

**MR. TSAI:** Nothing on behalf -- this is Jeffrey Tsai on behalf of Ms. Thao. Nothing more, Your Honor.

**MR. CHAN:** And Winston Chan for Andy Duong. Nothing. Thank you, Your Honor.

**THE COURT:** Okay. Then it's under submission and I'll issue a written order.

Mr. Chan, I'll see you this afternoon.

**MR. FINE:** Thank you, Your Honor.

**THE COURT:** We're adjourned.

(Proceedings concluded at 11:46 a.m.)

**---o0o---**

**CERTIFICATE OF REPORTER**

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE: Monday, May 4, 2026

Stephen W. Franklin, RMR, CRR
Official Reporter, U.S. District Court