CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

ABRAHAM FINE (CABN 292647)
MOLLY PRIEDEMAN (CABN 302096)
LLOYD FARNHAM (CABN 202231)
BRANDON K. MOORE (MDBN 1312180261)
Assistant United States Attorneys

    1301 Clay Street, Suite 340S
    Oakland, California 94612
    Telephone: (510) 637-3717
    FAX: (510) 637-3724
    Abraham.fine@usdoj.gov
    Molly.priedeman@usdoj.gov
    Lloyd.farnham@usdoj.gov
    Brandon.moore@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 25-CR-0003-YGR |
| Plaintiff, | **UNITED STATES' CONSOLIDATED OPPOSITION TO DEFENDANTS' MOTIONS TO EXCLUDE EVIDENCE** |
| v. | |
| SHENG THAO, ANDRE JONES, DAVID TRUNG DUONG, AND ANDY HUNG DUONG, | |
| Defendants. | |

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

FACTUAL BACKGROUND ...................................................................................................2

I.     Summary of the charged corruption scheme. ...........................................................2

II.    The government's Rule 404(b) disclosure. ..............................................................5

ARGUMENT ...........................................................................................................................8

I.     Legal Standard ..........................................................................................................8

II.    The evidence Defendants seek to exclude is directly relevant to the charged crimes, inextricably intertwined with the charged conspiracy, or otherwise admissible under Rule 404(b).

        A.    The August 2023 Vietnam trip, and its aftermath, go directly to the core of the relationship amongst the co-conspirators....................................................10

        B.    A. Duong and D. Duong's May 3, 2024, altercation with Juarez is directly relevant to the charged crimes and is an essential event in in the charged conspiracy. ...........................................................................................11

        C.    The Duongs' $5,000 donation to the Niagara Movement Foundation, made at Thao and Jones' request, is directly relevant to the charged crimes or otherwise inextricably intertwined with the charged conspiracy.....................................14

        D.    A. Duong and Juarez's bribery arrangement with Azevedo is inextricably intertwined with the charged conspiracy or otherwise admissible under Rule 404(b). ....................................................................................................16

        E.    Evolutionary Homes' arrangements with and entreaties towards other politicians are inextricably intertwined with the charged conspiracy.............................20

        F.    Thao and Jones obtaining a lease by creating a fake job for Jones is admissible under Rule 404(b). ............................................................................................21

        G.    The recorded 2019 call between Thao and A. Duong is relevant to showing the nature of their relationship. ...............................................................................23

CONCLUSION........................................................................................................................24

Page(s)

# Table of Authorities

## Cases

*Huddleston v. United States*,
485 U.S. 681 (1988)................................................................................................ 18

*United States v. Anderson*,
741 F.3d 938 (9th Cir. 2013) ................................................................................. 17

*United States v. Ashburn*,
2015 WL 588704 (E.D.N.Y Feb. 11 2015)........................................................... 23

*United States v. Castillo*,
181 F.3d 1129 (9th Cir. 1999) ......................................................................... 19, 22

*United States v. Charley*,
1 F.4th 637 (9th Cir. 2021) .................................................................................... 14

*United States v. Curtin*,
489 F.3d 935 (9th Cir. 2007) ................................................................................... 8

*United States v. DeGeorge*,
380 F.3d 1203 (9th Cir. 2004) ........................................................................... 9, 13

*United States v. Edwards*,
26 F. 4th 449 (7th Cir. 2022) .......................................................................... 18, 22

*United States v. Erickson*,
75 F.3d 470 (9th Cir. 1996) ................................................................................... 18

*United States v. Lillard*,
354 F.3d 850 (9th Cir. 2003) ................................................................................... 9

*United States v. Loftis*,
843 F.3d 1173 (9th Cir. 2016) ............................................................................. 8, 9

*United States v. Maximov*,
2011 WL 5128140 (D. Ariz. Oct. 31, 2011)......................................................... 23

*United States v. McCourt*,
925 F.2d 1229 (9th Cir. 1991) ............................................................................... 18

*United States v. McKoy*,
771 F.2d 1207 (9th Cir. 1985) ................................................................................. 9

*United States v. Miller*,
874 F.2d 1255 (9th Cir. 1989) ............................................................................... 18

*United States v. Morano*,
697 F.2d 923 (11th Cir. 1983) ............................................................................... 18

*United States v. Ojomo*,
332 F.3d 485 (7th Cir. 2003) ................................................................................. 13

*United States v. Perry*,
438 F.3d 642 (6th Cir. 2006) .......................................................................... 18, 22

*United States v. Peterson*,
244 F.3d 385 (5th Cir. 2001) ................................................................................. 22

*United States v. Pitre*,
960 F.2d 1112 (2d. Cir. 1992)................................................................................ 23

*United States v. Ramirez-Rodriguez*,
552 F.2d 883 (9th Cir. 1977) ................................................................................. 13

*United States v. Rizk*,
660 F.3d 1125 (9th Cir. 2011) ......................................................................... 13, 15

*United States v. Rodriguez,*
   880 F.3d 1151 (9th Cir. 2018) ........................................................................................ 19
*United States v. Sleugh,*
   2015 WL 3866270 (N.D. Cal. June 22, 2015) ................................................................ 19
*United States v. Williams,*
   989 F.2d 1061 (9th Cir. 1993) ................................................................................ 9, 15, 16
*United States v Lague,*
   971 F.3d 1032 (9th Cir. 2020) ................................................................................ 8, 17, 21

## Statutes

18 U.S.C. § 371 ...................................................................................................................... 2

**INTRODUCTION**

Defendants Andy Duong ("A. Duong"), Sheng Thao ("Thao"), and Andre Jones ("Jones") have moved to exclude several categories of evidence on the basis that their introduction would violate Federal Rules of Evidence 404(b) and/or 403.[1]  Much of the evidence Defendants seek to exclude relates to occurrences that took place among Defendants during the charged conspiracy, is directly probative of Defendants' intent and the nature of their corrupt relationship, and many of the occurrences Defendants seek to exclude were taken to further, preserve, or continue the charged conspiracy.  Those events (namely the Vietnam trip and its aftermath and the $5,000 payment to the Niagara Movement Foundation at Thao and Jones' direction) are thus not subject to Rule 404(b) and are admissible because they go directly to the core of the relationship amongst the co-conspirators.  Similarly, evidence relating to the May 3, 2024, altercation with co-conspirator Mario Juarez is directly relevant or otherwise inextricably intertwined with the charged conduct, as its admission will allow the government to tell a coherent story of Juarez's falling out with the Duongs, the dissolution of Evolutionary Homes, Juarez's motivations for speaking with law enforcement, and the Duongs' attempt to conceal and preserve the conspiracy by preventing Juarez from speaking with law enforcement.  Courts regularly hold that such evidence is relevant and admissible because it allows the government to tell a complete and coherent story of the charged crime.

Evidence showing that A. Duong and Juarez bribed San Leandro City Councilman Bryan Azevedo is inextricably intertwined with the charged conspiracy.  Specifically, this evidence reflects the Duongs and Juarez's larger efforts to bribe politicians to ensure the purchase of housing units from Evolutionary Homes, and the Duongs and Juarez's efforts to legitimize Evolutionary Homes at Thao's direction.  It is also classic Rule 404(b) evidence because it is similar to the charged bribery scheme and shows that Evolutionary Homes personnel followed a distinctive modus operandi, namely paying bribes by routing illicit payments through a public official's spouse, which is relevant to Defendants' intent regarding the payments from Evolutionary Homes to Jones.

