CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

ABRAHAM FINE (CABN 292647)
MOLLY K. PRIEDEMAN (CABN 302096)
LLOYD FARNHAM (CABN 202231)
BRANDON K. MOORE (MDBN 1312180261)
Assistant United States Attorneys

1301 Clay Street, Suite 340S
Oakland, California 94612
Telephone: (510) 637-3680

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SHENG THAO,<br>ANDRE JONES,<br>DAVID TRUNG DUONG, and<br>ANDY HUNG DUONG<br><br>Defendants. | Case No. 25-CR-00003 YGR<br><br>**UNITED STATES' RESPONSE TO DEFENDANT DAVID TRUNG DUONG'S OBJECTIONS TO ADMISSION OF CERTAIN COCONSPIRATOR STATEMENTS** |

# TABLE OF CONTENTS

INTRODUCTION ........................................ 1

BACKGROUND ........................................ 2

A. The Government's Timely Disclosure of Potential Coconspirator Statements ........ 2

B. The Conspiracy to Exchange Bribes of Money and Benefits for Official Actions ........ 3

LEGAL STANDARD ........................................ 3

ARGUMENT ........................................ 5

A. There is Extensive Evidence of the Conspiracy and Defendants' Connection to the Conspiracy ........ 5

B. The Statements Identified by the Government Were Made During the Course of And in Furtherance of the Conspiracy ........ 5

1. Juarez's Toast to the Creation of Evolutionary Homes with Coconspirators ........ 6

2. Juarez's Statements to Others Regarding the "Deal" with Thao for Oakland to Purchase Evolutionary Homes Units ........ 9

3. D. Duong's Response to a Request from Oakland's Deputy Mayor and Thao to Pay for a Bus to be used for a Parade ........ 12

4. The September 2023 Recorded Phone Call Between Thao and A. Duong ........ 13

5. Statements Related to the Duongs' and Juarez's Attempts to Quash a News Story at Thao's Request ........ 15

6. A. Duong's Message to D. Duong and K. Duong About Filing a False Police Report ........ 16

7. Andy Duong's Recorded Call to An Oakland City Councilmember Regarding Thao and Evolutionary Homes ........ 17

8. Juarez's Statements to Larry Gallegos About the Vietnam Trip ........ 18

9. Communications Regarding a Donation to the Niagara Movement Foundation ........ 19

10. A. Duong's Statements to Juarez Regarding Recording Politicians For Blackmail and Leverage ........ 20

CONCLUSION ........................................ 21

# Table of Authorities

Page(s)

Cases

*Bourjaily v. United States*,
483 U.S. 171 (1987) .......... 3, 4
*Sendejas v. United States*,
428 F.2d 1040 (9th Cir. 1970) .......... 4
*United States v. Arambula-Ruiz*,
987 F.2d 599 (9th Cir. 1993) .......... 4
*United States v. Bowman*,
215 F.3d 951 (9th Cir. 2000) .......... 17
*United States v. Ciresi*,
697 F.3d 19 (1st Cir. 2012) .......... 5, 9, 10
*United States v. Crespo de Llano*,
838 F.2d 1006 (9th Cir. 1987) .......... 3, 5
*United States v. Darden*,
70 F.3d 1507 (8th Cir. 1995) .......... 4
*United States v. Eubanks*,
591 F.2d 513 (9th Cir. 1979) .......... 3
*United States v. Garcia*,
16 F.3d 341 (9th Cir. 1994) .......... 4
*United States v. Gordon*,
844 F.2d 1397 (9th Cir. 1988) .......... 4
*United States v. Lujan*,
936 F.2d 406 (9th Cir. 1991) .......... 4
*United States v. Martinez*,
657 F.3d 811 (9th Cir. 2011) .......... 4
*United States v. Mason*,
658 F.2d 1263 (9th Cir. 1981) .......... 7
*United States v. Millsap*,
115 F.4th 861 (8th Cir. 2024) .......... 4, 9
*United States v. Nazemian*,
948 F.2d 522 (9th Cir. 1991) .......... passim
*United States v. Payne*,
437 F.3d 540 (6th Cir. 2006) .......... 4
*United States v. Santiago*,
837 F.2d 1545 (11th Cir. 1988) .......... 7
*United States v. Sears*,
663 F.2d 896 (9th Cir. 1981) .......... 8
*United States v. Snow*,
521 F.2d 730 (9th Cir. 1975) .......... 3
*United States v. Tille*,
729 F.2d 615 (9th Cir. 1984) .......... 4, 9
*United States v. Williams*,
989 F.2d 1061 (9th Cir. 1993) .......... 4, 11

## INTRODUCTION

The United States submits this brief in response to the defendant David Duong's opposition to the admissibility of certain evidence identified by the government as potential coconspirator statements. The proffered statements identified in the government's disclosures are admissible, often for various reasons as discussed further below; to the extent the statements are offered for their truth, they are admissible as nonhearsay under Rule 801(d)(2)(E) because they were made by a coconspirator during and in furtherance of a conspiracy.

Significantly, no defendant has objected to most of the 142 potential coconspirator statements identified by the government in its disclosures, and these statements should be ruled admissible. For many of the statements that defendant D. Duong does object to, the statements are not hearsay because they are not offered for their truth or there is another exception that supports admissibility.

The government's evidence in this case shows a wide-ranging and years-long conspiracy involving at least five people who have been charged with participating in the bribery scheme, defendants D. Duong, Andy Duong, Sheng Thao, and Andre Jones, and cooperating witness Mario Juarez. The rule and the case law are clear: statements that any of those conspirators made to anyone (not just among coconspirators) during and in furtherance of the conspiracy are admissible because the rules of evidence deem them nonhearsay.

In the defendant's brief some objections rely on a strawman argument that misses the point and invites an incorrect or irrelevant analysis. For example, the defendant objects that some statements admittedly made by coconspirators during the conspiracy are "narrative statements of past events" and therefore cannot be in furtherance of the conspiracy. But that characterization may be significant if the statement's *only* purpose was to narrate past events unrelated to the conspiracy; if a description of past events is intended to update coconspirators, build trust among conspirators, gain the confidence of a coconspirator, or explain the goals of the conspiracy, those statements are in furtherance of the conspiracy. Even if a statement refers to past events, it can still square with examples of admissible coconspirator statements, which include statements made to induce enlistment or further participation in the conspiracy, to prompt further action, to reassure members and reaffirm the existence of the conspiracy, to allay fears, or to keep coconspirators abreast of the conspiracy's activities. *See United*

*States v. Nazemian*, 948 F.2d 522, 529 (9th Cir. 1991).

