CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

JEFF MITCHELL (CABN 236225)
Chief, Criminal Division

ABRAHAM FINE (CABN 292647)
MOLLY PRIEDEMAN (CABN 302096)
LLOYD FARNHAM (CABN 202231)
BRANDON K. MOORE (MDBN 1312180261)
Assistant United States Attorneys

1301 Clay Street, Suite 340S
Oakland, California 94612
Telephone: (510) 637-3717
FAX: (510) 637-3724
Abraham.fine@usdoj.gov
Molly.priedeman@usdoj.gov
Lloyd.farnham@usdoj.gov
Brandon.moore@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>SHENG THAO,<br>ANDRE JONES,<br>DAVID TRUNG DUONG, AND<br>ANDY HUNG DUONG,<br><br>Defendants. | CASE NO. 4:25-cr-0003-YGR<br><br>UNITED STATES' TRIAL MEMORANDUM |

The government submits this trial memorandum for the Court's assistance in the trial of this matter, which is scheduled to begin October 13, 2026.

## I. The Charges in the Indictment

On January 9, 2025, the grand jury returned an eight-count indictment charging Defendants Sheng Thao, Andre Jones, David Duong ("D. Duong"), and Andy Duong ("A. Duong") with various bribery-related offenses. The indictment also charged Andy Duong with making false statements to the FBI. The specific charges in the indictment are as follows:

| COUNT | STATUTE | DESCRIPTION | DEFENDANTS |
|---|---|---|---|
| 1 | 18 U.S.C. § 371 | Conspiracy to Commit Bribery | All Defendants |
| 2 | 18 U.S.C. § 666(a)(1)(B) | Soliciting or Accepting a Bribe | Thao, Jones |
| 3 | 18 U.S.C. § 666(a)(2) | Offering or Paying a Bribe | D. Duong, A. Duong |
| 4 | 18 U.S.C. § 1349 | Conspiracy to Commit Honest Services Fraud | All Defendants |
| 5 | 18 U.S.C. § 1341, 1346 | Honest Services Mail Fraud | All Defendants |
| 6 | 18 U.S.C. § 1343, 1346 | Honest Services Wire Fraud | All Defendants |
| 7 | 18 U.S.C. § 1343, 1346 | Honest Services Wire Fraud | All Defendants |
| 8 | 18 U.S.C. § 1001 | False Statements | A. Duong |

## II. Length of Trial, Number of Witnesses, and Potential Stipulations

The government estimates that its case-in-chief will last approximately 13-16 trial days (not including jury selection, opening statements, and closing arguments). This estimate is also contingent on the parties reaching stipulations regarding authenticity and admissibility of most of the government's exhibits. The parties are currently in the process of finalizing such authenticity stipulations which will help streamline the presentation of evidence.

In addition, the government is in the process of drafting factual stipulations that it will provide to the defendants shortly. The government is hopeful that the parties can reach factual stipulations on several undisputed subjects, which will help further streamline the trial.

## III. The Evidence the Government will Present at Trial

The government below sets forth a detailed factual background of the facts it expects to prove at trial. Evidence supporting the events described below includes copious text messages and other

electronic messages (including Signal messages) among and involving the parties, financial records, communications describing and confirming meetings, pictures and recordings from A. Duong's phone, audio recordings of Evolutionary Homes board meetings, as well as testimony from percipient witnesses.

**A. Summary of the charged corruption scheme.**

The evidence presented at trial will show that in the lead-up to the 2022 Oakland mayoral election, and in the months that followed, Defendants and co-conspirator Mario Juarez ("Juarez")[1] engaged in a corruption conspiracy. D. Duong, A. Duong, and Juarez had recently formed a modular housing company (Evolutionary Homes) whose business model depended in part on local government contracts. D. Duong and A. Duong also owned California Waste Solutions ("CWS"), Oakland's recycling contractor, and wanted to ensure that city contract continued. At the same time, Thao was locked in a close election campaign. The parties struck an illicit deal that catered to their respective interests.

The evidence will show that over the course of multiple conversations, many during in person meetings, Thao committed to take steps to benefit Evolutionary Homes and CWS if she became mayor in exchange for various financial benefits to Thao and Jones. Specifically, Thao agreed to use her position as mayor to cause the City of Oakland (the "City") to purchase housing units from Evolutionary Homes, to help push through a contract extension for CWS, and to allow D. Duong, A. Duong, and Juarez to influence the appointment of various city officials. In exchange for these commitments, Thao and Jones were promised various benefits, including the funding of a negative political mailer campaign to help Thao win the election and the promise of a $300,000 payment to Jones through a purported job with Evolutionary Homes.