Evidence showing that in October 2021, Thao and Jones created a fake job for Jones to obtain a

---

[1] On July 21, 2026, Defendant David Duong ("D. Duong") filed a joinder in the motions of the other Defendants.  Dkt. No. 228.

lease is admissible under Rule 404(b) because it tracks the same distinctive pattern Thao and Jones employed in the charged conspiracy, namely fabricating a job for Jones to financially benefit themselves.  It is also relevant to their financial motive to engage in the charged bribery scheme less than a year later—they entered a lease on the basis of a fake job for Jones and were thus likely living above their means and in a precarious financial position when they engaged in the charged criminal activity one year later.  Finally, the recorded 2019 call between Thao and A. Duong, during which they discussed sensitive internal Oakland City Council deliberations and Thao expressed that she did not want to be seen in public with the Duongs, shows their deep and long-term relationship, forms the basis for their mutual trust, and is thus offered for a non-propensity purpose.  Accordingly, the government respectfully submits that Defendants' motions to exclude evidence should be denied.

**FACTUAL BACKGROUND**

To demonstrate how each of the items of evidence Defendants seek to exclude fits into the charged conspiracy, the government below sets forth a detailed factual background consisting of the government's proffer of the anticipated evidence at trial.  Evidence supporting the events described below includes copious text messages among the parties, financial records, communications describing and confirming meetings, pictures and recordings from A. Duong's phone, audio recordings of Evolutionary Homes board meetings, as well as Juarez's and many other witnesses' descriptions of events, among other corroborating items.

## I.    Summary of the charged corruption scheme.

The evidence presented at trial will show that in the lead-up to the 2022 Oakland mayoral election, and in the months that followed, Defendants and co-conspirator Mario Juarez ("Juarez")[2] engaged in a corruption conspiracy.  D. Duong, A. Duong, and Juarez had recently formed a modular housing company (Evolutionary Homes) whose business model depended on local government contracts.  D. Duong and A. Duong also owned California Waste Solutions ("CWS"), Oakland's recycling contractor, and wanted to ensure that city contract continued for decades.  At the same time, Thao was locked in a close election campaign and Thao and Jones (Thao's longtime romantic partner)

---

[2] Juarez has pled guilty to engaging in a conspiracy to commit bribery with Thao, Jones, D. Duong, and A. Duong, in violation of 18 U.S.C. § 371, and is expected to be a witness at trial.

lived together and had interconnected finances.  The parties struck an illicit deal that catered to their respective interests.

Text messages and witness testimony will show that over the course of multiple meetings, Thao committed to take steps to benefit Evolutionary Homes and CWS if she became mayor in exchange for various financial benefits to Thao and Jones.  Specifically, Thao agreed to use her mayoral power to cause the City of Oakland (the "City") to purchase housing units from Evolutionary Homes, to help push through a contract extension for CWS, and to allow D. Duong, A. Duong, and Juarez to influence the appointment of various city officials.  In exchange for these commitments, Thao and Jones were promised various benefits, including a negative political mailer campaign to help Thao's mayoral prospects and the promise of a $300,000/year no-show job for Jones at Evolutionary Homes.

Between October 2022 and May of 2024, Defendants and Juarez took significant steps in furtherance of their conspiracy.  During this time period, A. Duong, D. Duong, and Juarez financed and orchestrated a negative mailer campaign to help Thao's mayoral candidacy and made direct financial payments of $95,000 to Jones as part of the $300,000/year no-show job at Evolutionary Homes (which promised payments were increased during the course of the conspiracy).  Financial and other business records show that Thao benefitted from these payments.

After Thao became mayor, Thao and Jones took multiple steps to carry out their end of the bargain and met and communicated regularly with A. Duong, D. Duong, and Juarez.  In February and March of 2023, Thao pressured the Acting City Administrator to appoint Larry Gallegos (Juarez, A. Duong, and D. Duong's hand-picked choice) to Interim Deputy Director of the City's Housing Department.  Thao pushed through Gallegos' appointment against the advice of her staff to a position that would have significant influence over business in Evolutionary Homes' domain.  During the same time period, D. Duong, A. Duong, and Juarez were meeting with Gallegos.  Text messages, witness testimony, and pictures from A. Duong's phone show that on February 16, 2023, D. Duong and A. Duong hosted Gallegos for lunch at CWS.  On February 17, 2023, Gallegos went to dinner and karaoke bar with A. Duong, Juarez, and another Duong associate.  The government expects Gallegos to testify that during that evening, A. Duong recorded and took pictures of Gallegos with scantily-clad women, which made Gallegos uncomfortable.  The government also expects Juarez to testify that A. Duong told

U.S.' OPP. TO MOTIONS TO EXCLUDE EVIDENCE
25-CR-0003-YGR                                                    3

him he regularly took surreptitious photos and videos of politicians in compromising positions for potential use against them, which testimony is corroborated by the dozens of such videos, photos, and recordings found on A. Duong's phone.  Specifically, videos from A. Duong's phone show he took videos of Gallegos, Juarez, and others that night at a karaoke bar dancing with women.  Several months later, Thao also pressured a different city administrator, Jestin Johnson, to visit Evolutionary Homes and meet with the D. Duong, and also took meetings with representatives from Evolutionary Homes herself.

During the same time period, Defendants went to great lengths to preserve, conceal, and further the conspiracy.  As described below, in August 2023, Thao attended a trip to Vietnam as part of a trade delegation.  The trip was paid for in part by the Port of Oakland and subsidized by an organization led and funded by the Duongs.  The Duongs paid for Jones to attend the Vietnam trip, as well as Jones' daughter, and several other Oakland officials that Thao invited.  After the Vietnam trip, Thao took a vacation to Thailand with her son, a trip that was booked and paid for by a Duong-led organization.

Former San Leandro City Councilmember Bryan Azevedo attended the Vietnam trip along with several other public officials invited by the Duongs and Thao.  As described in detail below, shortly after the Vietnam trip, A. Duong and Juarez engaged in a bribery conspiracy with Azevedo.  Specifically, Azevedo agreed to use his power as a San Leandro City Councilman to benefit Evolutionary Homes in return for a percentage of the sales price from whatever modular housing company units the City of San Leandro ultimately purchased.  To help conceal the future payments Azevedo was to receive, A. Duong instructed him to open an LLC and bank account in his wife's name for the purpose of receiving the kickback payments—the same method A. Duong and Juarez employed with Thao and Jones.  The government expects Azevedo to testify that A. Duong specifically told Azevedo that he and Juarez had routed payments in that manner with other politicians.

In the months following the Vietnam trip, Thao learned that a reporter began inquiring about actions taken by Azevedo on the trip, including suspected drug use and activity involving prostitutes.  According to Thao staff members, when Thao learned about the reporting, she became irate, concerned that Azevedo's behavior on a trip she was prominently associated with would reflect badly on her and harm her politically.  On a phone call overheard by multiple Thao staffers, Thao became very upset with D. Duong and told him that if the media story came out about inappropriate conduct on the Vietnam trip,

Thao could no longer have a relationship with the Duong family. Specifically, according to Thao staffers who witnessed the call, Thao said something along the lines of "if this stuff happens, I can't work with you anymore" or "I can't f*** with you anymore." Thao's threats to D. Duong that she may no longer have a relationship with him if he did not do what she demanded, demonstrate the nature of their relationship and the existence of the conspiracy that Thao threatened to exit unless D. Duong took steps to fix the issue. In response, D. Duong, A. Duong, and Juarez took steps intended to prevent the story about Azevedo's conduct on the Vietnam trip from becoming public.