In another strawman argument, the defendant objects to statements that he says relate to another uncharged conspiracy involving the D. Duong-sponsored trip to Vietnam and the efforts of D. Duong and A. Duong to protect Thao from a potential negative news story regarding the trip. Whether another, uncharged criminal conspiracy existed among many of the same players is irrelevant. The statements at issue (and the actions and efforts by the Duongs to quash the story and protect the mayor at her insistence) furthered the charged conspiracy because those efforts were intended to ensure Thao's continued participation in the conspiracy. The offered statements, to the extent they are hearsay at all, were related to the conspiracy charged in this case.

## BACKGROUND

### A. The Government's Timely Disclosure of Potential Coconspirator Statements

On May 19, 2026, pursuant to the Court's February 9, 2026 scheduling order, the government disclosed to the defendants a list of statements it may seek to introduce as coconspirator statements under Rule 801(d)(2)(E) at trial. On June 10, 2026, at the defendants' request, the government disclosed an amended list that included Bates ranges for certain text message conversations. *See* Priedeman Decl., Ex. A (US Amended Coconspirator Statement Disclosures). Many of the statements included in the disclosure will not be offered for the truth and are admissible without a hearsay exception. However, to the extent they are offered for the truth of the matter asserted, they are admissible under Rule 801(d)(2)(E) because they were made by a coconspirator during and in furtherance of the conspiracy.[1] The disclosure included 142 statements broken into different categories ("Text Messages and Emails," "Apple Notes," "Audio and Video Recordings," "Witness Testimony," and "Other"), and for each statement the government described how the statement was made during the course of and in furtherance of the conspiracy. On July 10, 2026, defendant D. Duong filed a motion objecting to the admission of 12 of the 142 coconspirator statements (or in one case, a category of statements) disclosed by the

[1] These statements were identified in the government's disclosure to provide broader notice than necessary and because they are also admissible as coconspirator statements. The breadth of the government's disclosures was intended to aid the parties and the Court in early resolution of evidentiary issues, but the government's inclusion of a statement on the disclosure does not mean the statements are *only* admissible under Rule 801(d)(2)(E).

government. While Jones submitted a formal joinder to the objections (Dkt. No. 229), neither Thao nor A. Duong has formally joined D. Duong's objections.

**B. The Conspiracy to Exchange Bribes of Money and Benefits for Official Actions**

In the leadup to the 2022 Oakland mayoral election and following Thao's election as the mayor of Oakland, D. Duong, A. Duong, and Juarez agreed to provide Thao significant resources to support her campaign for mayor, as well as cash payments to Thao's long-term romantic partner Jones. In exchange, Thao agreed to use her position and influence if elected mayor to benefit D. Duong, A. Duong, and Juarez, including agreeing to have Oakland purchase modular housing units from Evolutionary Homes, agreeing to appoint a preferred candidate as a high-ranking city official, and pushing for an extension of CWS's recycling contract. In furtherance of the conspiracy, D. Duong and A. Duong spent $75,000 on a negative mailer in support of Thao's campaign that was organized and implemented by Juarez. Following the election, D. Duong, A. Duong, and Juarez paid $95,000 to Jones for the benefit of Thao and Jones in furtherance of the deal. Thao also took significant steps to carry out her end of the bargain, including by ensuring the appointment of the Duongs' and Juarez's choice of a city official to a high-level position within the city, meeting with Evolutionary Homes, and by pressuring the Oakland City Administrator to visit Evolutionary Homes.

## LEGAL STANDARD

Under Rule 801(d)(2)(E), an out-of-court statement is admissible as non-hearsay if the proponent of the evidence demonstrates by a preponderance of the evidence that: (1) a conspiracy existed when the statement was made; (2) both the declarant and the defendant(s) against whom the statement is offered were members of the conspiracy; and (3) the statement was made in furtherance of the conspiracy. *Bourjaily v. United States*, 483 U.S. 171, 175–76 (1987); *United States v. Crespo de Llano*, 838 F.2d 1006, 1017 (9th Cir. 1987); *United States v. Snow*, 521 F.2d 730, 733 (9th Cir. 1975).

"It is the responsibility of the judge, rather than the jury," to determine whether the government has met its burden, *United States v. Eubanks*, 591 F.2d 513, 519 (9th Cir. 1979). In determining whether the requirements of the coconspirator rule have been met, the Court can rely on any relevant evidence, whether admissible or not, including the coconspirator statements themselves. *Bourjaily*, 483 U.S. at 175, 178–79 & n.2 ("[T]he judge should be empowered to hear any relevant evidence, such as affidavits

or other reliable hearsay."); *Id.* at 178 ("Out-of-court statements made by anyone, including putative coconspirators, are often hearsay. Even if they are, they may be considered . . . ."); *United States v. Gordon*, 844 F.2d 1397, 1402 (9th Cir. 1988) ("hearsay may be considered").

The defendants need not be present at the time a coconspirator made the declaration. *Sendejas v. United States*, 428 F.2d 1040, 1045 (9th Cir. 1970); *United States v. Williams*, 989 F.2d 1061, 1068 (9th Cir. 1993). There also is no requirement that the person to whom a statement is made be a member of the conspiracy in order for the statement to be admissible under Rule 801(d)(2)(E). *See, e.g.*, *United States v. Martinez*, 657 F.3d 811, 816 (9th Cir. 2011); *Williams*, 989 F.2d at 1068 (affirming admission of statement "not made to a coconspirator"); *United States v. Lujan*, 936 F.2d 406, 410 (9th Cir. 1991) (analyzing only coconspirator status of declarant); *United States v. Garcia*, 16 F.3d 341, 342, 344 (9th Cir. 1994) (statement made to undercover agent).