Between October 2022 and May of 2024, Defendants and Juarez took significant steps in furtherance of their conspiracy. During this time period, A. Duong, D. Duong, and Juarez financed and orchestrated a negative mailer campaign to help Thao's mayoral candidacy and made direct financial payments of $95,000 to Jones as part of the $300,000/year job at Evolutionary Homes (the amount of

[1] Juarez has pled guilty to engaging in a conspiracy to commit bribery with Thao, Jones, D. Duong, and A. Duong, in violation of 18 U.S.C. § 371, and is expected to be a witness at trial.

the promised payments was significantly increased during the course of the conspiracy).

After Thao became mayor, Thao and Jones took multiple steps to carry out their end of the bargain and met and communicated regularly with A. Duong, D. Duong, and Juarez. In February and March of 2023, Thao pressured the Acting City Administrator to appoint Larry Gallegos (Juarez, A. Duong, and D. Duong's hand-picked choice) to the position of Director of the Oakland Housing Department, and Gallegos was eventually appointed Interim Deputy Director of the Department. Thao pushed through Gallegos' appointment, against the advice of her staff, to a position that would have significant influence over business in Evolutionary Homes' domain. Several months later, Thao also pressured a different City Administrator appointed by Thao, Jestin Johnson, to visit Evolutionary Homes and meet with D. Duong, and she also took meetings with representatives from Evolutionary Homes herself.

Defendants went to great lengths to preserve, conceal, and further the conspiracy. As described below, in August 2023, Thao attended a trip to Vietnam as part of a trade delegation. The trip was paid for in part by the Port of Oakland and subsidized by an organization led and funded by the Duongs. The Duongs paid for Jones to attend the Vietnam trip, as well as Jones' daughter, and several other Oakland officials that Thao invited. After the Vietnam trip, Thao took a vacation to Thailand with her son, a trip that was booked and paid for by a Duong-led organization.

Former San Leandro City Councilmember Bryan Azevedo[2] attended the Vietnam trip along with several other public officials invited by the Duongs and Thao. Shortly after the Vietnam trip, Azevedo agreed to use his power as a San Leandro City Councilman to benefit Evolutionary Homes in return for a percentage of the sales price from whatever modular housing company units the City of San Leandro ultimately purchased. To help conceal the future payments Azevedo was to receive, A. Duong instructed him to open an LLC and bank account in his wife's name for the purpose of receiving the kickback payments—the same method A. Duong and Juarez employed with Thao and Jones. The government expects Azevedo to testify that A. Duong specifically told Azevedo that he and Juarez had

[2] Azevedo has pled guilty to engaging in a conspiracy to commit honest services wire fraud with A. Duong and Juarez, in violation of 18 U.S.C. § 1349, and is expected to be a witness at trial. Azevedo also pled guilty to making false statements to federal agents, in violation of 18 U.S.C. § 1001.

routed payments in that manner with other politicians.

In the months following the Vietnam trip, Thao learned that a reporter began inquiring about actions taken by Azevedo on the trip, including suspected drug use and activity involving prostitutes. According to Thao staff members, when Thao learned about the reporting, she became irate, concerned that Azevedo's behavior on a trip she was prominently associated with would reflect badly on her and harm her politically. On a phone call overheard by two different Thao staffers, Thao became very upset with D. Duong and told him that if the media story came out about inappropriate conduct on the Vietnam trip, Thao could no longer have a relationship with the Duong family. Specifically, according to Thao staffers who witnessed the call, Thao told D. Doung of "if this stuff happens, I can't work with you anymore" or "I can't f*** with you anymore." Thao's threats to D. Duong end her relationship with him if he did not do what she demanded, demonstrate the nature of their relationship and the existence of the conspiracy—which Thao threatened to exit unless D. Duong took steps to fix the potential public relations crisis. In response, D. Duong, A. Duong, and Juarez took steps intended to prevent the story about Azevedo's conduct on the Vietnam trip from becoming public by paying an associate of the reporter $10,000s with the intention of preventing the publication of the story.