In the spring of 2024, the relationship between the Duongs and Juarez became strained, eventually leading the Duongs to take steps to prevent Juarez from revealing their conspiracy to law enforcement. The Duongs began asking Juarez for increased documentation for his expenses, while Juarez became frustrated by the Duongs' failure to reimburse him for expenses. By late April, they reached a breaking point. Juarez asked to dissolve the partnership, and the Duongs threatened legal action based on loans given to Juarez. In response, Juarez threatened to go to law enforcement with allegations about their joint corruption scheme with Thao, among other allegations, if they pursued legal action against him, explicitly warning in an April 24, 2024, email to D. Duong, A. Duong, and others that he was writing "for your records when you get subpoenaed by the FBI, City Attorneys, FPPC, and others." *See* Fine Decl. Ex. 1. As described below, on May 3, 2024, the Duongs locked Juarez out of the Evolutionary Homes office space and an argument between Juarez and the Duongs ensued, during which Juarez again threatened to report them to law enforcement. The government expects Juarez to testify that during the altercation, a Duong family member made a phone call, after which several individuals showed up and assaulted Juarez and robbed him of his personal belongings, including his phone, a watch, and a gold chain. On June 20, 2024, the FBI executed a search warrant at A. Duong's residence and recovered a watch and chain that Juarez has identified as the watch and chain that was stolen from him during the falling out with the Duong family. Fine Decl. Ex. 2 (picture of watch and chain found at A. Duong's house). After the assault, the Duongs made a false police report alleging that Juarez had attacked them in an attempt to discredit his allegations about the bribery scheme.

**II.      The government's Rule 404(b) disclosure.**

On May 19, 2026, pursuant to the Court's February 9, 2026 scheduling order, the government

disclosed to Defendants evidence it may seek to admit at trial pursuant to Federal Rule of Evidence 404(b). Fine Decl. Ex. 3 (Disclosure Letter). As an initial matter, the government disclosed in that letter several areas of evidence that are directly relevant and material to the charged conduct and/or are otherwise inextricably intertwined with the charged conspiracy, and thus outside the scope of Rule 404(b). Specifically, the government described: (a) the Vietnam trip attended by Thao, Jones, D. Duong, A. Duong, and many others; (b) Thao's threat to D. Duong to leave the conspiracy if he did not stop a negative news story about the Vietnam trip; (c) Thao and Jones' request that the Duongs make a $5,000 donation to the Niagara Movement Foundation intended to benefit Thao politically; (d) A. Duong's recordings of Juarez making a toast to Evolutionary Homes at the outset of the conspiracy (described in detail in the government's opposition to D. Duong's motion to re co-conspirator statements); (e) evidence surrounding the May 3, 2024, altercation between Juarez and the Duongs during which the Duongs took steps to prevent Juarez from reporting their conspiracy to law enforcement; and (f) A. Duong and Juarez's conversations with other public officials on behalf of Evolutionary Homes in furtherance of the conspiracy. Given that that these subjects are directly relevant or inextricably intertwined with the charged conduct, the government does not consider these topics to be Rule 404(b) evidence, and provided notice of these items out of an abundance of caution.

The government's disclosure further described that in addition to bribing Thao and Jones, A. Duong and Juarez bribed Azevedo in the fall of 2023. Specifically, Azevedo agreed to use his power as a San Leandro City Councilman to benefit Evolutionary Homes in return for a percentage of the sales price from whatever modular housing company units the City of San Leandro ultimately purchased. To help conceal the future payments Azevedo was to receive, A. Duong instructed him to open an LLC and bank account in his wife's name for the purpose of receiving the kickback payments and told Azevedo that he and Juarez had done that with other politicians. Azevedo has pled guilty to this conduct and is a potential witness for the government at trial to testify both about the Vietnam trip and its aftermath, as well as the later bribery arrangement with A. Duong and Juarez. As described below, this evidence is inextricably intertwined with the charged conduct because it shows Evolutionary Homes' broader effort to bribe local politicians to secure the purchase of its housing units. It is also admissible under Rule 404(b) because it shows Evolutionary Homes personnel followed a distinctive modus operandi, namely

paying bribes by routing illicit payments through a public official's spouse, which is relevant to Defendants' intent regarding the payments from Evolutionary Homes to Jones.

The government's Rule 404(b) disclosure further described that one year before the charged conspiracy, Thao and Jones obtained a lease by creating a fake job for Jones. As set forth above, a key component of the government's case is that Thao, Jones, D. Duong and A. Duong conspired to commit bribery and to funnel bribe payments to Thao and Jones under the guise of a no-show job for Jones at Evolutionary Homes. The government expects Juarez to testify that this arrangement was Thao's idea and she requested that the payments be funneled through Jones to conceal her involvement in the scheme. Less than a year earlier, Thao and Jones used a similar modus operandi to create a fake job for Jones for their mutual benefit. In October of 2021, Thao and Jones sought to obtain a lease for their house in Oakland. To obtain the lease, however, Jones needed to have an income-paying job. Thao reached out to her sister, who owned a cannabis consulting company, and Thao asked her sister to write a letter falsely stating that her company would be employing Jones at a salary of $150,000 per year. Text messages between Thao and her sister show them explicitly discussing the fake job letter and then sharing the fake job letter with Jones via email. *See* Fine Decl. Ex. 4 (text messages). Thao and Jones then submitted the falsified job letter as part of their lease application. *See* Fine Decl. Ex. 5 (false job letter).

The government's disclosure set forth that this evidence was admissible under Rule 404(b), as it shows Thao and Jones' modus operandi of creating a fake job for Jones to mutually benefit Thao and Jones. Furthermore, it is relevant to motive, as it shows Thao and Jones had a financial incentive to engage in the charged conduct approximately one year later, as they were living under a lease they likely could not afford.

Finally, the letter disclosed that the government may introduce a recorded 2019 phone call between A. Duong and Thao that was seized from one of A. Duong's devices. *See* Fine Decl. Ex. 6 (recording). During this phone call, Thao provided A. Duong with information on sensitive internal Oakland City Council deliberations (including where individual council members stood) regarding a then-pending dispute between CWS and the City regarding CWS overcharging its customers. In the recorded call, Thao and A. Duong discussed an upcoming lunch to discuss strategy regarding the CWS

overcharging issue and Thao requested that the lunch be in a private room at a restaurant, stating "we don't want to be seen with you guys." As set forth below, this evidence is relevant for a non-propensity purpose (namely showing the relationship and basis for mutual trust amongst co-conspirators) as it shows their deep and long-term relationship as it relates to business before the City of Oakland.

**ARGUMENT**

## I.    Legal Standard

Federal Rule of Evidence 404(b) requires, upon a defendant's request, that the government provide reasonable notice of the nature of evidence of other crimes, wrongs, or acts that it intends to introduce. "Rule 404(b) applies solely to evidence of 'other' acts, not to evidence of the very acts charged as crimes in the indictment." *United States v. Loftis*, 843 F.3d 1173, 1176 (9th Cir. 2016). For other act evidence to be admissible under Rule 404(b), it must meet the Ninth Circuit's four-part test. Evidence is admissible under that test when: (1) the evidence tends to prove a material element of the offense for which the defendant is now charged; (2) the other act is not too remote in time; (3) sufficient proof exists for the jury to find that the defendant committed the other acts, and; (4) in cases where prior act evidence is being introduced to prove intent, the other acts must be sufficiently similar to the charged conduct. *United States v*

*e*, 971 F.3d 1032, 1038 (9th Cir. 2020).