To be considered "during the course and in furtherance of" a conspiracy for purposes of Rule 801(d)(2)(E), a coconspirator statement must "further the common objectives of the conspiracy" or "set in motion transactions that [are] an integral part of the [conspiracy]." *United States v. Arambula-Ruiz*, 987 F.2d 599, 607-08 (9th Cir. 1993) (internal quotations omitted.) "Examples of admissible coconspirator statements include: statements made to enlist or further participation in the group's activities; statements made to prompt further action on the part of coconspirators; statements made to reassure members of a conspiracy's continued existence; statements made to allay a coconspirator's fears; and statements made to keep coconspirators abreast of an ongoing conspiracy's activities." *Nazemian*, 948 F.2d at 529. Statements designed to conceal an ongoing conspiracy are made in furtherance of the conspiracy for purposes of Rule 801(d)(2)(E). *United States v. Payne*, 437 F.3d 540, 546 (6th Cir. 2006). When analyzing whether a declarant's statement was in furtherance of the conspiracy, the Court analyzes the intent of the declarant, not the actual effect in advancing the goals of the conspiracy. *Nazemian*, 948 F.2d at 529.

Statements of a coconspirator that include or consist of descriptions of past events can be in furtherance of a conspiracy and admissible under Rule 801(d)(2)(E). *See e.g., United States v. Millsap*, 115 F.4th 861, 872–73 (8th Cir. 2024), cert. denied, 145 S. Ct. 1186, 221 L. Ed. 2d 258 (2025), citing *United States v. Darden*, 70 F.3d 1507, 1529 (8th Cir. 1995); *United States v. Tille*, 729 F.2d 615, 620

(9th Cir. 1984); *see also United States v. Ciresi*, 697 F.3d 19, 29 (1st Cir. 2012).

## ARGUMENT

### A. There is Extensive Evidence of the Conspiracy and Defendants' Connection to the Conspiracy

D. Duong does not contest that there is sufficient evidence establishing the existence of the conspiracy and the defendants' connection to the conspiracy. Def. D. Duong's Motion at 2 ("defense does not contest that the statements proffered by the government were made by an alleged coconspirator during the relevant time period.") Nor could he. As the Court has previously acknowledged, the record "includes significant documentary evidence tying David Duong, Andy Duong, Thao, Jones, and Juarez to the alleged corruption scheme, including messages and notes from Juarez's iCloud account, financial records showing the allegedly corrupt payments, phone records showing significant communication regarding those payments, and other documentary evidence related to the scheme." Dkt. 193 (Order Denying Motion to Suppress) (detailing examples of the documentary evidence supporting each defendant's connection to the conspiracy). The evidence cited by the government in its opposition to the defendants' Motions to Suppress, incorporated by reference here, and cited by the Court in its opinion denying the motion, is more than sufficient to establish the existence of the conspiracy and tie each defendant to the conspiracy. Dkt. 151 and 152 (Gov't Opp. and exhibits); *Crespo de Llano*, 838 F.2d at 1017 (holding that once a conspiracy is shown, the prosecution need only present "slight evidence" connecting a defendant (or other coconspirator) to the conspiracy).

### B. The Statements Identified by the Government Were Made During the Course of And in Furtherance of the Conspiracy

The defendants do not contest that the vast majority of the disclosed statements were made in furtherance of the conspiracy. As detailed in its disclosure to the defendants, the government has demonstrated by a preponderance of evidence that the 130 uncontested disclosed statements were made by a coconspirator in furtherance of the conspiracy. As a result, the Court should admit this proffered evidence as coconspirator statements under Rule 801(d)(2)(E). For the reasons stated in its initial disclosure, and for the legal and factual reasons explained in more detail below, the Court should also conclude there is a sufficient basis for the government to admit the remaining 12 contested statements and categories of evidence as coconspirator statements.

**1. Juarez's Toast to the Creation of Evolutionary Homes with Coconspirators**

The government seeks to admit a video recorded by A. Duong on October 5, 2022. *See* Priedeman Decl., Ex. B (Video of first Juarez toast Oct. 5, 2022). This video was recorded the day that Juarez and the Duongs met at the office of California Waste Solutions (CWS) in Oakland to celebrate the Evolutionary Homes partnership, and that very same day Juarez reached out to Thao to set up a meeting to discuss the negative mailer campaign and commitment to purchase housing units. Juarez, D. Duong, and Kristina Duong are visible in the video. In the video, Juarez toasts to the formation of Evolutionary Homes and discusses his relationship with and loyalty to the Duongs and CWS. In the recording, Juarez states:

> "The day after you won the City of Oakland contract, you were there, paying everyone, everyone was like f***ing piranhas . . . I was there, I was in your office, $50,000, $100,000, whatever it was, and you say what do you want and I said I just want to do business with you."

*Id.* at 0:12. The government expects Juarez to testify that this statement refers to the Duongs giving cash to multiple public officials in exchange for their assistance in helping CWS secure the Oakland recycling contract in 2014. In the toast Juarez goes on to state:

> "I defended your family, I defend CWS, I defend them physically, we advocate for CWS every time we have a problem, if anyone f***s with CWS, I have stepped up to the plate, and I think I've proven that time and time again."

*Id.* at 0:38. Juarez also states "I believe in our friendship is a long term strategy, so that's the best way that I can explain it. So we're starting this project, hopefully this is one of many projects that we do together, that we make a lot of money." *Id.* at 1:07.

Approximately 30 seconds after the above-described video was recorded A. Duong recorded another video. *See* Priedeman Decl., Ex. C (Video of second Juarez toast Oct. 5, 2022). At the beginning of the second video, which appears to be a retake of the toast based on directions to do the toast again, K. Duong tells Juarez to "keep it PG," an instruction apparently intended, at least in part, to omit reference to payments to city officials. *Id.* at 0:02. The people around Juarez are laughing during both the first video and the second video, and no one corrects or refutes what Juarez had said in the first video. In the second sanitized version of the toast, Juarez gave a similar speech without the allegations of bribery or payments to city officials.

As an initial matter, a hearsay exception is not required because the government does not seek to admit Juarez's statements in this video for the truth of what Juarez said during the toast, i.e., that the Duongs did in fact make payments to individuals after securing the City of Oakland recycling contract in 2014, or that Juarez has "stepped up to the plate" for CWS. Rather, the government intends to admit the statements as evidence of A. Duong and D. Duong's understanding of Juarez's corrupt intentions in forming Evolutionary Homes. Regardless of whether the Duongs did in fact make prior payments to public officials for securing the City of Oakland recycling contract, the fact that Juarez referenced alleged bribes or payments in the context of celebrating the formation of Evolutionary Homes bears directly on Juarez, A. Duong, and D. Duong's corrupt intentions in forming the business.