In the spring of 2024, the relationship between the Duongs and Juarez became strained, eventually leading the Duongs to take steps to prevent Juarez from revealing their conspiracy to law enforcement. The Duongs began asking Juarez for increased documentation for his expenses, while Juarez became frustrated by the Duongs' failure to reimburse him for expenses. By late April, they reached a breaking point. Juarez asked to dissolve the partnership, and the Duongs threatened legal action based on loans given to Juarez. In response, Juarez threatened to go to law enforcement with allegations about their joint corruption scheme with Thao, among other allegations, if they pursued legal action against him. On May 3, 2024, the Duongs locked Juarez out of the Evolutionary Homes office space and an argument between Juarez and the Duongs ensued, during which Juarez again threatened to report them to law enforcement. The government expects Juarez to testify that during the altercation, a Duong family member made a phone call, after which several individuals showed up and assaulted Juarez and robbed him of his personal belongings, including his phone, a watch, and a gold chain.

On June 20, 2024, the FBI executed a search warrant at A. Duong's residence and recovered a

watch and chain that Juarez has identified as the watch and chain that was stolen from him during the falling out with the Duong family. On the same day, A. Duong sat for a recorded interview with the FBI. During that interview, A. Duong lied repeatedly. Among other false statements, A. Duong told the FBI that Jones never received any money from Evolutionary Homes and that as far as he knew, Jones had no connection to Evolutionary Homes.

## IV. Legal Analysis and the Elements

Concurrent with this Trial Memorandum, the parties have filed proposed jury instructions that include both stipulated and disputed instructions. The government's proposed jury instructions contain a fulsome description of the elements of each charge that the government must prove, including proposed instructions that have been used in similar cases and which the Ninth Circuit has affirmed on appeal, as well as authority supporting the government's proposed instructions. Many of the government's proposed jury instructions are drawn from recent bribery cases in which the Ninth Circuit, in published opinions, affirmatively approved the jury instructions the district court gave in those cases. *See United States v. Ridley-Thomas*, __ F.4th __, 2026 WL 2222362 (9th Cir. Aug. 3, 2026); *United States v. Shen Zhen New World I, LLC*, 115 F.4th 1167 (9th Cir. 2024). Below is a brief summary of the elements of each charge.

### A. Count One: 18 U.S.C. § 371 (Conspiracy to Commit Bribery) (All Defendants)

The elements of 18 U.S.C. § 371 that the government must prove beyond a reasonable doubt are: (1) beginning on or about October 7, 2022, and continuing through on or about June 20, 2024, there was an agreement between two or more persons to commit bribery; (2) the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it; (3) one of the members of the conspiracy performed at least one overt act for the purpose of carrying out the conspiracy.

### B. Count Two: 18 U.S.C. § 666(a)(1)(B) (Accepting a Bribe) (Thao & Jones)

The elements of 18 U.S.C. § 666(a)(1)(B) that the government must prove beyond a reasonable doubt against Sheng Thao are: (1) the defendant was an agent of the City of Oakland; (2) the defendant, for the benefit of any person, corruptly solicited, demanded, accepted, or agreed to accept anything of value from another person; (3) the defendant acted with the intent to be influenced or rewarded in

connection with some business, transaction, or series of transactions of the City of Oakland; (4) the business, transaction, or series of transactions involved something valued at $5,000 or more; and (5) the City of Oakland received more than $10,000 in federal funding during a one-year period. Because the government does not contend that defendant Jones was an agent of the City, for Jones to be found guilty of Count Two, the government must prove beyond a reasonable doubt that he aided and abetted the offense of accepting a bribe, or that a member of the conspiracy committed the crime charged in Count Two and he was a member of the conspiracy.

**C. Count Three: 18 U.S.C. § 666(a)(2) (Paying a Bribe) (D. Duong & A. Duong)**

The elements of 18 U.S.C. § 666(a)(2) that the government must prove beyond a reasonable doubt are: (1) the defendant gave, offered, or agreed to give a thing of value to another person; (2) the defendant did so corruptly with the intent to influence or reward an agent of a local government—specifically, the City of Oakland—in connection with some business, transaction, or series of transactions of the government; (3) this business, transaction, or series of transactions involved a thing with a value of $5,000 or more; and (4) the City of Oakland received more than $10,000 in federal funding during a one-year period.