The Ninth Circuit has long held that "Rule 404(b) is a rule of inclusion—not exclusion—which references at least three categories of other 'acts' encompassing the inner workings of the mind: motive, intent, and knowledge." *Id*. at 1040 (citing *United States v. Curtin*, 489 F.3d 935, 944 (9th Cir. 2007) (en banc)). "Under our low threshold test of sufficiency, the government need not prove Rule 404(b) evidence by a preponderance of the evidence. Instead, the government need only lay a factual foundation from which a jury could reasonably conclude that the defendant committed the allegedly-similar bad acts, and that he possessed the requisite intent in committing those bad acts." *Id*. (internal

citations omitted).   Rule 404(b) permits the introduction of evidence of other crimes, wrongs or acts for any purpose other than to show action in conformity therewith, including as proof of "motive, opportunity, preparation, plan, knowledge, identity, or absence of mistake or lack of accident."  Rule 404(b)(2).  Rule 404(b) is an inclusionary rule which admits evidence of other acts unless it tends only to prove criminal disposition. *Curtin*, 489 F.3d at 944-45.  So "inclusionary" is the rule that "evidence of other crimes may be probative on issues that are not listed specifically in Rule 404." *United States v. McKoy*, 771 F.2d 1207, 1213-14 (9th Cir. 1985).

However, a significant portion of the evidence Defendants seek to exclude is directly related to the charged conspiracy, or otherwise inextricably intertwined, and thus not subject to the requirements of Rule 404(b).  See *United States v. Lillard*, 354 F.3d 850, 854 (9th Cir. 2003) (holding the notice requirement, like Rule 404(b), does not extend "where the evidence the government seeks to introduce is directly related to, or inextricably intertwined with, the crime charged in the indictment."); *accord* Fed. R. Evid. 404(b), Advisory Committee Note to the 1991 Amendment (explaining that the rule "does not extend to evidence of acts which are 'intrinsic' to the charged offense").  Evidence of other acts is inextricably intertwined when (1) it constitutes a part of the transaction that serves as the basis for the criminal charge, or (2) it helps the prosecutor offer a coherent and comprehensible story regarding the commission of the crime.  *United States v. DeGeorge*, 380 F.3d 1203, 1220 (9th Cir. 2004). Furthermore, the Ninth Circuit has held that uncharged transactions in a scheme should not be excluded as "other act" evidence if they are part of the same scheme or if they are inextricably intertwined with the charged conduct.  See *Loftis*, 843 F.3d at 1176-78 ("even if the uncharged transactions at issue were not part of the crime charged, they would not be subject to exclusion under Rule 404(b) because they are 'part of the same transaction' as the charged transactions. The inextricably intertwined doctrine, therefore, affords a second basis for concluding the evidence should not be treated as 'other' crimes or 'other' acts evidence under Rule 404(b).").  As the Ninth Circuit explained, "[t]he policies underlying Rule 404(b) are inapplicable when offenses committed as part of a single criminal episode become other acts simply because the defendant is indicted for less than all of his actions." *United States v. Williams*, 989 F.2d 1061, 1070 (9th Cir. 1993) (internal citation omitted).

**II.    The evidence Defendants seek to exclude is directly relevant to the charged crimes, inextricably intertwined with the charged conspiracy, or otherwise admissible under Rule 404(b).**

    **A.    The August 2023 Vietnam trip, and its aftermath, go directly to the core of the relationship amongst the co-conspirators.**

As described above, in August 2023, the Vietnamese American Business Association ("VABA"), an organization controlled by the Duong family, hosted a trade delegation trip to Vietnam. D. Duong, A. Duong, Thao, Jones, Jones's daughter, Gallegos, Azevedo, and several other East Bay public officials attended the trip. Financial records and witness testimony will show that the Port of Oakland paid for a portion of Thao's trip expenses and VABA (controlled by D. Duong) paid for a portion of Thao's trip expenses. VABA also paid for Jones's trip expenses, Jones's daughter's trip expenses, Gallegos's trip expenses, and Azevedo's trip expenses, including 10 days of lodging and business class airfare to Vietnam. VABA also paid for Thao and Thao's son to travel to Thailand after the Vietnam trip and emails between VABA staff and Thao show that VABA booked Thao's son's travel to Thailand, costing approximately $9,000. Text messages between Thao and her staff explicitly discuss Thao's knowledge that "David" would be paying for everyone to attend the Vietnam trip except Thao. On August 8, 2023 (during the Vietnam trip), A. Duong sent a text message to Juarez and other Evolutionary Homes staff members stating: "Google sheng thao . . . we all over the news . . . During the international trade Evo has been shared!!!" The Indictment explicitly described the Vietnam trip and listed it as an overt act in furtherance of the charged conspiracy. Dkt. No. 1 at 11-12; 15-16.

The Vietnam trip (and its aftermath) are directly relevant to the charged crimes because occurrences on the Vietnam trip, and their potential public disclosure, led Thao to threaten to exit the conspiracy in the months following the trip. As set forth above, Thao staffers will testify that Thao became upset when a reporter began asking questions about members of the VABA delegation engaging in relations with prostitutes. On a phone call overheard by multiple Thao staffers, Thao yelled at D. Duong and told him that if the media story came out about inappropriate conduct on the Vietnam trip, Thao could no longer have a relationship with the Duong family. Specifically, according to Thao staffers who witnessed the call, Thao said something along the lines of "if this stuff happens, I can't work with you anymore" or "I can't f*** with you anymore."

Witness testimony, text messages, financial records, and recordings recovered from Andy Duong's phone will show that several weeks later, D. Duong, A. Duong, and Juarez met with an associate of the reporter at a restaurant in Livermore and gave him a $10,000 check for the purpose of preventing the story about the Vietnam trip from coming out.  The $10,000 check provided to the associate of the reporter was drawn from CWS's bank account.  Azevedo drove with D. Duong, A. Duong, and Juarez to meet with the associate of the reporter, but Azevedo remained in the car during the meeting.  Several days after making the $10,000 payment, A. Duong recorded a call with Azevedo wherein he and Azevedo discussed the fact that the article was not going to come out because of A. Duong's actions and that they should not tell others about the arrangement.  Thao's demands to D. Duong and threats that she may no longer have a relationship with him if he did not do what she demanded, along with D. Duong, A. Duong, and Juarez's response, demonstrate the nature of their relationship and the existence of the conspiracy that Thao threatened to exit unless D. Duong took steps to fix the issue.

A. Duong's motion seeks to exclude "evidence of alleged irrelevant conduct on the trip to Vietnam" and specifically describes two videos from Vietnam regarding sexually explicit conversations relating to a massage parlor between A. Duong, Azevedo, and others (which A. Duong's motion does not specifically identify by bates number or attach as exhibits).  The government presumes A. Duong is referring to a video, recorded by A. Duong, that depicts A. Duong, Azevedo, and others driving in a car on August 5, 2023 (during the Vietnam trip) discussing sexual interactions from the previous evening.  That video is attached as Exhibit 7 to the Fine Declaration.  The government does not intend to introduce this specific video in its affirmative case.  However, if Defendants suggest or assert that such sexual activity did not actually occur on the Vietnam trip during cross examination of Azevedo, then this video could come in as a prior consistent statement by Azevedo.  Accordingly, if Defendants somehow open the door during cross examination or during the defense case, then the government reserves its right to seek to admit the video.