To the extent the statements described above are offered for the truth of the matter asserted, they are admissible against all defendants under Rule 801(d)(2)(E) because they were made by a coconspirator during and in furtherance of the conspiracy. Juarez's statements in the video appear to be directed almost entirely at D. Duong and are designed to convey Juarez's loyalty to D. Duong by referencing their prior relationship, Juarez's willingness to "defend" CWS and the Duongs, and his excitement for the formation of Evolutionary Homes. Courts have routinely held that statements like these designed to "reassure" coconspirators," "allay a coconspirator's fears," or "obtain the confidence" of a coconspirator are in furtherance of the conspiracy. *See Nazemian*, 948 F.2d at 529 ("statements made to reassure members of a conspiracy's continued existence" and "to allay a coconspirator's fears" are in furtherance of the conspiracy); *United States v. Mason*, 658 F.2d 1263, 1270 (9th Cir. 1981) (Statements of reassurance . . . are in furtherance of a conspiracy); *United States v. Santiago*, 837 F.2d 1545, 1549 (11th Cir. 1988) ("[B]oasts and other conversations may be in furtherance of a conspiracy if such statements are used to obtain the confidence or to allay the suspicions of a coconspirator").

The video of Juarez's toast to the partnership between the Duongs and Juarez takes place at the time when the conspiracy was forming and contains several key statements and promises that are critical to the formation and progression of the conspiracy. The video includes the following Juarez statements:

> "The day after you [D. Duong] won the City of Oakland contract … You said what do you want? I said I just want to do business with you." Priedeman Decl., Ex. B at 0:12.
>
> "I defended your family, I defend CWS, I defend them physically." *Id.* at 0:38.

> "If anyone f***s with CWS, I step up to the plate, and I think I've proven that time and time again." *Id.* at 0:47.

Juarez is effectively making a loyalty oath, promising Juarez's future loyalty to the family often while looking directly at and addressing D. Duong—a critical component of maintaining a criminal conspiracy. By professing his past and future loyalty, and conveying to D. Duong that Juarez can be trusted to both keep secrets like the past payments to city officials and to conduct business in the Duongs' interest ("hopefully … we make a lot of money."), Juarez is promoting and furthering the conspiracy. *Id.* at 1:16.

The statements are also admissible against D. Duong and A. Duong as adoptive admissions. Fed. R. Evid. 801(d)(2)(B). "To constitute an admission by silence, the statement must be made in the defendant's presence and hearing, and the defendant must actually understand what was said and have an opportunity to deny it." *United States v. Sears*, 663 F.2d 896, 904 (9th Cir. 1981). In addition, the Court must determine "whether under the circumstance an innocent defendant would normally be induced to respond." *Id.* The evidence here is sufficient to warrant a jury's reasonable conclusion that D. Duong and A. Duong actually understood Juarez's statements regarding the prior payments related to the recycling contract. The beginning of the video clearly shows that D. Duong and A. Duong were within several feet of Juarez while he was speaking, and the video pans to D. Duong and shows him listening to Juarez. Moreover, given the context, a defendant who did not engage in the conduct described by Juarez (i.e. the payment of bribes related to the recycling contract), would respond—either denying the statements or leaving the room.

The second video, the sanitized version that did not contain the references to payments to officials for the award of the recycling contract, is also admissible to provide context to the first video, and to explain how and why the statements in the first video relate to and further the conspiracy. The lack of any response or rebuke from the Duongs in either video also supports the inference that the Duongs adopted these statements.

The defendant D. Duong's objection to the admission of this video is only that in the video Juarez is "narrating purported past events related to CWS and to his relationship with the Duongs." Def. D. Duong's Motion at 4. But this description provides no basis to exclude these statements. The Court

must look to the meaning of these statements, and consider why Juarez is making them, to determine whether they are in furtherance of the conspiracy. *See e.g., Millsap*, 115 F.4th at 872–73 ("We have explained, however, that 'statements that describe past events are in furtherance of the conspiracy if they are made to ... keep co-conspirators abreast of current developments and problems facing the group.'"); *Tille*, 729 F.2d at 620 ("When a purpose of the conspiracy is to formulate future strategies of concealment, narrations of past events may be in furtherance of the continuing conspiracy"); *Ciresi*, 697 F.3d at 29 (approving of admission of narratives of past events that were "calculated to impress upon Caranci the ease with which other bribes could be solicited in the future.").

These statements convey future loyalty and that Juarez can be trusted to protect the Duongs' interests as they pursue the new venture; it is difficult to imagine more significant promises among criminal conspirators.

**2. Juarez's Statements to Others Regarding the "Deal" with Thao for Oakland to Purchase Evolutionary Homes Units**

The government seeks to admit testimony and text messages regarding statements made by Juarez to three individuals (Julie Wedge, Cesley Frost, and Larry Gallegos) regarding Thao's agreement to purchase housing units from Evolutionary Homes, as each statement was part of Juarez's efforts to move forward Oakland's approval and purchase of the housing units—a key goal of the corrupt agreement and conspiracy. *See* Def. Ex. A, lines 1-3, 6. The government anticipates that both Julie Wedge and Cesley Frost will testify that Juarez successfully recruited them to work for Evolutionary Homes without a salary or upfront payment by promising future payment based on the sale of housing units, including the units that Juarez and A. Duong represented Thao had agreed to purchase.

The government also seeks to admit a text message exchange between Juarez and Wedge discussing Wedge's anticipated role at Evolutionary Homes and Thao's agreement to purchase the housing units. *See* Priedeman Decl., Ex. D (relevant text messages between Wedge and Juarez). In the text message exchange on May 2, 2023, Juarez explained that Wedge's role at Evolutionary would be to "Write up the technical stuff – applications and proposals," and "Each unit has been agrees [sic] the City will pay $299,000 for each." *Id.* at OAK-0192598. When Wedge asked if she would be paid, Juarez responded "Per unit on approved funding," that they "don't forsee any bs," and that they had "Larry

Gallegos assigned to Housing from CEDA to walk out proposal," referring to the steps needed to complete the sale of units to Oakland. *Id.* at OAK-0192599 - OAK-0192600. In the same conversation, Juarez told Wedge that "your friends at the Mayors office are working close with sheng and company . . . From CWS" and that "All deals are Cut." *Id.* at OAK-0192577, OAK-0192590.