**D. Count Four: 18 U.S.C. § 1349 (Conspiracy to Commit Honest Services Mail or Wire Fraud) (All Defendants)**

The elements of 18 U.S.C. § 1349 that the government must prove beyond a reasonable doubt are: (1) beginning on or about October 7, 2022, and continuing through on or about June 20, 2024, there was an agreement between two or more persons to commit honest services mail fraud and wire fraud; and (2) the defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

**E. Counts Five, Six, and Seven: 18 U.S.C. §§ 1341, 1343, 1346 (Honest Services Fraud) (All Defendants)**

The elements of 18 U.S.C. §§ 1341, 1343, and 1346 that the government must prove beyond a reasonable doubt are: (1) the defendant devised or knowingly participated in a scheme or plan to deprive the City of Oakland or its the residents of their right of honest services; (2) the scheme or plan consisted of a bribe in exchange for at least one official act by a public official. The "exchange" may be express or may be implied from all the surrounding circumstances; (3) the public official owed a fiduciary duty

to the City of Oakland or its residents; (4) the defendant acted with the intent to defraud by depriving the citizens of the City of Oakland of their right of honest services; (5) the scheme or plan was material; that is, it had a natural tendency to influence, or was capable of influencing, a person's or an entity's acts; and (6) in the case of mail fraud (Count Five), the defendant used, or caused someone to use, the mails to carry out or to attempt to carry out the scheme or plan; or in the case of wire fraud (Count Six), that an interstate wire transmission was used in furtherance of the scheme.

Bribery involves an agreement to the exchange of a thing or things of value for one or more official acts by a public official. This is called a "quid pro quo" (a Latin phrase meaning "this for that" or "these for those"). Bribery also includes offers and solicitations of things of value in exchange for official acts. For the payor, bribery includes providing, offering, or agreeing to provide a thing of value to a public official in exchange for an official act. For the public official, bribery includes soliciting, accepting, or agreeing to accept a thing of value in exchange for an official act. The government does not need to prove that the public official performed the official act that was the object of the exchange or genuinely intended to perform it.

The public official and the payor need not state the quid pro quo in express terms. Rather, the intent to exchange may be established by circumstantial evidence, including the defendant's words and conduct, and all the surrounding circumstances and the rationale or logical inferences that may be drawn from the evidence.

The government is not required to prove that each participant in the scheme personally benefited.

The mailings charged in Count Five are negative campaign mailers mailed to Oakland residents on or about November 1, 2022, regarding Sheng Thao's opponents in the November 2022 Oakland mayoral election. The interstate wire transmission charged in Count Six is the deposit of a $35,000 check made out to Andre Jones drawn on a Housing Company bank account on or about April 28, 2023. The interstate wire transmission charged in Count Seven is the deposit of a $35,000 check made out to Andre Jones drawn on a Housing Company bank account on or about November 29, 2023.

**F. Count Eight: 18 U.S.C. § 1001(a)(2) (False Statements to Government Agency) (A. Duong Only)**

The elements of 18 U.S.C. § 1001(a)(2) that the government must prove beyond a reasonable

doubt are: (1) the defendant made a false statement; (2) the statement was made in a matter within the jurisdiction of the Federal Bureau of Investigation; (3) the defendant acted willfully; that is, the defendant acted deliberately and with knowledge both that the statement was untrue and that his or her conduct was unlawful; and (4) the statement was material to the decisions or activities of the Federal Bureau of Investigation; that is, it had a natural tendency to influence, or was capable of influencing, the agency's decisions or activities. The specific false statements charged in the indictment occurred during Andy Duong's June 20, 2024, recorded interview with FBI agents during which he stated that he had no knowledge of Jones ever receiving payments from Evolutionary Homes, that he never spoke to Jones about Evolutionary Homes, and that he does not "deal with Andre Jones for anything."

## V. Anticipated Trial Issues

### A. FBI Special Agent Katherine Barclay can authenticate Evolutionary Homes board meeting recordings.

Between October of 2023 and February 2024, Evolutionary Homes had several board meetings attended by David Duong, Andy Duong, Mario Juarez, and others. During these meetings, the parties discussed Evolutionary Homes business matters and also made explicit reference on several occasions to illicit agreement they had with Sheng Thao and Andre Jones. Cecilia Mendez, a longtime associate of Juarez who also worked for Evolutionary Homes, made audio recordings of those board meetings. The government anticipates entering into evidence excerpts from the recordings and the government has provided the defense with the specific excerpts it intends to admit.