**B.    A. Duong and D. Duong's May 3, 2024, altercation with Juarez is directly relevant to the charged crimes and is an essential event in in the charged conspiracy.**

As described above, D. Duong and A. Duong had a falling out with Juarez that culminated with a

dispute that occurred on May 3, 2024.  The series of events is well documented.  In the lead up to the altercation, D. Duong and A. Duong accused Juarez of misappropriating money and on April 24, 2024, Juarez responded, in writing, stating that if the Duongs pursued legal actions, he could report their criminal activity to law enforcement, including the bribery scheme with Thao and Jones.  *See* Fine Decl. Ex. 1.  The government expects Juarez to testify that on the afternoon of May 3, 2024, Juarez went to the Evolutionary Homes offices and realized had been locked out.  When he confronted D. Duong and A. Duong on the premises, a heated argument ensued, during which Juarez again threatened to expose the Duongs' criminal activity.  As Juarez was walking away from the argument with D. Duong and A. Duong, several individuals assaulted him and robbed him of his personal belongings, including his phone, a watch, and a gold chain.  On June 20, 2024, the FBI executed a search warrant at A. Duong's residence and recovered a watch and chain that Juarez has identified as the watch and chain that was stolen from him during the falling out with the Duong family.  Fine Decl. Ex. 2 (picture of watch and chain found at A. Duong's house).

Phone records and text messages also show that the Duongs attempted to contact Thao around the time of the confrontation with Juarez, indicating Thao's connection to the incident.  Shortly after the altercation, Juarez reported the incident to the Oakland Police Department, as well as the bribery scheme with Thao, and within weeks Juarez began cooperating with the federal investigation into Thao, Jones, and the Duongs (which had been ongoing for approximately a year at that point).

At 9:42pm on May 3, A. Duong texted an Oakland police officer he had a long-term relationship with and asked if the officer could come to CWS to take a police report regarding the incident with Juarez.  Specifically, A. Duong texted the officer: "We had former partner came in our building at 4PM and made deaf [sic] threats with loaded guns and cartel members surrounding our building trying to extort and blackmail us.  I called so many OPD but none can come even Mayor Thao called and no response."  After the OPD officer responded that he would send someone the next day, A. Duong texted D. Duong and other Duong family members that: "One of my personal OPD will contact me tomorrow around 11-12 to come and do report."  The next day, an OPD officer came to CWS to take a police report from A. Duong, D. Duong, and Kristina Duong.  Fine Decl. Ex. 8 (A. Duong police report).

The evidence relating to the May 3 incident is inextricably intertwined with the charged conduct,

U.S.' OPP. TO MOTIONS TO EXCLUDE EVIDENCE
25-CR-0003-YGR                                             12

as its introduction allows the government to tell a coherent story of Juarez's falling out with the Duongs and the dissolution of Evolutionary Homes, his motivations for speaking with law enforcement, and the Duongs' attempt to conceal and preserve the conspiracy by preventing Juarez from speaking with law enforcement.  The assault of Juarez was less than two weeks after Juarez threatened to report the Duongs to law enforcement and was a direct effort to prevent him from disclosing the existence of the conspiracy.  D. Duong and A. Duong's outreach to Thao around the time of the May 3 incident further indicates Thao's connection to the series of events.  Courts regularly allow such evidence to be admitted because it permits the government to tell "a coherent and comprehensible story regarding the commission of the crime." *DeGeorge*, 380 F.3d at 1220 (citation omitted); *see also United States v. Ojomo*, 332 F.3d 485, 488-89 (7th Cir. 2003) ("Acts satisfy this 'inextricably intertwined' doctrine if they complete the story of the crime on trial; their absence would create a chronological or conceptual void in the story of the crime; or they are so blended or connected that they incidentally involve, explain the circumstances surrounding, or tend to prove any element of, the charged crime.") (internal citation omitted); *United States v. Rizk*, 660 F.3d 1125, 1131 (9th Cir. 2011) ("The rule is well established that the government in a conspiracy case may submit proof on the full scope of the conspiracy; it is not limited in its proof to the overt acts alleged in the indictment.").

Furthermore, evidence related to the May 3 altercation with Juarez is relevant to all Defendants because its admission will permit the government to tell a coherent story about a major event in their joint conspiracy, namely Juarez's expulsion and why Juarez ultimately went to law enforcement of his own volition.  Moreover, the government expects Defendants to argue that no conspiracy existed because Evolutionary Homes never actually got a contract from the City of Oakland.  Juarez's expulsion from the conspiracy, which led to the conspiracy's ultimate unraveling when law enforcement executed search warrants several weeks later, is a necessary part of the story and explanation for why Evolutionary Homes never ultimately achieved a contract from the City.

A. Duong seeks to exclude all evidence relating to the May 3, 2024, altercation with Juarez because he claims Juarez's expected testimony constitutes "outrageous claims by an unreliable cooperating witness" and asserts "there is no clear evidence that any altercation occurred," notwithstanding Juarez's expected testimony and the fact that his watch and chain were found at A.

Duong's house.  That is not a reason to prevent the government from presenting this evidence, as courts have long held that credibility determinations are within the province of the jury.  *See, e.g.*, *United States v. Ramirez-Rodriguez*, 552 F.2d 883, 884 (9th Cir. 1977) (stating the general proposition that "it is the exclusive function of the jury to weigh the credibility of witnesses, resolve evidentiary conflicts and draw reasonable inferences from proven facts.").  To the extent A. Duong believes Juarez's description of events is not credible (despite the evidence described above), he may present evidence showing a different set of circumstances took place.

A. Duong cites only one case in support of his argument—*United States v. Charley*, 1 F.4th 637, 648–50 (9th Cir. 2021).  But that case involved a conviction for assault by a single defendant and the Ninth Circuit's holding that the defendant's previous assaults were too dissimilar to come in as Rule 404(b) evidence, concluding that "there is no logical connection between those prior incidents and the charged assault." *Id*. at 648.  Unlike our case, *Charley* was not a conspiracy case and the uncharged assault described therein had no connection to the charged conduct and was not necessary to tell a coherent story about the conspiracy.  Here, evidence relating to the May 3 incident, which occurred during the period of the charged conspiracy, is necessary for the government to tell a coherent story about the Duongs and Juarez's falling out, Juarez's motivations for testifying, and the Duongs' efforts to prevent Juarez from reporting the criminal activity to law enforcement.

**C.    The Duongs' $5,000 donation to the Niagara Movement Foundation, made at Thao and Jones' request, is directly relevant to the charged crimes or otherwise inextricably intertwined with the charged conspiracy.**

Jones seeks to exclude evidence regarding a $5,000 payment the Duongs made to the Niagara Movement Foundation at Thao and Jones' direction in March of 2023.[3]  As set forth above, Thao, Jones, D. Duong, A. Duong, and Juarez met for dinner on March 9, 2023, during which they discussed the charged conspiracy.  The government expects Juarez to testify that during that dinner, Thao and Jones requested an additional benefit from the Duongs, namely the $5,000 payment to purchase a table at an upcoming dinner Thao wished to attend.  Messages and bank records corroborate Juarez's statements that Thao and Jones asked the Duongs to pay for a table for the Niagara Movement's event.  The

---

[3] Thao, A. Duong, and D. Duong seek joinder in Jones' motion to exclude this evidence, but have not provided any additional analysis or argument beyond that included in Jones' motion.

Niagara Movement Democratic Club held a 50th Anniversary party at Geoffrey's Inner Circle on Saturday, March 18, 2023. On March 15, 2023, Jones messaged Juarez information about the event. He appeared to copy and paste information about the event, including a link to purchase tables of ten for $5,000 from Eventbrite, a website used to purchase tickets for events. The message also included the statement that checks can "be made out to Niagara Movement Foundation."