The meaning of Juarez's statements is clear: Thao had made a deal to purchase the units, all Wedge needed to do was "write up the technical stuff," and she would be compensated after Thao successfully purchased the units. *Id.* At OAK-0192598. Telling Wedge that the "deals are cut" for the city's purchase of the units was made to induce her to begin preparing the written proposals that may be needed to finalize the purchase and induce her to do this with a per unit payment by communicating that the mayor had already committed to the purchase. *Id.* at OAK-0192590.

The government also seeks to admit testimony from Larry Gallegos regarding statements made by Juarez telling Gallegos that Thao had agreed to purchase housing units from Evolutionary Homes. As detailed in the proffered evidence described in the government's opposition regarding Rule 404(b) evidence, Gallegos was a city official whom Juarez and the Duongs handpicked, and Thao selected, for appointment to a high-level city position related to Oakland housing as part of the corrupt agreement. The evidence at trial will show that Juarez and the Duongs believed that Gallegos could help finalize the city's purchase of the housing units by helping to locate and facilitate funding sources.

The government will also offer testimony that Juarez told Cesley Frost that Thao had agreed that Oakland would purchase 300 housing units from Evolutionary Homes. Juarez communicated by text message with Frost, confirming to Frost that an upcoming meeting between Thao and Frost about the Evolutionary Homes units was a "formality," indicating that there was already a commitment from the mayor to purchase the units. *See* Priedeman Decl. Ex. E (text messages between Frost and Juarez). D. Duong has not objected to the admissibility of the text message exchange but has objected to testimony about Juarez's statements to Frost that the purchase of units was a "done deal." Def. Motion at 3. The evidence at trial will show that Juarez had enlisted Frost to be a public face of Evolutionary Homes, and to initiate and participate in meetings with government officials, including with Thao and the mayor's office. These statements by Juarez, during the conspiracy, were made to direct and guide Frost, to let her know about Thao's commitment to the city's purchase of the units, so that she could work to finalize

the contemplated transactions. Both Frost and Wedge were working for Evolutionary Homes with the expectation that they would be paid when units were sold, so Juarez, unquestionably a member of the conspiracy, communicating to them that future sales of the units to Oakland was certain (a "done deal") was critical to securing their best efforts to work on the housing unit project.

Defendant D. Duong's grounds for objecting to each of these items of evidence are sparse, and he objects only because the statements do not contain any suggestion of bribery or misconduct, that the statements themselves do not suggest an effort to recruit the witnesses to "join the conspiracy," and that the statements are statements of historical fact. D. Duong Motion at 3. None of these assertions provides a legally or factually valid reason for the proffered evidence to fall outside the scope of admissible coconspirator statements.

It is not necessary that a statement be made directly to another member of the conspiracy for it to qualify as a coconspirator statement under Rule 801(d)(2)(E). *Williams*, 989 F.2d at 1068. Rather, what matters is whether the statement was made by a coconspirator with the intention to further any aspect of the conspiracy, including to "advance a common objective of the conspiracy or set in motion a transaction that is an integral part of the conspiracy." *Id.* Here, the statements made by Juarez to Wedge, Frost, and Gallegos, all "set in motion a transaction that is an integral part of the conspiracy." *Id.* Juarez told Wedge and Frost about the deal with Thao to encourage them to work (for free) on Evolutionary Homes, with the promise of a future payout. At Juarez's direction, Frost reached out and met with Thao as a "formality" on behalf of Evolutionary Homes, and Wedge worked on drafting Evolutionary Homes' proposals for funding from the city, both steps that were necessary to achieve the goals of the conspiracy. Likewise, according to other evidence that the government will offer at trial, Juarez and the Duongs discussed and stated their belief that Gallegos could help them navigate the city's procedures for granting funding, and Juarez's statements regarding the preexisting deal with Thao were designed to further that goal.

Juarez's statements are also admissible as prior consistent statements under Rule 801(d)(1)(B). Pursuant to Rule 801(d)(1)(B), a statement is not hearsay if (1) the declarant testified and is subject to cross-examination; (2) the statement is consistent with the declarant's testimony; and (3) the statement is offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a

recent improper influence or motive in so testifying or to rehabilitate the declarant's credibility as a witness when attacked on other grounds. Fed. R. Evid. 801(d)(1)(B). Depending on the nature of any attack on Juarez's credibility at trial, the government may also seek to admit these statements under Rule 801(d)(1)(B).[2]

**3. D. Duong's Response to a Request from Oakland's Deputy Mayor and Thao to Pay for a Bus to be used for a Parade**

The government seeks to admit a text message exchange on February 23, 2024 between A. Duong and D. Duong in which A. Duong relays a request from Thao to pay for a bus for her staff for a parade. *See* Priedeman Decl., Ex. F (messages between A. Duong and D. Duong regarding bus sponsorship). In the message exchange, A. Duong messaged D. Duong and said "Dad, Oakland Deputy of Mayor [sic] Kimberly Mayfield asked if CWS can help with the Black Joy Parade by sponsoring their buses?" *Id.* D. Duong responded: "I do not know if she can do anything good," to which A. Duong responded "She still deputy Mayor and can move things around beside Sheng. Sheng also asked her to ask us about the parade too." *Id.* In a subsequent text, A. Duong messaged D. Duong again and said: "Dad, Sheng just called and ask [sic] if can pay the bus for her office for the parade this Sunday? I say will check in with the team?" *Id.* at OAK-0188856.

D. Duong's statement is relevant because it implies that the funds to sponsor a bus at the request of the Deputy Mayor may not be worth it because the Deputy Mayor cannot do anything for the Duongs. The statement shows D. Duong considers this type of sponsorship and support as transactional and only beneficial if he can get something in return. This statement supports the government's proof and theory at trial—that the defendants knowingly entered a corrupt bribery arrangement with the Duongs—and tends to prove the corrupt intent of both D. Duong and A. Duong.