The government anticipates authenticating the recordings through FBI SA Katherine Barclay, who is familiar with the voices of the individuals captured on the recordings from her participation in the investigation and can identify the speakers, together with the recordings' contents and other surrounding circumstances. *See* Fed. R. Evid. 901(a), (b)(4), (b)(5); *United States v. Ehmer*, 87 F.4th 1073, 1122-1123 (9th Cir. 2023) (affirming authentication of recorded interview based on an FBI agent's identification of the speaker's voice and surrounding circumstances, notwithstanding the absence of testimony from the individual who conducted the interview).

### B. Reciprocal Discovery and the Defense's Witness and Exhibit Lists

Rule 16 of the Federal Rules of Criminal Procedure creates certain reciprocal discovery

obligations on the part of defendant to produce three categories of materials that he intends to introduce as evidence at trial: (1) documents and tangible objects; (2) reports of any examinations or tests; and (3) expert witness disclosure. Fed. R. Crim. P. 16(b)(1)(A)-(C). Rule 16 imposes on defendants a continuing duty to disclose these categories of materials. Where a party fails to produce discovery as required, the rule empowers this Court to "prohibit that party from introducing the undisclosed evidence," or "enter any other order that is just under the circumstances." Fed. R. Crim. P. 16(d)(2). The Court has set Defendants' Rule 16 Discovery Cutoff as September 18, 2026. Dkt. No. 173 at 3.

The government has repeatedly requested "all reciprocal discovery to which it is entitled under Federal Rules of Criminal Procedure 16(b) and (c) and 26.2" from the defendants. The government has thus far received no reciprocal discovery from defendants. To the extent a defendant attempts to introduce or use any evidence at trial that has not already been produced in discovery to the government, such evidence should be excluded. *See Taylor v. Illinois*, 484 U.S. 400, 415 (1988) (defense failure to comply with, or object to, government's discovery request before trial justified exclusion of unproduced evidence).

The defense also does not currently have any deadline for witness lists, exhibit lists, or *Jencks* statements. The government respectfully requests that the Court order all defendants to provide the government with these materials by September 18, 2026 (the same day as its discovery cutoff). Given the complexity of the factual and legal issues in this case, the government anticipates that it may contest the admission of certain evidence. Absent notice of the defendants' anticipated witnesses and exhibits, the government will be forced to litigate objection to the evidence during trial.

**C. Use of Interview Reports For Impeachment Purposes**

Many of the government's witnesses did not give prior statements that were memorialized verbatim. However, federal law enforcement agents did interview essentially every witness, and those agents summarized the interviews in reports. These summaries are not equivalent to a witness's actual statements. *See United States v. Severson*, 49 F.3d 268, 271-72 (7th Cir. 1995); *United States v. Schoenborn*, 4 F.3d 1424, 1427 (7th Cir. 1993) (explaining that a third party's characterization of a statement is not the same as an actual prior statement, unless the witness subscribed to that characterization). While the government does not anticipate any of the witnesses testifying in a way that

is inconsistent with the agents' reports, memory changes over time. To the extent any of the government's witnesses testify inconsistently with an agent's report, the witnesses cannot properly be impeached using an agent's report because the agents' reports are not the equivalent of the witness's own statements. *See United States v. Bao*, 189 F.3d 860, 866 (9th Cir. 1999) ("Only the declarant of the prior inconsistent statement, and not another witness, may be impeached with the statement."); *Bemis v. Edwards*, 45 F.3d 1369, 1372 (9th Cir. 1995) ("Whereas an inconsistent statement by a testifying witness can be used to impeach that witness's credibility, an inconsistent account by another source is offered to show an alternative view of the truth."); *United States v. Leonardi*, 623 F.2d 746, 757 (2d Cir. 1980) (holding that witness could not be impeached with FBI agent's statements where witness had not subscribed to statements and the interview did not purport to memorialize all of the witness's statements).

**D. Truthful Testimony Provisions of Plea Agreements**

The government intends to call two witnesses (Juarez and Azevedo) who have entered into plea agreements in which they agreed to cooperate with the government. The plea agreements each contain a provision that requires the witness to fully cooperate with the government, including by testifying as a witness if called upon to do so. The plea agreements also include provisions requiring the cooperating witnesses to be honest and forthcoming, and to render truthful testimony.