On March 16, 2023, Jones messaged Juarez and said, "Got a second?" Toll records indicate that Juarez and Jones had two fifteen-minute calls the same day. On March 17, 2023, Jones messaged Juarez and said, "Hey man. Could they drop it off at my house today?" which appears to be a reference to the requested check. That same day, Jones spoke with both D. Duong and A. Duong on the phone and Jones messaged D. Duong and said "$5,000 Niagara Movement Foundation," again appearing to reference the request for a check from the Duongs to pay for the event the next day. Bank records indicate that a check for $5,000 was written to Niagara Movement Foundation on March 17, 2023, from CWS's bank account.

This evidence relates to each charged Defendant during the time period of the charged conspiracy. Furthermore, the requested $5,000 payment was discussed during a key meeting of the conspiracy. As such, it is evidence of the existence of the conspiracy, as it shows a financial benefit provided by the Duongs to Thao and Jones to further the goals of the conspiracy, and illustrates the nature of the continuing relationship among co-conspirators during the criminal conduct. It further shows that Thao and Jones' financial arrangement during the timeframe of the conspiracy wherein Jones would receive money meant to benefit Thao. The Ninth Circuit has long held that "the government in a conspiracy case may submit proof on the full scope of the conspiracy; it is not limited in its proof to the overt acts alleged in the indictment." *Rizk*, 660 F.3d at 1131. Evidence relating to the $5,000 benefit the Duongs provided to Thao and Jones falls well within the scope of the conspiracy and shed light on the nature of the co-conspirators' relationship.

In seeking to exclude evidence of this transaction, Jones asserts that "there is no mention of the donation to the Niagara Movement Foundation in the indictment." Dkt. No. 221 at 11. But the Ninth Circuit has long held that "[t]he policies underlying Rule 404(b) are inapplicable when offenses committed as part of a single criminal episode become other acts simply because the defendant is

indicted for less than all of his actions." *Williams*, 989 F.2d at 1070.  Jones further argues that "[n]or is there evidence that the payment constituted some type of financial benefit to Thao and Jones."  Dkt. No. 221 at 11.  This is simply wrong.  The evidence presented at trial will show that Thao and Jones explicitly requested the payment and discussed at the March 9 dinner that Thao's presence at the Niagara Movement Foundation event would benefit her politically.  Finally, Jones asserts that this evidence is irrelevant to a full understanding of the alleged bribery scheme.  Not so.  As described throughout, Thao and Jones frequently requested benefits from the Duongs during the charged conspiracy and the Duongs regularly obliged, the payment to Niagara and sponsoring of the Vietnam trip serving as examples.  This provision of benefits from one set of co-conspirators to another set is directly relevant to the nature of the relationship amongst the participants in the charged scheme.

### D.  A. Duong and Juarez's bribery arrangement with Azevedo is inextricably intertwined with the charged conspiracy or otherwise admissible under Rule 404(b).

The government expects Azevedo to testify on two distinct subject matters.  First, as described above, Azevedo attended the Vietnam trip, is a percipient witness as to what happened on that trip, and is also a percipient witness to the steps D. Duong, A. Duong, and Juarez took in the aftermath of the Vietnam trip to prevent the publication of a story related to Azevedo's conduct on the trip.  Second, the government expects Azevedo to testify that he engaged in a bribery arrangement with A. Duong and Juarez, during which they instructed Azevedo to open an LLC and bank account in his wife's name to conceal the illicit bribery payments.  Azevedo has pled guilty to this bribery conduct.  *See* Case No. 25-CR-0358-YGR.  A. Duong has moved to exclude evidence related to the bribery scheme with Azevedo.  *See* Dkt. No. 219 at 6-9.

As an initial matter, A. Duong and Juarez's bribery arrangement with Azevedo is inextricably intertwined with the charged conspiracy.  These events took place in the fall of 2023 (in the middle of the charged conspiracy), involved two co-conspirators, and reflect Evolutionary Homes' broader effort to bribe politicians in exchange for the purchase of housing units from Evolutionary Homes.  The Ninth Circuit has made clear that "[t]he policies underlying Rule 404(b) are inapplicable when offenses committed as part of a single criminal episode become other acts simply because the defendant is indicted for less than all of his actions." *Williams*, 989 F.2d at 1070.  Moreover, trial evidence,

including recordings of Evolutionary Homes board meetings involving D. Duong, A. Duong, and Juarez, show that, at the direction of Thao, an important part of their bribery scheme was to make Evolutionary Homes appear legitimate so that Thao would not face backlash for following through on their agreement to push the City to purchase units from the company. A. Duong and Juarez's arrangement with Azevedo was part of that strategy. Furthermore, Azevedo's attendance on the Vietnam trip and his involvement in its aftermath further connect him to all co-conspirators and show that the bribery scheme involving Azevedo is inextricably intertwined and embedded within the broader conspiracy.

The Ninth Circuit's decision in *United States v. Anderson*, 741 F.3d 938 (9th Cir. 2013) is instructive on this point. There, the defendant was charged with conducting a scheme to fraudulently sell counterfeit Adobe software. The defendant sought to preclude the government from introducing uncharged conduct involving the sale of other Adobe software that occurred six months after the charged conduct, arguing that such evidence was neither inextricably intertwined nor admissible under Rule 404(b). In rejecting the defendant's argument, the Ninth Circuit held that such conduct was inextricably intertwined with the charged offense because it "help[ed] explain Anderson's business operations" and was relevant because "the larger and more sophisticated his operation was, the more likely it was that he knew what he was doing was illegal." *Id*. at 950. The Ninth Circuit further concluded that such conduct was admissible because it was "similar to the charged conduct" and "[i]t was probative because it showed the scale of Anderson's operations and conduct." *Id*. So too here. The fact that A. Duong and Juarez engaged in a bribery scheme similar to the one they engaged in with Thao and Jones is inextricably intertwined with the charged conspiracy because it shows the scale of Evolutionary Homes operations and illicit conduct.

The bribery scheme involving Azevedo is also admissible under Rule 404(b), as it is very similar to and involved the same distinctive modus operandi as the charged conspiracy, namely that Evolutionary Homes personnel bribed a public official, in exchange for help obtaining city contracts, by routing illicit payments through the official's spouse in order to avoid detection. As such, it is relevant to Defendants' intent regarding the purpose of the payments Evolutionary Homes made to Jones in furtherance of the charged conspiracy. The Ninth Circuit has long held similar uncharged acts admissible under Rule 404(b) to prove intent. *See Lague*, 971 F.3d at 1040 ("we hold that uncharged

U.S.' OPP. TO MOTIONS TO EXCLUDE EVIDENCE
25-CR-0003-YGR                                17

prescriptions of controlled substances in enormous quantities, and in dangerous combinations, support a reasonable inference that the underlying prescriptions were issued outside the usual course of professional practice and without a legitimate medical purpose. Lague's practice-wide evidence was therefore probative of his unlawful intent, undermining his defense at trial that the charged prescriptions amounted to 'a few bad judgments.'"). Furthermore the distinctive characteristic of routing illicit payments through a public official's spouse, present in both bribery schemes, weighs in favor of admission under Rule 404(b). *See United States v. Edwards*, 26 F. 4th 449, 455 (7th Cir. 2022) ("Our cases ... have considered modus operandi to mean a 'distinctive'—not identical—'method of operation.'") (citations omitted); *United States v. Perry*, 438 F.3d 642, 648 (6th Cir. 2006) ("two crimes of sufficient distinctive similarity can create a pattern or modus operandi."); *United States v. Miller*, 874 F.2d 1255, 1269-70 (9th Cir. 1989) (holding uncharged bribery scheme was similar enough to the charged bribery scheme such that admission would have been proper under Rule 404(b) if sufficient limiting instruction given).