The text messages are also relevant because the statements show that Thao herself, first indirectly through the Deputy Mayor and then directly to A. Duong, made another request for financial support to the Duongs. The highly relevant inference from the back and forth is that the Duongs are

[2] In other pretrial filings, the defendants have already raised their possible attacks on Juarez's credibility, including that he was motivated by revenge after the Duongs attempted to oust him from Evolutionary Homes or that he provided information incriminating the defendants in order to obtain benefits from the government.

more likely to pay for this sponsorship if they can expect "anything good" from the official making the ask. For this reason, these messages are relevant to show the transactional relationship with Thao and the nature of their relationship overall—both facts that are relevant to show existence of the conspiracy and intent. This relevance does not depend on the truth of the statements by D. Duong or A. Duong.

To the extent these statements are offered for the truth of the matter asserted, they are admissible both as statements of party-opponents against Thao, A. Duong, and D. Duong under Rule 801(d)(2)(A), and against all defendants under Rule 801(d)(2)(E) because they were made by coconspirators during and in furtherance of the conspiracy. Thao's request that the Duongs pay for a bus for her staff occurred during the middle of the conspiracy and just one month after Thao directed the City Administrator to tour Evolutionary Homes. Thao's request that the Duongs pay for the bus was made both to further participation in the group's activities and to prompt further action on the part of the coconspirators by encouraging A. Duong and D. Duong to make further payments to ensure that she carried out her end of the corrupt bargain. A. Duong and D. Duong's exchange about Thao's request was "made to keep coconspirators abreast of [the] ongoing conspiracy's activities." *See Nazemian*, 948 F.2d at 529. The relationship between the request and the conspiracy is made explicit by D. Duong's initial resistance to pay for the bus when he believed the request came from Thao's staffer because he believed the staff couldn't "do anything good" for the conspiracy. *See Id.* at OAK-0188855. In response, A. Duong pushed back and explained that the staffer *could* help them, and by explaining that the request had come from Thao herself. *See Id.*

**4. The September 2023 Recorded Phone Call Between Thao and A. Duong**

The government also seeks to admit a recording recovered from A. Duong's phone of a September 18, 2023 phone call between Thao and A. Duong. *See* Priedeman Decl., Ex. G (recording of call between Thao and A. Duong re inviting council members). The recording appears to have been surreptitiously recorded by A. Duong, as there is no indication from him or Thao referring to it being recorded. During the call, Thao expresses frustration that the Duongs invited two City Councilmembers (who did not support Thao) to an event. During the recording, Thao stated that she did not care if the Duongs had a "great relationship" with the other city councilmembers before, they now needed to "pick and choose" and that the other City Councilmembers should never be invited to anything that "sounds

even cool" by the Duongs. *Id.* at 0:30, 2:45. A. Duong stated that he would "let David know." *Id.* at 1:26. To the extent any the statements described above are offered for the truth of the matter asserted, they are admissible both as statements of party-opponents against Thao and A. Duong under Rule 801(d)(2)(A), and against all defendants under Rule 801(d)(2)(E) because they were made by coconspirators during and in furtherance of the conspiracy. Thao's message to A. Duong could not be more clear: if the Duongs wanted her to further the objectives of the conspiracy, they needed to prioritize her demands and her political interests, including not inviting other City Councilmembers that she did not like to Duong sponsored activities.

The tone and contents of the recording are also relevant to showing the nature of the relationship between Thao, D. Duong, and A. Duong—Thao openly demands that the Duongs follow her instructions about excluding her political enemies from public events. These demands show that Thao believed that the Duongs needed her, and this belief supports the government's theory that Thao had entered a corrupt agreement with the Duongs.

This call is relevant to show intent and knowledge, the nature of the relationship between coconspirators during the conspiracy, and the existence of the conspiracy itself, and are not relevant for the truth of any assertions made by Thao about the councilmembers or the events in question.

The relevance of the recording does not depend on or relate to the truth of any statements made by Thao, but instead are offered as additional evidence of the corrupt agreement at the core of this conspiracy, by showing that Thao believed she was entitled to additional favorable treatment and benefits from the Duongs. In addition, Thao's veiled threats to leave the conspiracy unless they met her demands, is evidence of the nature, scope, and existence of the conspiracy.

In any event, any hearsay statements in the recording are statements of a coconspirator, Thao, to another coconspirator, A. Duong, who reacts and acknowledges the statements. The statements were made in order to prompt further actions by other coconspirators, namely ensuring that the Duongs do not support Thao's political enemies and do protect Thao's interests. The clear implication is that Thao believed she could direct and control the Duongs' political activities and associations with other politicians, and that the ability to direct these actions ensured her continued participation in the conspiracy. The reassurances provided by A. Duong induced further participation in the conspiracy.

The directives by Thao were intended to prompt further action by A. Duong and D. Duong, and to reaffirm the existence of the conspiracy. Any of these grounds make this recording admissible as coconspirator statements. *See Nazemian*, 948 F.2d at 529.

The defendant's motion objects to the admission of the contents of this recorded conversation only because "Nothing in it relates to the alleged bribe or any other aspect of the charged conspiracy." Motion at 6. But the admissibility of a coconspirator's statement under the rules and the appropriate legal test does not depend on whether the crime itself is referenced in the conversation. This statement is relevant both for a non-hearsay use, and as a statement in furtherance of the conspiracy, and the Court should overrule this objection.

**5. Statements Related to the Duongs' and Juarez's Attempts to Quash a News Story at Thao's Request**

The government seeks to admit a number of text messages related to the Duongs' and Juarez's attempt to quash a potentially damaging public news report about the Vietnam trip attended by the Duongs, Thao, and Jones. As detailed in the government opposition regarding 404(b) evidence, in late July and early August 2023, Thao and Jones attended a trade delegation trip to Vietnam, sponsored by the Duongs. Several months after the Vietnam trip, a reporter began asking questions about the trip, including whether San Leandro City Councilmember Bryan Azevedo had engaged in sexual conduct with prostitutes during the trip. The government anticipates that several witnesses will testify that when Thao learned that a reporter was inquiring about the trip, she became upset and concerned that a negative story about the trip could reflect poorly on her. The government anticipates that several witnesses will testify that they overheard a call between Thao and D. Duong where she threatened D. Duong that if the news report about the inappropriate conduct on the Vietnam trip came out, she could not "work with him anymore." Evidence at trial will demonstrate that after that call between D. Duong and Thao, D. Duong, A. Duong, and Juarez met with an associate of the reporter at a restaurant in Livermore in December 2023 and gave him a $10,000 check in an attempt to prevent the story about the Vietnam trip from being published. The $10,000 check provided to the associate of the reporter was drawn from CWS's bank account. The government seeks to admit, among other evidence, text messages arranging the meeting with the associate of the reporter, as well as a recorded call between A.