"Eliciting testimony on direct examination that a witness entered into a plea agreement that requires truthful testimony may constitute vouching." *United States v. Dorsey*, 677 F.3d 944, 953 (9th Cir. 2012). However, "referring to a plea agreement's mandate to be truthful does not constitute vouching for a witness if such references are 'made in response to an attack on the witness's credibility because of his plea bargain,' including an attack in defense counsel's opening statement." *Id*. (citation omitted); *see also* id. at 954 ("Defense counsel implied in his opening statement that Fomby was a liar and that he was biased because he got 'a deal from the government.' The prosecutor permissibly responded to this attack by eliciting testimony that Fomby's plea agreement required him to tell the truth. When the defense opens a door, it should not be surprised to see the prosecutor enter.").

Here, the government anticipates that defense counsel will attack one or more of the cooperating witnesses' credibility, perhaps as early as opening statement. If the defense does so, the government

should be permitted to elicit testimony regarding the truthful testimony provisions of the respective plea agreement during direct examination as appropriate.

**E. Admissibility of Prior Consistent Statements**

Pursuant to Rule 801(d)(1)(B), a statement is not hearsay if (1) the declarant testified and is subject to cross-examination about a prior statement; (2) the statement is consistent with the declarant's testimony; and (3) the statement is offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying or to rehabilitate the declarant's credibility as a witness when attacked on other grounds. Fed. R. Evid. 801(d)(1)(B).

As set forth above, the government expects Mario Juarez to testify in its case-in-chief. As set forth in prior briefing, many of Juarez's statements (in text messages, emails, recordings, or otherwise) are admissible as co-conspirator statements or are otherwise admissible for a non-hearsay purpose. *See, e.g.*, Dkt. No. 237 (Government Response to Defendants' Motion to Exclude Co-Conspirator Statements). Here, the government expects that the defense will argue that Mario Juarez (or perhaps other government witnesses) fabricated their testimony or were influenced by an improper motive. To the extent the defense makes these arguments, and to the extent Juarez's statements are not admissible as co-conspirator statements or for some other non-hearsay purpose, the government should be permitted to introduce Juarez's consistent statements previously made in writing or to other witnesses that are consistent with his in-court testimony.

**F. Inadmissibility of a Defendant's Self-Serving Hearsay**

It is a well-established legal principle that a defendant's statement can only be introduced by the government, and not by the defendant, as an admission by a party-opponent. Fed. R. Evid. 801(d)(2). The rule does not require that the statement actually be an admission or that it be inculpatory.

As discussed above, all of the Defendants made multiple statements during the course of the conspiracy, in text messages, audio recordings, or orally to other people. Furthermore, A. Duong made statements to federal law enforcement in a recorded statement. The government intends to introduce many of the Defendants' statements in its case-in-chief. When that happens, subject to the rule of completeness, Defendants are precluded from eliciting or introducing their own statements through any

witness, whether on direct or cross-examination, as such statements constitute inadmissible hearsay. Fed. R. Evid. 801(c); *United States v. Nakai*, 413 F.3d 1019, 1022 (9th Cir. 2005) (holding that the defendant's attempt to elicit his own statements from a witness was "inadmissible hearsay").

**G. Defense Witnesses**

**1. Scope of Defendant Cross-Examination**

A defendant who testifies at trial waives his right against self-incrimination and subjects himself to cross-examination concerning all matters reasonably related to the subject matter of his testimony. The scope of defendant's waiver is coextensive with the scope of relevant cross-examination. *United States v. Cuozzo*, 962 F.2d 945, 948 (9th Cir. 1992); *see also United States v. Black*, 767 F.2d 1334, 1341 (9th Cir. 1985) ("What the defendant actually discusses on direct does not determine the extent of permissible cross-examination or his waiver. Rather, the inquiry is whether 'the government's questions are reasonably related' to the subjects covered by the defendant's testimony.") (internal quotations and citation omitted).

**2. Content and Manner of Character Evidence**

Federal Rule of Evidence 405(a) sets forth the sole methods by which character evidence may be introduced. It states that where evidence of a character trait is admissible, proof may be made in two ways: (1) by testimony as to reputation and (2) by testimony as to opinion. Fed. R. Evid. 405(a). Thus, a defendant cannot introduce specific instances of his good conduct through the testimony of others. *See Michelson v. United States*, 335 U.S. 469, 477 (1980) ("The witness may not testify about defendant's specific acts or courses of conduct or his possession of a particular disposition or of benign mental or moral traits.").