Evidence relating to the Azevedo bribery scheme is also directly admissible against Thao, Jones, and D. Duong because it is relevant to the intent and purpose of the payments made to Jones by Evolutionary Homes. Specifically, the fact that A. Duong and Juarez routed illicit payments to Azevedo through his romantic partner shows a distinct modus operandi, which makes it more likely that the intent and the true purpose of Evolutionary Homes' payments to Jones was actually to route the payments to Thao through her romantic partner. The Ninth Circuit has recognized "the unremarkable proposition that evidence of a third party's extrinsic offenses," like A. Duong and Juarez's bribes to Azevedo, "are admissible when relevant to some issue other than propensity, and is not inadmissible under Rule 404(b) because it is not a prior bad act of the defendant which the government is precluded from introducing." *United States v. McCourt*, 925 F.2d 1229, 1234 (9th Cir. 1991). *See also United States v. Morano,* 697 F.2d 923, 926 (11th Cir. 1983) (evidence that third party with whom defendant was linked had prior conviction for arson using unusual method showed common plan and modus operandi). Rule 404(b)'s plain language supports the conclusion that A. Duong and Jaurez's bribery scheme with Azevedo is admissible against all Defendants, as the rule specifically refers to "any other crime, wrong, or act" and does not limit its applicability to acts of a charged defendant. Accordingly, the Azevedo

bribery scheme is not only relevant to and admissible against A. Duong, it is also relevant to and admissible against all Defendants.[4]

A. Duong's main argument for excluding this evidence is that the series of events involving Azevedo amounts to character propensity evidence prohibited by Rule 404(b).  Not so.  The reason the Azevedo bribery evidence is relevant is not to show that A. Duong bribed Azevedo, and therefore he must have bribed others.  Rather, the distinctive manner in which A. Duong and Juarez conspired to rout bribery payments through Azevedo's wife to avoid detection goes directly to A. Duong and the other Defendants' intent regarding the payments to Jones.  The Ninth Circuit has long held that "Rule 404(b) is a rule of inclusion; unless the evidence of other acts *only* tends to prove propensity, it is admissible." *United States v. Castillo,* 181 F.3d 1129, 1134 (9th Cir. 1999) (internal citation omitted) (emphasis added).  Here, there is a non-propensity basis to admit the bribery scheme with Azevedo, to prove intent and modus operandi, and thus it should come into evidence.

The cases A. Duong relies on do not support his argument.  A. Duong relies on *United States v. Rodriguez*, 880 F.3d 1151, 1168 (9th Cir. 2018).  But in that case the Ninth Circuit "conclude[d] the government established the logical connection between the 2005 conviction and the charged offense" and thus "[t]he evidence was properly admitted."  A. Duong also relies on this Court's decision in *United States v. Sleugh*, 2015 WL 3866270, at *4–6 (N.D. Cal. June 22, 2015).  But *Sleugh* involved a drug deal that culminated in armed robbery and murder, and the government sought to introduce, under Rule 404(b), a separate armed robbery of a liquor store that the defendant committed six years before the charged offense.  As such, this Court held that the six-year-old armed robbery was too attenuated and dissimilar to the charged offense to be admitted under Rule 404(b).  The Azevedo evidence, in contrast, involves a similarly distinctive bribery scheme undertaken during the same time period as the charged

---

[4] D. Duong's joinder cites the Ninth Circuit's decision in *United States v. Erickson*, 75 F.3d 470, 479 (9th Cir. 1996) for the proposition that "evidence of a defendant's prior bad acts is admissible only against that defendant."  *See* Dkt. No. 228 at 2.  While *Erickson* did use that language, it did so only in dicta (while holding that any error was harmless) and also is distinguishable in that it did not consider the prior acts as relevant to any co-defendants.  Furthermore, it cited to the Supreme Court's decision in *Huddleston v. United States*, 485 U.S. 681, 685 (1988), which was a single-defendant case that did not discuss whether Rule 404(b) evidence was admissible against other parties.  As set forth above, other cases from the Ninth Circuit and elsewhere, as well as Rule 404's plain language, make clear that acts of third parties can be admissible as 404(b) evidence.

conspiracy.  The other cases A. Duong relies on have facts far afield from ours or are merely relied on to state the legal standard for admitting evidence under Rule 404(b).

A. Duong's argument that admission of the Azevedo evidence would amount to a variance in the indictment is unfounded, as any purported jury confusion would presumably be cured by a limiting instruction allowing the jury to only consider the Azevedo evidence for purposes including intent, absence of mistake, or modus operandi, and cautioning them not to consider the evidence for any improper purpose, such as whether any Defendant had a general propensity to engage in criminal activity.  In addition, A. Duong argues that this evidence "serves only to present a mini-trial within a trial, wasting time and confusing the issues."  Dkt. No. 219 at 8.  Not so.  The evidence regarding the Azevedo bribery scheme will be brief and straightforward any purported confusion can be cured by a limiting instruction regarding what the evidence may be considered for, as is common in joint trials. Accordingly, admission of the evidence will neither create a mini trial nor confuse the issues.

**E.      Evolutionary Homes' arrangements with and entreaties towards other politicians are inextricably intertwined with the charged conspiracy.**

The evidence presented at trial will show that as part of their scheme, Thao encouraged D. Duong and A. Duong to secure contracts for Evolutionary Homes from other public entities to legitimize the company and make it easier for her to follow through on her promises to secure contracts from Oakland.  Accordingly, the government intends to introduce evidence, including documents, recordings, and witness testimony, showing that A. Duong and Juarez had discussions with Oakland and Alameda County elected officials in furtherance of the charged conspiracy.  Specifically, the government will introduce recorded phone calls between A. Duong and Oakland City Councilmembers during which A. Duong described instructions Thao had given him, and instructions he had given to Thao, about Evolutionary Homes and CWS.  In these recordings, A. Duong explicitly mentions Thao's name and describes the instructions Thao gave to A. Duong.  Those recordings are attached as Exhibits 9 and 10 to the Fine Declaration, and one of the recordings is discussed separately in the government's opposition to Defendants' motion to exclude co-conspirator statements.  These discussions in furtherance of the conspiracy relate directly to the charged conduct as they show A. Duong and Juarez executing on Thao's instruction to attempt to obtain broader support for Evolutionary Homes to help obfuscate their corrupt

arrangement.

A. Duong's motion on this subject appears to focus on evidence showing that A. Duong told Juarez that he regularly recorded public officials in compromising situations for potential use as leverage against them. This expected testimony is corroborated by the dozens of videos found on A. Duong's phone showing various public officials dancing at clubs, drinking alcohol, or engaging in party-like behavior. As described above, videos showing Gallegos, A. Duong, and Juarez at a club in February 2023 are directly relevant to their efforts to push Thao to appoint Gallegos to a high-level position in the City's housing department. Juarez's expected testimony about A. Duong recording public officials sheds light on the purpose behind these videos. A. Duong's motion further describes a video seized from A. Duong's phone of a public official in a limousine, but A. Duong neither attaches that video to his motion nor identifies it by bates number. Nevertheless, the government does not intend to introduce any videos showing public officials dancing in a limousine unless Defendants open the door to such videos being relevant by suggesting that the videos A. Duong took of Azevedo were taken for some other legitimate purpose.