Duong and Azevedo wherein A. Duong discusses with Azevedo that the article was not going to come out, and that Azevedo should not discuss the arrangement with anyone. *See, e.g.,* Priedeman Decl., Ex. A at pg. 8 [OAK-0199286 & OAK-0197280], pg. 14 [OAK-0188756].

To the extent the statements described above are offered for the truth of the matter asserted, they are admissible under Rule 801(d)(2)(E) because they were made by coconspirators during and in furtherance of the conspiracy and as a statement of a party-opponent to the extent they were made by Thao, A. Duong, or D. Duong. Contrary to D. Duong's suggestion, the messages and recording about the payments to the reporter's associate are directly related to the conspiracy. As detailed above, after Thao learned that a reporter was investigating Azevedo's actions on the Vietnam trip, she was upset, and reached out to D. Duong threatening to end the conspiracy i.e. stop "working" with him, if the story was published. In direct response to that call, D. Duong, A. Duong, and Juarez met with the associate of the reporter and paid him $10,000 in an attempt to prevent the story from being published. The messages coordinating and discussing those payments are in furtherance of the conspiracy because they were done with the purpose of ensuring Thao's continued participation in the conspiracy. *See Nazemian*, 948 F.2d at 529 (statements made to further participation in the group's activities are in the furtherance of the conspiracy).

**6. A. Duong's Message to D. Duong and K. Duong About Filing a False Police Report**

The government seeks to admit a May 3, 2024 text message exchange between the Duongs and Juarez in which A. Duong relays to D. Duong and K. Duong that "[o]ne of [his] personal OPD will contact [him] tomorrow around 11-12 to come and do report," and the next day at approximately 10 am, A. Duong stated that "[a]round 11-12 OPD can come office make report." *See* Priedeman Decl. Ex. H at (text messages on May 3, 2024). The text exchange occurred the evening of the May 3, after the assault of Juarez, and prior to the Duongs' demonstrably false report to OPD about the incident.

As an initial matter, no hearsay exception is required because the government does not seek to admit the text messages for the truth of the matter asserted. The relevancy of the statements stems from the fact that A. Duong communicated his belief to D. Duong and K. Duong that an Oakland Police Department (OPD) officer would take a report about the May 3 incident, not whether an officer would in

fact take the report (which the government will separately prove through two different OPD officers' testimony and the report itself). Regardless, to the extent that the messages are offered for the truth, they are admissible as coconspirator statements. Although Juarez was no longer participating in the conspiracy by May 2024, the charged conspiracy continued. Thao remained mayor, the alleged agreement between Thao, Jones, and the Duongs had not terminated, and the objectives of the conspiracy – including securing official action benefitting Evolutionary Homes and securing an extension of CWS's recycling contract – had not been abandoned. On May 14, 2024, after the May 3 incident, D. Duong sent a formal request to Thao and the City Council asking for the CWS recycling contract extension, a key aspect of the corrupt deal. Indeed, the May 14 letter is alleged as an overt act in the indictment. Dkt. 1 at 16. The messages from A. Duong coordinating the filing of a false police report were intended to coordinate the remaining conspirators' response to Juarez after his departure from the conspiracy, to preserve the ongoing conspiracy, to conceal the existence of the conspiracy, and protect its continued operations after Juarez became adverse to their interests by discrediting him and preventing him from reporting the conspiracy to law enforcement. *See United States v. Bowman*, 215 F.3d 951, 960 (9th Cir. 2000) (statements that helped conceal conspiracy admissible are made in furtherance of the conspiracy).

K. Duong is also included on the message chain and responds that she will be available to meet with the OPD officer taking the report. K. Duong is not charged here, but played a key role in Evolutionary Homes, including appearing on incorporation documents, approving the payments to Andre Jones, and approving the payments designed to prevent the publication of a negative story about Vietnam. Even if she is not part of the charged conspiracy, in these messages A. Duong enlists her help in the preparation of a police report intended to discredit Juarez.

### 7. Andy Duong's Recorded Call to An Oakland City Councilmember Regarding Thao and Evolutionary Homes

The government seeks to admit a recording of a January 20, 2024 call between A. Duong and an Oakland City Councilmember. *See* Priedeman Decl. Ex. I (Jan. 20, 2024 recorded conversation between A. Duong and Councilmember). During the call, A. Duong and the councilmember discussed the recall attempts against Thao, Pamela Price, and Oakland City Councilmember Nikki Fortunato Bas, as well as

Evolutionary Homes. During the call, A. Duong expresses that the Duongs will put a "stop" to the recalls, but their support was contingent on Thao continuing to work toward the purchase of Evolutionary Homes units. During the call, A. Duong described a call he had with Thao where A. Duong told Thao that if she wanted to "continue for another term," she "better start acting right," and stated that after his conversation with Thao, Thao called City Administrator Jestin Johnson and Jestin Johnson toured Evolutionary Homes. Ex. I at 5:30-7:00. Immediately after describing that conversation to the Councilmember, A. Duong pitched Evolutionary Homes to the councilmember and stated that he wanted "Oakland to be the first" to purchase the housing units and invited the Councilmember to tour the housing units. *Id.* at 7:00-8:20.

The recording is admissible both as a statement of a party-opponent against A. Duong under Rule 801(d)(2)(A), and against all defendants under Rule 801(d)(2)(E). The government anticipates that Juarez will testify that Thao told the Duongs and Juarez that they should make Oakland's agreement to purchase Evolutionary Homes' units look more legitimate by gaining the support of the Oakland City Council. A. Duong's statements to the Councilmember reflect an attempt to gain his support for Evolutionary Homes and are therefore in furtherance of the goals of the conspiracy. In the above-described phone call, A. Duong makes clear to the Councilmember that the Duongs will support Thao (and other politicians) as long as they help the Duongs. Inherent in A. Duong's retelling of his threat to Thao is the implicit message that the Duongs' support of the Councilmember was also contingent on his willingness to support the Duongs and Evolutionary Homes.