Nor can defendant circumvent the prohibition of his offering so-called "good acts" evidence under any other theory of admissibility, including with respect to proof of his intent in this case. While Rule 404(b) allows for limited uses of "other crimes, wrongs, or acts" in a criminal case, courts have consistently denied defendants' attempts to offer evidence of their own good deeds or noncorrupt acts in public corruption and white-collar cases. *See, e.g., United States v. Dawkins*, 999 F.3d 767, 792–93 (2d Cir. 2021) (affirming exclusion of "good act" evidence in public corruption case where defendant could not establish innocence "through proof of the absence of criminal acts on specific occasions"). In

addition, no trait of character is an "essential element of a charge, claim, or defense" in this case and thus specific instances of conduct are not admissible under this narrow exception. Fed. R. Evid. 405(b); see also id. Adv. Comm. Notes ("[T]he rule confines the use of evidence of [specific instances of conduct] to cases in which character is, in the strict sense, in issue and hence deserving of a searching inquiry.").

Unlike the defense, however, the government may inquire into specific instances of a defendant's past conduct relevant to the character trait the defense has put at issue. *See* Fed. R. Evid. 405(a). A defendant's character witnesses may be cross-examined about their knowledge of the defendant's wrongful acts to prevent this advantage given to the defendant from "becoming an unfair and unreasonable one." *See Michelson*, 335 U.S. at 479. "A witness who has endorsed the character of the defendant may be cross-examined about whether he's heard about prior bad acts of the defendant." *United States v. Bush*, 58 F.3d 482, 489 (9th Cir. 1995) (citing Fed. R. Evid. 405(a)). The only prerequisite is that there must be a good faith basis that the incidents inquired about are relevant to the character trait at issue. *See United States v. Salazar-Gaeta*, 447 F.2d 468, 469 (9th Cir. 1971). "The price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him." *Michelson*, 335 U.S. at 479.

Here, in light of the bribery charges as well as the false statement charge, it may be proper for character witnesses to testify about a defendant's alleged character traits for law-abidingness and truthfulness. *See* Fed. R. Evid. 404(a)(2)(A); *United States v. Diaz*, 961 F.2d 1417, 1419 (9th Cir. 1992). If the defense opens the door in this way, the government may inquire regarding specific instances of prior bad acts by defendant. For example, if David Duong or Andy Duong call character witnesses that testify about their alleged law-abiding character, then the government should be permitted to question those witnesses about their knowledge of specific instances of bad acts by David Duong and Andy Duong, including allegations regarding straw donations that was the subject of a Public Ethics Commission investigation and which investigation was written about in the press.

To the extent the defense offers any such character evidence, it should do so during the defense's case and not on cross-examination during the government's case-in-chief. The scope of a cross-

examination is within the discretion of the trial court. Fed. R. Evid. 611(b). Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness. *Id*. While the Court has discretion to permit inquiry into additional matters on cross-examination, the Court should bar the defense from seeking to elicit self-serving character testimony from current or former City of Oakland employees and other witnesses with whom any defendant has worked closely on cross-examination during the government's case.

**3. Duplicative or Unnecessary Character Witnesses**

None of the Defendants has provided the government with a witness list. As such, the government does not know whether any Defendant intends to call any character witnesses. To the extent any Defendant does intend to call character witnesses, the Court maintains the "right to impose some limitation on the number of witnesses testifying about a particular fact," including defendant's character, as such "must be left to the sound discretion of the judge." *United States v. Henry*, 560 F.2d 963, 965 (9th Cir. 1977) (citation omitted) (no abuse of discretion limiting defendant to two character witnesses instead of four); *see also United States v. Moss*, 34 F.4th 1176, 1188 (11th Cir. 2022) (court properly limited defense to six character witnesses instead of 16, explaining "[i]t is well-established that district courts have considerable discretion to limit the number of character witnesses and that we should overturn these determinations rarely and only on a clear showing of prejudicial abuse of discretion.") (cleaned up).

DATED: September 2, 2026

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

/s/
ABRAHAM FINE
MOLLY K. PRIEDEMAN
LLOYD FARNHAM
BRANDON MOORE
Assistant United States Attorneys