**F.     Thao and Jones obtaining a lease by creating a fake job for Jones is admissible under Rule 404(b).**

As set forth above, a key component of the government's case is that Thao, Jones, D. Duong and A. Duong conspired to funnel bribe payments to Thao and Jones under the guise of a no-show job for Jones at Evolutionary Homes. One year earlier, Thao and Jones used a similar modus operandi to fabricate a job for Jones for their mutual benefit. In October of 2021, Thao and Jones obtained a lease for their house in Oakland. To obtain the lease, however, Jones needed to have an income-paying job. Thao reached out to her sister, who owned a cannabis consulting company, and Thao asked her sister to write a letter falsely stating that her company would be employing Jones at a salary of $150,000 per year. Thao and Jones then submitted the falsified job letter as part of their successful lease application.

The evidence on this issue will be brief and straightforward and thus will not create any sort of mini trial. Specifically, the government will prove this series of events through the testimony of Thao's sister (who will testify that Thao instructed her to write a fake job letter for Jones), as well as text messages explicitly discussing the falsified job letter, and emails showing Thao and Jones' collective

knowledge of the fake job.  Fine Decl. Ex. 4 (text messages), Ex. 5 (fake job letter), Ex. 11 (email).

This evidence meets all four of the Ninth Circuit's Rule 404(b) factors.  *See Lague*, 971 F.3d at 1038 (describing four-part test under Rule 404(b)).  First, the evidence goes to a material point because it shows Thao and Jones had interconnected finances and a financial motive to engage in the charged bribery scheme.  They obtained a lease that they likely could not afford by fabricating a job for Jones, and thus had a motive to obtain illicit payments from the Duongs approximately a year later to maintain their lifestyle.  The evidence also shows Thao and Jones' distinctive modus operandi of creating a fake job for Jones to mutually benefit themselves, and thus is relevant to intent.  Importantly, trial evidence will show that Thao first pitched the idea to Juarez to route the conspiracy's illicit payments via a fake job for Jones at Evolutionary Homes.  As such, this evidence shows modus operandi, lack of mistake, intent, and motive in regards to the subsequent payments made to Jones and Thao relating to Jones' fake job with Evolutionary Homes.  Second, it is not too remote in time, as it took place approximately one year before the charged conspiracy began.  Third, the evidence that Thao and Jones committed this act is strong, as the government expects Thao's sister to testify as such and the text messages between Thao and her sister clearly demonstrate that the purported job set forth in letter was not genuine.  *See* Fine Decl. Ex. 4.  Finally, the offenses are similar in that they used the same modus operandi of a fake job for Jones to mutually benefit Thao and Jones, as discussed above.

Jones and Thao assert that this evidence is too dissimilar to the charged crimes to be admitted and is not unusual or distinctive enough to be considered intent or modus operandi evidence.  *See* Dkt. No. 221 at 6-8; Dkt. No. 218. at 5-8.[5]  Not so.  Thao and Jones employed the same distinctive manner of committing fraud, namely employing a fake job for Jones for their mutual benefit.  Courts "have considered modus operandi to mean a 'distinctive'—not identical—'method of operation'" and Thao and Jones' distinctive method of committing fraud meets that threshold.  *Edwards*, 26 F. 4th at 455; *see also Perry*, 438 F.3d at 648 ("two crimes of sufficient distinctive similarity can create a pattern or

---

[5] Thao's accusation that the government has violated Section 9-23.211 of the Justice Manual is wrong.  That section discusses witness immunity for close family relatives and explicitly states that justification exists to compel the testimony of a sibling "if the testimony to be elicited relates to illegal conduct in which there is reason to believe that both the witness and the relative were active participants," which is exactly what happened here.

modus operandi."); *United States v. Peterson*, 244 F.3d 385, 392–93 (5th Cir. 2001) (fraud case holding admissible "evidence of similar subsequent conduct (relatively closely linked in time), and evidence of his intent on that subsequent occasion, to draw inferences about the intent underlying his conduct.").

The Ninth Circuit has long held that "Rule 404(b) is a rule of inclusion; unless the evidence of other acts *only* tends to prove propensity, it is admissible." *Castillo,* 181 F.3d at 1134 (internal citation omitted) (emphasis added). Here, there is a clear non-propensity reason to admit the October 2021 fake job incident, namely that it shows Thao and Jones had a financial motive to commit the charged bribery scheme and is also relevant to their intent and modus operandi regarding the no-show job for Jones at Evolutionary Homes. Accordingly, this evidence is admissible under Rule 404(b).

### G.    The recorded 2019 call between Thao and A. Duong is relevant to showing the nature of their relationship.

As set forth above, the government seized from A. Duong's phone a recorded call between Thao and A. Duong from April of 2019. At the time of this phone call, CWS was engaged in contentious litigation with the City. On the recorded call, Thao provided A. Duong with information on sensitive internal Oakland City Council deliberations (including where individual council members stood) regarding a then-pending dispute between CWS and the City of Oakland regarding CWS overcharging its customers. Fine Decl. Ex. 6 at 00:10 – 09:20 (describing various councilmembers' positions on the CWS refund issue and strategy for a meeting with council members the next day). Later in the call, when discussing a meeting set for the following day at a restaurant, Thao said the suggested restaurant was "not private enough" to have this conversation (at 12:16) and Thao went on to say "I prefer a private room because we don't really want to be seen with you guys" (at 14:07-14:13).

This evidence is directly relevant to the charged conspiracy because it shows the deep and long-term relationship between Thao, the Duongs, and CWS, and also shows their history of conducting sensitive meetings in person and in private, which is what happened during the charged bribery scheme. Courts have held such evidence is admissible to show how a relationship and mutual trust developed among co-conspirators. *See United States v. Pitre*, 960 F.2d 1112, 1119 (2d. Cir. 1992) ("Prior act evidence may be admitted to inform the jury of the background of the conspiracy charged, to complete the story of the crimes charged, and to help explain to the jury how the illegal relationship between

participants in the crime developed."); *United States v. Ashburn*, 2015 WL 588704 at *11 (E.D.N.Y Feb. 11 2015) (holding prior acts admissible to explain "how illegal relationships and mutual trust developed between coconspirators."); *United States v. Maximov*, 2011 WL 5128140 at *2 (D. Ariz. Oct. 31, 2011) (holding other acts evidence "can be admitted to explain the background, formation, and development of the illegal relationship.  Other bad acts evidence is admissible if it helps the jurors understand the basis for the conspirators' relationship of mutual trust.") (citing J. Weinstein & M. Berger, *Weinstein's Federal Evidence,* § 404.22[5][b] (Matthew Bender 2d ed. 2011)).

Here, the recorded 2019 call between Thao and A. Duong helps show the basis for Thao and the Duongs' long-term relationship of mutual trust and provides relevant color to their subsequent meetings during the time period of the charged conspiracy.  Accordingly, it will be offered for a non-propensity purpose (namely showing the relationship and basis for mutual trust amongst co-conspirators) as it shows their deep and long-term relationship as it relates to business before the City of Oakland.

## CONCLUSION

For the foregoing reasons, the government respectfully requests that the Court deny Defendants' motions to exclude evidence.

DATED:  July 24, 2026                                         Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

__/s/_____
ABRAHAM FINE
MOLLY K. PRIEDEMAN
LLOYD FARNHAM
BRANDON MOORE
Assistant United States Attorneys