**8. Juarez's Statements to Larry Gallegos About the Vietnam Trip**

The government seeks to admit witness testimony regarding statements that Juarez made to Larry Gallegos during the conspiracy regarding about the Thao and the Mayor's Office intent to extend an invitation to Gallegos to join the Vietnam trip. As described above, a significant aspect of the corrupt agreement at the center of this conspiracy was the promise by Thao to appoint a department official selected by the Duongs and Juarez; this is specifically alleged in the indictment as a part of the conspiracy and the appointment is alleged as an overt act in furtherance of the conspiracy. Any efforts by Thao, Juarez, and D. Duong to curry favor with Gallegos before and after his pre-determined appointment is part of the very same effort that was central to the conspiracy—securing the purchase of

Evolutionary Homes housing units by the City of Oakland.

The evidence at issue, and the testimony that the government seeks to offer is summarized in the government's disclosure: Juarez told Gallegos about the upcoming Vietnam trip, and told him that he would be hearing from the Mayor's Office about an invitation. *See* Priedeman Decl. Ex A at pg. 18. As described in the indictment, and explained in the government's proffer of evidence included in the opposition to the motion to exclude 404(b) evidence, Gallegos was appointed to the position of Deputy Director of Housing in March 2023. The trip to Vietnam, sponsored by a group controlled by D. Duong, included all four defendants, including Jones and Thao. Gallegos also went on that trip, and was selected to go and invited by the Mayor's Office.

The significance of Juarez being the one to first tell Gallegos about the trip and the upcoming invitation—rather than someone in the Mayor's Office or other city staff or an employee of the Vietnamese American Business Association—is that Juarez intended to communicate to Gallegos that Juarez helped secure the invitation. The evidence about that outreach is relevant not for its truth, but to show the intended effect it had on Gallegos, and because it tends to prove that the appointment of Gallegos as directed by Juarez and D. Duong was a key aspect of the corrupt arrangement.

Even if it is admitted only for the truth of the matter asserted, the comments from Juarez, a coconspirator, to Gallegos, were in furtherance of the conspiracy. The explicit goal of the conspiracy was to ensure the city purchased the housing units, and Gallegos was now in an official position that could help move that effort forward. Juarez's statements to Gallegos were intended to both curry favor and illustrate to Gallegos his close alignment with Thao and D. Duong—both of these messages conveyed in the statements furthered the conspiracy because the intent was to prompt further action by city officials such as Gallegos. The government does not allege that Gallegos was part of the conspiracy or knew that his appointment was part of the secret deal between the defendant, but as discussed above, statements to people outside the conspiracy can be in furtherance of the conspiracy.

**9. Communications Regarding a Donation to the Niagara Movement Foundation**

The government seeks to admit a text message exchange between D. Duong and Jones regarding Jones's request for a $5,000 donation for the Niagara Movement Foundation from the Duongs and

Juarez. *See* Priedeman Decl. Ex. J (messages between Jones and D. Duong March 9, 2023). In the exchange, Jones messages D. Duong and says "$5,000 Niagara Movement Foundation." *Id.* at OAK-0188792. Evidence at trial, including additional messages between Juarez and Jones, and anticipated testimony by Juarez, will show that Jones and Thao asked the Duongs to pay $5,000 to the Niagara Movement Foundation to purchase a table at the foundation's fundraiser on March 18, 2023. Evidence at trial will also demonstrate that the Duongs provided a $5,000 check to Jones, and that Thao and Jones ultimately attended the fundraiser. The demand from Jones, and the payment by the Duongs for the benefit of Thao and Jones, is both a part of and evidence of the conspiracy, and conversations and communications about this demand for payment are admissible either as party admissions or as statements made in furtherance of the conspiracy.

To the extent that the message between Jones and D. Duong is considered for the truth of the matter asserted, it is admissible both as statement of a party-opponent against Jones under Rule 801(d)(2)(A), and against all defendants under Rule 801(d)(2)(E) because it was made by a coconspirator during and in furtherance of the conspiracy. Jones's request that the Duongs donate $5,000 to the Niagara Movement Foundation occurred during the middle of the conspiracy, as the Duong and Juarez were actively trying to ensure that Thao followed through with her agreement. Jones's request that the Duongs pay for a table for Thao and Jones was made both to further participation in the group's activities and to prompt further action on the part of the coconspirators by encouraging the Duongs and Juarez to make further payments to ensure that Thao carried out her end of the corrupt bargain.

The objections filed by D. Duong argue that the donation benefited only the Niagara Movement Foundation, but this ignores the fact that Thao and Jones were able to attend a gala dinner event, likely with guests invited by Thao and Jones, because the Duongs purchased the table. The government will argue that the demand and the payment were part of this conspiracy, and even if they were not, the payment furthered the conspiracy by ensuring continued participation by Jones and Thao.

### 10. A. Duong's Statements to Juarez Regarding Recording Politicians For Blackmail and Leverage

The government seeks to admit testimony from Juarez regarding statements A. Duong made that

he records politicians and keeps the recordings for potential blackmail.

The anticipated testimony is admissible both as a statement of a party-opponent against A. Duong under Rule 801(d)(2)(A), and against all defendants under Rule 801(d)(2)(E). The government recovered dozens of videos, recorded phone calls, and surreptitious photographs from A. Duong's phone. The government anticipates introducing evidence that A. Duong filmed/recorded city employees and officials as part of the conspiracy, with the hopes of using the recordings for potential blackmail. For example, in a message between Juarez and A. Duong, Juarez asked A. Duong a good date to "[t]ake Larry Gallegos to party – he is a devoted Christian – think of his sins while he parties." On the night of February 17, 2023 and early morning of February 18, 2023, A. Duong took multiple pictures and videos of Gallegos out at a club, with scantily clad women in the background. A. Duong also took multiple pictures of Thao at CWS, Evolutionary Homes, on the Vietnam trip, and at key meetings where the conspiracy was discussed. A. Duong's statement about recording politicians for blackmail was in furtherance of the conspiracy because it explained to Juarez, another coconspirator, why he took the recordings of both Gallegos and Thao, as leverage against two key individuals who he hoped would further the objectives of the conspiracy.

**CONCLUSION**

For the foregoing reasons, the government respectfully requests that the Court admit the statements in Exhibit A to the Priedeman Declaration and deny D. Duong's motion to exclude the coconspirator statements.

DATED: July 24, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

/s/
ABRAHAM FINE
MOLLY K. PRIEDEMAN
LLOYD FARNHAM
BRANDON MOORE
Assistant United States Attorneys