# EXHIBIT 1

*WENDY J. OLSON, IDAHO STATE BAR 7634*
*UNITED STATES ATTORNEY*
*GEORGE W. BREITSAMETER, IDAHO STATE BAR NO. 2871*
*RAYMOND E. PATRICCO, DISTRICT OF COLUMBIA BAR NO. 454792*
*ASSISTANT UNITED STATES ATTORNEYS*
*DISTRICT OF IDAHO*
*MARK L. WILLIAMS, NEW YORK STATE BAR NO. 4796611*
*TRIAL ATTORNEY, U.S. DEPARTMENT OF JUSTICE TAX DIVISION*
*ATTORNEYS FOR THE UNITED STATES OF AMERICA*
*WASHINGTON GROUP PLAZA IV, SUITE 600*
*800 EAST PARK BOULEVARD*
*BOISE, IDAHO 83712-7788*
*TELEPHONE: (208) 334-1211*
*FACSIMILE: (208) 334-1038*

*UNITED STATES DISTRICT COURT FOR THE DISTRICT OF IDAHO*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>DOUGLAS L. SWENSON, MARK A. ELLISON, DAVID D. SWENSON, JEREMY S. SWENSON,<br><br>Defendants. | CR No. 13-091-S-BLW<br><br>UNITED STATES' OPPOSITION TO DEFENDANTS' MOTION TO COMPEL PRODUCTION OF TIC PURCHASER TAX RETURN INFORMATION |

The United States of America and Wendy J. Olson, United States Attorney for the District of Idaho, George W. Breitsameter and Raymond E. Patricco, Assistants United States Attorney, and Mark L. Williams, Trial Attorney for the United States Department of Justice, Tax

Division, hereby respond to Defendants' Motion to Compel Production of TIC Purchaser Tax Return Information. (ECF No. 61.) The United States respectfully requests that the motion be denied in its entirety.

## I. INTRODUCTION

Defendants make a civil-type discovery request pertaining to information in the exclusive control of the Internal Revenue Service civil division. Defendants request that the United States turn over tax returns of more than 5,000 DBSI investor-victims that the government does not have possession of, access to, nor even knowledge of. Defendants' central argument relies on the mistaken assumption that the civil division of the IRS is a government agent subject to Rule 16 and *Brady* disclosure requirements. Regardless, Defendants' request does not make a threshold showing of materiality as required by Rule 16, especially when taken in conjunction with the government's burden of complying with the Defendants' request and the public interest in taxpayer privacy. Lastly, contrary to Defendants' statements, DBSI investor-victims' tax returns are not exculpatory. In fact, they are not relevant.

## II. FACTUAL BACKGROUND

Defendants formerly operated DBSI, a conglomerate of affiliated companies that was, among other things, engaged in the acquisition, development, management and sale of commercial real estate properties throughout the United States. DBSI sold a range of security investments, including Tenant-in-Common 1031 exchange interests (TIC investments), to accredited investors[1] across the United States.

---

[1] Defendants state that DBSI sold securities to "accredited (i.e., sophisticated) investors." (ECF 61-1 at 2). This statement is inaccurate. Accredited Investor is a term of art defined at 17 C.F.R. § 230.215. Its definition explicitly distinguishes between one who qualifies as an accredited investor and one who is "sophisticated" as defined at 17 C.F.R. § 230.506(b)(2)(ii). The term Accredited Investor unequivocally includes unsophisticated persons. This is

### A. 1031 Exchanges Generally

Broadly stated, a 1031 exchange, or "like-kind" exchange, is a swap of one business or investment asset for another. Typically, the business or investment asset is real estate. If the like-kind exchange or swap of real estate falls within the guidelines of 26 U.S.C. § 1031, which requires that in the case of a cash sale, the proceeds from the sale be held by a third party and used to make a like-kind investment within a specified time frame, it is not considered a taxable event and no taxable gain need be recognized. In simple terms, the IRS does not consider an exchange, unlike a typical sale, as "cashing out" of the investment and, therefore, allows the taxable gain to be deferred.

By way of example, and in its most simple form, two property owners, Landlord A and Landlord B, each own a rental property. Landlord A's rental property is located in Aspen and is worth $500,000. Landlord B's (much larger) rental property is located in Bend and also worth $500,000. Landlord A and B may exchange (or swap) their rental properties with one-another and, so long as the exchange does not run afoul of 26 U.S.C. § 1031, it is not considered a taxable event because neither Landlord has "cashed out" of his real estate investment. Rather, the two are merely trading rental properties located in different cities. This direct swap is known as a "simultaneous exchange." A "delayed" or "deferred" exchange is similar. In the case of a delayed or deferred exchange, Landlord A can sell his property and use the proceeds from the sale to purchase Landlord B's property at a later date so long as the sale and purchase occur within a certain time frame as proscribed by 26 U.S.C. § 1031. If Landlord A's delayed

---

unsurprising as Congress designed the securities laws primarily to protect investors incapable of protecting themselves. *See Weissbuch v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 558 F.2d 831, 834 (7th Cir.1977) (securities acts passed to protect small investors); *Brown v. Gilligan, Will & Co.*, 287 F. Supp. 766, 772 (S.D.N.Y. 1968) (primary purpose of securities laws is to protect those investors unable to protect themselves).

exchange complies with the requirements set forth in 26 U.S.C. § 1031, the sale of Landlord A's property would not be considered a taxable event. In contrast, if Landlord A sold his respective $500,000 rental property and invested the proceeds from the sale into the stock market, he has "cashed out" of his real estate investment and, thus, must recognize any taxable gain on the sale of his rental property.

If Landlord A's Aspen property is worth $500,000, and Landlord B's Bend property is worth $400,000, a 1031 exchange becomes a bit more complicated. In this case, and in very simple terms, Landlord A can still exchange his Aspen property for the property in Bend, but Landlord A will receive $100,000 cash back that is not part of the like-kind exchange. Thus, Landlord A sells his Aspen property for $500,000 and uses the funds to purchase a $400,000 property in Bend. There is then $100,000 remaining (which belongs to Landlord A) that was not part of the like-kind exchange. The $100,000 cash that Landlord A receives is known as "boot."[2] Boot is not considered part of the like-kind exchange and Landlord A is treated as though he "cashed out" $100,000 of his real estate investment. Thus, Landlord A must recognize the taxable gain on (only) this amount. Important to the instant Motion, it does not matter whether Landlord A receives $100,000 cash or a $100,000 unsecured promissory note from Landlord B. This $100,000 was not part of the like-kind exchange and is, therefore, taxable boot.

As Defendants state, "[t]he tax deferral benefits of a 1031 exchange were unavailable to investors who owned only partial interests before 2002. But in 2002, the IRS issued a new revenue ruling that allowed investors to pool their investment funds and purchase fractional

[2] Boot, an Old English term, means "something given in addition to" or "something to equalize a trade."

interests in property as tenants-in-common while maintaining 1031 exchange tax deferral benefits." (ECF No. 61-1 at 2).

Broadly speaking, after 2002 both Landlord A and Landlord B were able to sell their respective properties and use the funds to purchase fractional interests in a strip mall or office tower. Prior to this revenue ruling, had either Landlord A or B sold his rental property and used the money to purchase an interest in an office tower, the sale would have been considered "cashing out" and, thus, a taxable event. Because neither Landlord A nor Landlord B's $500,000 rental property was worth enough by itself to exchange for an office tower, this revenue ruling now allowed Landlords A and B, along with other like-minded property owners, who would own the property as tenants-in-common, to sell/exchange their rental properties and purchase/receive fractional interests in much larger pieces of commercial real estate. Because this no longer ran afoul of 26 U.S.C. § 1031, it was no longer considered "cashing out" of a real estate investment and, thus, not a taxable event.

As Defendants state, "DBSI successfully capitalized on this new rule" (ECF 61-1 at 2) and purchased commercial real estate properties, including strip malls and office towers, from unrelated third parties and immediately resold (for 20% to 30% more than what DBSI paid) fractional interests in the property to TIC investors. DBSI sold these TIC investments, known as TIC offerings, through private placement offerings under Regulation D of the Securities Act of 1933. As more fully described below, DBSI was extremely successful in marketing and selling TIC investments in large part because of 1) DBSI's Master Lease and its guaranteed fixed rate of return; and 2) Accountable Reserves.

### B. DBSI's Master Lease

DBSI's Master Lease provided that upon DBSI selling a property (e.g. strip mall, office tower, etc.) to TIC investors, DBSI became the "Master Tenant" and leased the entire property from said TIC investors for a period of 10 to 20 years. During this period, DBSI was obligated to manage and operate the individual property, make fixed payments to TIC investors, and service any debt on the property. TIC Investors were entitled to collect their return, approximately 6.5%, by monthly check and had no obligations aside from capital improvements, tenant improvements, and leasing commissions, which were to be covered by Accountable Reserves, as described further below. As Master Tenant, DBSI was entitled to all of the cash flow from the underlying tenants who rented space in the property. DBSI attempted to maximize the cash flow from the underlying tenants in order to bring in more money than DBSI paid out to the TIC investors who owned the property (approximately 6.5%).

In short, the Master Lease was touted as alleviating risk to TIC investors because DBSI paid TIC investors a fixed return regardless of the performance of the TIC investors' underlying property. TIC investors were entitled to receive their 6.5% fixed return even if their property only returned 4% to DBSI. TIC investors' fixed return was guaranteed by DBSI which represented itself as having a net worth in excess of $105 million. Additionally, a TIC investor did not need experience in managing and/or operating an office tower or strip mall, nor did the TIC investors need to worry about the difficulties in operating and managing a property with dozens of other TIC investors, all of whom were likely strangers living across the United States.

### C. Accountable Reserves

Under DBSI's Master Lease, individual TIC investors, as owners of the property, were responsible only for capital improvements, tenant improvements, and leasing commissions on

their respective property. DBSI collected funds to cover these costs at the time individual TIC investors purchased their respective share in an individual property. These funds were referred to as "Accountable Reserves."

As stated by the DBSI Bankruptcy Examiner:

> Initially, capital improvements, repairs, tenant and leasing costs and other expenses in connection with the investment asset were paid by DBSI which would set up a receivable from the property to be collected at the sale of the property. Investors relied on the financial strength of DBSI to be able to pay these costs over the term of the master lease. However, in 2005, DBSI related entities began routinely designating approximately 5 percent of the funds from investors at closing that were to be set aside to pay such costs and expenses in connection with the asset over the term of the master lease. These additional funds were referred to as "Accountable Reserves." Investors were assured that the collection of such Accountable Reserves would ensure that the investment would be properly maintained over the course of the master lease without the risk of investors being required to invest additional funds for improvement or maintenance of the asset.

Final Report of the Examiner at 44-45; http://www.mckennalong.com/assets/attachments/DBSI Report Final Report and Appendices.pdf..

Any Accountable Reserves that were not used on a TIC investor's property for certain enumerated expenses (i.e. capital improvements, tenant improvements, and leasing commissions) were to be returned to the investors upon the sale of the property or termination of the master lease or management agreements. As Defendants concede TIC Offering Private Placement Memorandums (PPMs) specifically represented that Accountable Reserves "cannot be used to fund operations" and "any remaining accountable reserves at the time of the termination of the Master Lease will be repaid to the Purchasers." (ECF No. 61-4 at 4 citing Belton Town Center PPM, Calfo Decl., Ex. A.)

According to the DBSI Bankruptcy Examiner,

> DBSI and its affiliated entities collected a total of $99,691,566 in Accountable Reserves in connection with improved and unimproved real estate projects sold to investors . . . . According to the schedule provided by McKinlay, approximately $18,006,232 of the Accountable Reserve funds have been used by DBSI and its

> affiliated entities to pay expenses related to the Accountable Reserve Projects. The Examiner understands that approximately $81,685,334 of Accountable Reserve funds have not been used for the permitted expenditures in connection with the Accountable Reserve Projects . . . . DBSI and its affiliates used tens of millions of dollars in Accountable Reserve funds to cover general operating costs and expenses of the DBSI Group. These funds were never reserved by DBSI or it affiliates. Accordingly, these Accountable Reserves have been used and are no longer available.

Final Examiner Report at 99-100, 116; http://www.mckennalong.com/assets/attachments/DBSI Report Final Report and Appendices.pdf.

## III. RELEVANT CASE LAW

Unlike civil proceedings, "[t]here is no general constitutional right to discovery in a criminal case." *Weatherford v. Bursey*, 429 U.S. 545 (1977). Criminal discovery is governed by Rules 16 and 26.2 of the Federal Rules of Criminal Procedure, the *Jencks* Act, 18 U.S.C. § 3500, and the Due Process Clause of the Fifth and Fourteenth Amendments as interpreted by *Brady v. Maryland* and its progeny. As in the context of trial, the Due Process Clause operates in the discovery context to assure the defendant's right to a fair trial. *United States v. Agurs*, 427 U.S. 97, 107 (1976). In applying the Due Process Clause to discovery issues, the Supreme Court has recognized that inquiry arises not only "in advance of trial . . . [when] the prosecutor must decide what, if anything, he should voluntarily submit to defense counsel," but also after trial, when "a judge may be required to decide whether a nondisclosure deprived the defendant of his right to due process." *Id.* at 108. Although the timing of both inquiries differs, the Court has held that "[l]ogically the same standard must apply at both times." *Id.* In so holding, the Court noted that "[f]or unless the omission deprived the defendant of a fair trial, there was no constitutional violation requiring that the verdict be set aside; and absent a constitutional violation, there was no breach of the prosecutor's constitutional duty to disclose." *Id.*

Materiality is at the very heart of the requirements under Federal Rule of Criminal Procedure 16 for disclosure of materials to the defense. Defendants have the burden of making a "threshold showing of materiality, which requires a presentation of 'facts which would tend to show that the Government is in possession of information helpful to the defense.'" *United States v. Santiago*, 46 F.3d 885, 894 (9th Cir. 1995); *see also United States v. Mandel*, 914 F.2d 1215 (9th Cir. 1990). "Neither a general description of the information sought nor conclusory allegations of materiality suffice; a defendant must present facts which would tend to show that the Government is in possession of information helpful to the defense." *United States v. Little*, 753 F.2d 1420, 1445 (9th Cir. 1984); *United States v. Cadet*, 727 F.2d 1453, 1468 (9th Cir. 1984). The Ninth Circuit has also rejected that a defendant can, without more, be excused from making a preliminary showing of materiality by arguing that "the information necessary to make a showing, if it can be made at all, is in the possession of the government." *Mandel*, 914 F.3d at 1219. In *Mandel*, the Ninth Circuit held that "ordering production by the government without any preliminary showing of materiality is inconsistent with Rule 16." *Id.* The Court of Appeals went on to caution district courts that "[p]articularly where, as here, the government has shown that complying with the request would be unduly burdensome, it is incumbent on the district court to consider the government interests asserted in light of the materiality shown. Without a factual showing there is no basis upon which the court may exercise its discretion, and for it to ignore the requirement is to abuse its discretion." *Id.*

## IV. ARGUMENT

Pursuant to *Brady v. Maryland* and its progeny (collectively " *Brady*"), the United States has an obligation to learn of and disclose material favorable evidence known to the government. *Brady* does not, however, "require a prosecutor to unearth from an agency, even an agency

involved in the investigation, every random scrap of paper of possible defense use. Given their enormity, it would be impractical to scour all files and desks and lockers looking for all nuggets, large and small. Fishing expeditions are not required." *United States v. Cerna*, 633 F.Supp.2d 1053, 1061 (N.D.Cal. 2009). Rather, a prosecutor's duty to learn of exculpatory evidence, and the extent to which knowledge of such evidence will be imputed to him, extends only as far as his "prosecution team." *United States v. Cerna*, 633 F.Supp. 2d at 1058-59. Thus, the threshold issue in determining the scope of the United States' discovery obligations under *Brady* is defining who is part of the prosecution team.[3]

The prosecution team includes all federal, state and local law enforcement officers and other government officials participating in the investigation and prosecution of the criminal case against the defendant. United States Attorney's Manual ("USAM") 9-5.001; *see United States v. Meros*, 866 F.2d 1304, 1309 (11th Cir. 1989) ("*Brady* and its progeny apply to evidence possessed by a district's 'prosecution team,' which includes both investigative and prosecutorial personnel.") "The prosecutor will be deemed to have knowledge of and access to anything in the possession, custody[], or control of any federal agency participating in the same investigation of the defendant." *United States v. Bryan*, 868 F.2d 1032, 1036 (9th Cir. 1989) (district boundaries irrelevant). Thus, the prosecution team in a prison murder case was deemed to have "knowledge of and access to" witnesses' Bureau of Prisons inmate files when BOP had gathered the physical evidence in the case and had provided the prosecution with the defendant's inmate file. *United States v. Santiago*, 46 F.3d 885, 893 (9th Cir. 1995).

---

[3] Rule 16 also limits the United States' disclosure obligations to those items in the "government's possession, custody and control." Fed. R. Crim. P. 16(a)(1)(E). Thus, discovery under that rule is similarly limited to items in the possession of the prosecution team. To the extent that Defendants rely on Rule 16 as an alternative basis for disclosure of the items requested, the following analysis is equally applicable.

### A. DBSI Investor Tax Returns are Not In the Possession of the Government

Defendants are charged with defrauding thousands of investors and conspiring to launder the proceeds of their fraud. Although some victims of this fraud presumably filed tax returns, those tax returns are not, nor have they ever been, in the possession, custody, or control of the prosecution team. The prosecution team has no knowledge of DBSI investor tax returns nor does the prosecution team have access to DBSI investor tax returns.

In determining whether a federal agency, such as the IRS, has documents "in the possession of" the prosecution team, district courts in the Ninth Circuit have looked to whether the agencies have supplied significant amounts of information to the prosecutor that the government will rely on in the case, as well as whether the agencies were, or have to be, subjected to formal processes to obtain the information. See, e.g., *United States v. Salyer*, 271 F.R.D. 148, 156-57 (E.D. Cal. 2010). Similarly, the Ninth Circuit has held that documents are in the government's "possession" for discovery purposes when the government has reviewed or had access to them. *See United States v. Santiago*, 46 F.3d 885, 894 (9th Cir. 1995) (extending Rule 16 obligation to documents possessed by the Bureau of Prisons, where the prosecutors "had knowledge of and access to" documents).

#### i. <u>DBSI investor tax returns are held by the civil division of the IRS</u>

By statute and by practice the IRS is not like other federal agencies. While one side of the IRS is charged with investigating possible tax and tax-related crimes, there is a "vast administrative arm of the IRS, i.e., ordinary tax collection, [that] is not." *United States v. Zinnel*, 2011 WL 5593109, at *3 (E.D. Cal. 2011) (holding that "non-disclosed IRS non-party tax information" is not "in the possession of the 'government,' even when the Criminal Division of the IRS is considered the 'government.'"), *request for reconsideration granted on other grounds*,

Case 1:13-cr-00009-BLW Document 387 Filed 07/09/15 Page 12 of 28

2011 WL 6825684; *see also United States v. Bryan,* 868 F.2d 1032, 1036 (9th Cir. 1989) ("[G]iving 'government' its broadest reading by expanding it to include all federal agencies (such as the IRS) would not only wreak havoc, but would give the defense access to information not readily available to the prosecution" (alteration in original)) (quoting *United States v. Robertson*, 634 F.Supp. 1020, 1025 (E.D. Cal. 1986)); *United States v. Colima-Monge*, 962 F.Supp. 1337, 1341 (D.Or.,1997) (government was not required to obtain and produce informant's tax returns upon discovery request of defendant in absence of any evidence that prosecutor had knowledge of and access to informant's tax returns); *United States v. Brodnik*, 710 F. Supp. 2d 526, 569 (S.D. W. Va., 2010) (IRS Notices requested by defendant in tax evasion prosecution not within possession, custody, or control of prosecution or material to preparing defense).

DBSI investors' tax returns are held by the civil division of the IRS, the same government agency that holds the tax returns of every other U.S. taxpayer. All U.S. taxpayer returns cannot fairly be said to be in the possession of the prosecution team. Instead, they are part of the same "vast administrative arm" unaffected and uninvolved in the criminal investigation of the Defendants. The prosecution team has investigated the perpetrators of DBSI's fraud, not its victims. Like the documents at issue in *United States v. Stein*, the DBSI investors' tax returns that the defense now seeks "are in the possession of the civil side of the IRS in locations dispersed throughout the country." *United States v. Stein*, 424 F.Supp. 2d 720, 723 (S.D.N.Y. 2006) (finding that the entire IRS is not acting on the government's behalf and there was no evidence that any member of the prosecution team has reviewed any of the requested materials); *see also United States v. Lochmondy*, 890 F.2d 817, 823-24 (6th Cir. 1989)("[T]he prosecutor never had possession or knowledge of the income tax returns sought by the defendants. Since the prosecution never obtained disclosure of those returns, § 6103(i)(4) is inapplicable. The district

Case 4:21-cr-00091-CRW Document 187 Filed 10/05/26 Page 13 of 28

court, therefore, properly reconsidered and rescinded its order requiring the IRS to produce the returns."); *United States v. Bibby*, 752 F.2d 1116, 1124-25 (6th Cir. 1986) (a witness's audit file is not in the government's possession when the prosecutor never saw or possessed the file). Neither the prosecutors, the FBI Special Agent, the IRS-CI Special Agent, nor the cooperating Revenue Agent, have reviewed or possessed DBSI investors' tax returns that are the basis of Defendants' discovery request.

ii. The IRS civil division has not participated in the criminal investigation

Contrary to Defendants arguments, the IRS civil division has *not* participated in this investigation. Although there was at one time a cooperating Revenue Agent, this is true for almost all criminal tax investigations and prosecutions. The United States is unaware of any Court holding that because a cooperating Revenue Agent assisted the prosecution team, any and all IRS tax information is in the possession of the government for Rule 16 and *Brady* purposes. Defendants cite no authority for this extraordinary proposition. Further, the fact that the "prosecution has already obtained tax information from the IRS" (ECF No. 61-1 at 9) does not transform the entire civil side of the IRS into a member of the prosecution team. More specifically, "to the extent that the prosecution and investigators have simply queried agencies, private entities, or persons to confirm or dis-affirm leads, theories, facts, and have obtained a stray document or two, these agencies or persons are not within the government for purposes of this case." *United States v. Salyer*, 271 F.R.D. 148, 156 (E.D. Cal. 2010) (noting that "the prosecution does not become the FOIA (Freedom of Information Act) agent for the defense"). Here, IRS Criminal Investigators made formal requests to obtain tax returns of five individual taxpayers, four of which are the defendants. IRS Criminal Investigators also obtained tax returns for approximately eight DBSI-related entities and Code Six Management LLC. Such

communication is hardly the sort of extensive collaboration that renders separate agencies part of one prosecution team for *Brady* purposes.

iii. The government does not have access to DBSI investor tax returns

Defendants state the "prosecution has 'access' to the returns in the IRS's possession because the IRS regularly provides this kind of information to prosecutors." (ECF No. 61-1 at 9). This is incorrect. The IRS cannot simply disclose tax returns to the Department of Justice. In fact, the logistics of complying with any Court order requiring the disclosure of DBSI investor tax returns underscores that the materials are not in the government's possession.

Congress enacted a federal statute, Title 26, United States Code, Section 6103, to protect the privacy of taxpayer return information. 26 U.S.C. § 6103 generally prohibits, with certain exceptions, the disclosure of "any return or return information." 26 U.S.C. § 6103(a). Section 6103 prohibits the IRS from disclosing returns or return information, as those terms are defined in 26 U.S.C. § 6103(b)(1) and (b)(2), unless disclosure is authorized under a specific provision of Title 26. *Church of Scientology of Cali. v. IRS*, 484 U.S. 9 (1987). Third-party tax return and return information may be disclosed in a federal judicial proceeding pertaining to tax administration "to the extent required by an order of a court pursuant to Section 3500 of Title 18, United States Code, or Rule 16 of the Federal Rules of Criminal Procedure, such court being authorized in the issuance of such an order to give due consideration to congressional policy favoring the confidentiality of returns and return information . . . ." 26 U.S.C. § 6103(h)(4)(D).

Section 6103(h)(4)(A) does not apply in this case because that subparagraph only applies if the taxpayer whose return information is to be disclosed "is a party to the proceeding." Subparagraphs (B) and (C) of section 6103(h)(4) establish "item" and "transaction" tests under which the returns and return information of taxpayers who are not parties to such proceedings

may be disclosed in the proceedings. Under section 6103(h)(4)(B), a third party's return information may be disclosed only "if the treatment of an item reflected on such [third party's] return is *directly related* to the resolution of an issue in the proceeding." (Emphasis added.) As more fully described below, no item on DBSI investors' tax returns will be at issue, or directly related to an issue, in this case. Under section 6103(h)(4)(C), such information may be disclosed if it "directly relates to a transactional relationship between a person who is a party to the proceeding and the taxpayer which *directly affects* the resolution of an issue in the proceeding." (Emphasis added.) As more fully described below, DBSI investor tax returns do not directly affect the resolution of any issue in the proceeding.

As such, the Special Agent with the Criminal Investigation Division of the IRS cannot personally access DBSI investor tax returns. To obtain any of the original tax returns sought by Defendants, the Special Agent must make a formal request, approved by his Supervisory Special Agent, to the civil side of the IRS. This request must include why the tax returns are relevant to the criminal investigation. Only after receiving a formal request for the tax file may the civil side of the IRS disclose information about that file. The civil side of the IRS is solely and completely responsible for locating, retrieving and turning over each tax return. In this case, the Special Agent would have to submit to the civil side of the IRS a specific, individualized request for each tax return for each respective tax year associated with the 5,000+ DBSI investors for whom the Defendant seeks tax returns. This is no different than making an access request for information in the possession of the Securities & Exchange Commission, or issuing a subpoena to a third party for records. The fact that the government could access the records via a formal request does not mean that all IRS records are in the possession of the prosecution team.

Any disclosure of tax return information must comply with section 6103(h)(2). The section allows for disclosure to "officers and employees of the Department of Justice . . . personally and directly engaged in, and solely for their use in, . . . preparation for any proceeding . . . before any Federal or State Court, but only if" one of three subsections applies (described above). 26 U.S.C. § 6103(h)(2). Because the prosecution team cannot obtain original tax returns without making a formal request to the civil side of the IRS that complies with 26 U.S.C. § 6103, Courts have held that the prosecution team is under no obligation to order a witness's tax returns that are in the IRS's possession. *See United States v. Lochmondy*, 890 F.2d 817, 824 (6th Cir. 1989) (holding that the district court properly rescinded its order requiring production where "the prosecution never obtained disclosure of those returns" from the IRS); *United States v. Bibby*, 752 F.2d 1116, 1125 (6th Cir. 1985) (where, "as here, the record shows that the prosecutor had never seen the tax audit, never had it in his possession, and did not know what it contained, *Brady* does not require that he obtain it and give it to the defense. If the defendants wanted the tax audit, the proper course was to seek it from the IRS itself").

Furthermore, Defendants' Motion claims the government possesses DBSI investor tax returns because it has access to them. The government has the same access to DBSI investor tax returns as it does to all tax returns filed with the IRS. Defendants appear to argue that government must search through millions of tax returns to ensure there are no materials discoverable under both Rule 16 and *Brady.*" Because the IRS is one of the 'investigating agencies,' the prosecution must search its files for exculpatory information." ECF No. 61-1 at 8). This is an extraordinary position as it would require any and all prosecutions involving the IRS to search millions of tax returns located across the country. Not only would this be impossible, but this would destroy the very privacy that Congress sought to protect by enacting 26 U.S.C. § 6103.

Regardless, the Ninth Circuit expressly rejected such an argument (in the context of a tax prosecution) in holding that were the government to include "all federal agencies (such as the IRS) [it] would not only wreak havoc, but would give the defense access to information not readily available to the prosecution" *United States v. Bryan,* 868 F.2d 1032, 1036 (9th Cir. 1989) (quoting *United States v. Robertson*, 634 F.Supp. 1020, 1025 (E.D. Cal. 1986)); *See also United States v. Liquid Sugars, Inc.*, 158 F.R.D. 466, 474 (E.D. Ca. 1994) (stating in Rule 16 context, "for obvious practical reasons, not every governmental agency can be considered as part of the 'government' for discovery purposes").

iv. The government does not have knowledge of DBSI investor tax returns

Defendants argue that the government has " sufficient 'knowledge'" of DBSI investor tax returns "[b]ecause the prosecution undoubtedly knows that tax returns exist." (ECF No. 61-1 at 9.) This statement is conclusory and inaccurate. The prosecution team has no knowledge of any tax returns by any DBSI investor. Although the government sincerely hopes that each investor is in tax compliance and filed tax returns, the government cannot represent this to be the case nor can the government represent what, if anything, will be found on DBSI investor tax returns.

v. The government is not required to interrogate fraud victims

Defendants argue that "despite interviewing approximately 100 TIC purchasers, IRS agents neglected to ask a single one about payment of capital gains taxes on the Accountable Reserves. The government cannot claim innocent ignorance when it reasonably should have obtained these documents." (ECF No. 61-1 at 11.) Any claim or argument that the United States must investigate any and every victim's tax compliance is meritless.

> Moreover, counting cooperating witnesses or victims amongst those constituting the "government" would lead to absurd results. Defendants would have this court compel the government to use whatever process necessary to interrogate, on behalf of the defense, all persons who gave the government any information, and

> then to search or seize the files of all persons with whom the government acquired any information during an investigation, on the off chance that something material or exculpatory or impeaching might be found with the witnesses/victims. The government would be turned into the reluctant defense investigator, and with much more investigative power to boot. Nothing in Rule 16, or in the *Brady/Giglio* jurisprudence, suggests such a tilting of the adversary system.

*United States v. Zinnel*, 2011 WL 5593109, at *3 (E.D. Cal. 2011), *request for reconsideration granted on other grounds*, 2011 WL 6825684.

**B. MATERIALITY**

Even if DBSI investor tax returns are "within the government's 'possession and control,'" Rule 16 also requires a party seeking discovery to make a showing of materiality of the information sought. *United States v. Santiago*, 46 F.3d 885, 894 (9th Cir. 1995) (citing Fed.R.Crim.P. 16(a)(1)(C)). "Neither a general description of the information sought nor conclusory allegations of materiality suffice." *Id* (quoting *United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir.1990)). A trial judge's finding on materiality is reviewed for an abuse of discretion. *Id.* (citing *United States v. Little*, 753 F.2d 1420, 1444 (9th Cir.1984); *United States v. Cadet*, 727 F.2d 1453, 1468 (9th Cir.1984)).

i. Defendants' request is too general too general to justify disclosure

Defendants' "belie[f]" that DBSI investors' tax returns "will show that no taxes were paid on these funds" (ECF No. 61-1 at 6) falls far short of the "case specific facts" necessary to demonstrate materiality. *Santiago*, 46 F.3d 885 at 895. Defendants speculate as to what DBSI investor tax returns might contain, reasoning that they must necessarily review the tax returns to know if the tax returns are helpful. While the Defendants used different words, the reasoning is fatally circular in the same way as the argument rejected by the Ninth Circuit in *Mandel*, where the defendant argued that "the information necessary to make a [materiality] showing, if it can be

Case 4:21-cr-00091-CBW Document 387 Filed 01/05/26 Page 19 of 28

made at all, is in the possession of the Government." *United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990). As noted by the Ninth Circuit:

> However, "the appellant['s] mere speculation about materials in the government's files [does not require] the district court or this court under *Brady* to make the materials available for [the appellant's] inspection." *United States v. American Radiator & Standard Sanitary Corp.*, 433 F.2d 174, 202 (3d Cir. 1970). Nor does *Brady* "require the trial court to make an in camera search of the government files for evidence favorable to the accused." *United States v. Harris*, 409 F.2d 77, 80–81 (4th Cir. 1969). Brady does not establish a "duty to provide defense counsel with unlimited discovery of everything known by the prosecutor." *United States v. Agurs*, 427 U.S. 97, 106, 96 S.Ct. 2392, 2398, 49 L.Ed.2d 342 (1975). Rather, in a case in which a specific request for evidence is made, "the test for materiality is whether the requested evidence might affect the outcome of the trial." *Id.* at 104, 96 S.Ct. at 2397; *United States v. Goldberg*, 582 F.2d 483, 488 (9th Cir. 1978).

*United States v. Michaels*, 796 F.2d 1112, 1116 (9th Cir. 1986) (alteration in original); *see also Alvarez*, 358 F.3d at 1211 (citing *Michaels*, 796 F.2d at 1116). "The mere possibility that an item of undisclosed information might have helped the defense...does not establish 'materiality' in the constitutional sense." *Agurs*, 427 U.S. at 109–10.

Indeed, the materiality requirement in Rule 16 is intended to prevent fishing expeditions and the associated delays it causes in the case and the trial. Criminal defendants may not embark on a "broad or blind fishing expedition among documents possessed by the Government." *Jencks v. United States*, 353 U.S. 657, 667, 77 S.Ct. 1007, 1 L.Ed.2d 1103 (1957) (quoting *Gordon v. United States*, 344 U.S. 414, 419, 73 S.Ct. 369, 97 L.Ed. 447 (1953)). Rejecting fishing expeditions is even more appropriate when the Defendants seeks tax returns the privacy of which Congress expressly sought to protect by enacting a federal statute. 26 U.S.C. § 6103.

ii. <u>Defendants' allegation of materiality is conclusory</u>

Defendants' Motion is predicated on the claim that DBSI investor tax returns are "exculpatory and material to the defense" because it is "the defense's position that the TIC

purchasers were never told Accountable Reserves remained their property." Rather, "TIC purchasers were told that [accountable reserves] were part of the purchase price of 'like-kind' property and were treated as unsecured loans to DBSI." (ECF 61-1 at 6.) Simply put, this statement is contradictory. Accountable Reserves cannot both be "part of the purchase price of 'like-kind' property" and at the same time an "unsecured loan to DBSI." It is through this contradictory statement that Defendants argue DBSI investor tax returns are relevant.

Defendants are in a difficult position. If Defendants claim that Accountable Reserves are "part of the purchase price of 'like-kind' property"(ECF 61-1 at 6) then, of course, the funds are taxable income to DBSI. DBSI, however, did not treat the $99 million it received in Accountable Reserves as income, nor did it pay tax on these funds. At the same time, Defendants need to justify why they were permitted to use TIC Investors' Accountable Reserves for anything they saw fit (as a company would do with its profits), including operations, overhead, salary, loans to technology companies, returns to prior investors, etc. Defendants therefore make the conclusory claim that Accountable Reserves were "unsecured loans to DBSI" (ECF 61-1 at 6), yet they provide no loan documents, loan agreements, or anything else that would support such a claim.

Accountable Reserves cannot be both part of the purchase price and at the same time an unsecured loan. Whether these funds are taxable "boot" or part of the like-kind exchange is dependent on what these funds were. If Accountable Reserves were in fact loans then they should *not* be treated as taxable boot. "Unsecured loans" cannot be considered a like-kind exchange. However, if Accountable Reserves are part of the purchase price of a property, then the funds are part of the like-kind exchange and no boot would exist. Defendants cannot credibly claim they were both. Defendants argue that if DBSI investors did *not* claim boot on their tax returns, then the tax returns are exculpatory because it corroborates Defendants' claim that

Accountable Reserves were part of the purchase price. But this would be inculpatory to Defendants' other claim that Accountable Reserves were loans.

Regardless of the defense theory Defendants choose, DBSI investor tax returns are not relevant. First, as Defendants point out, "the PPMs explicitly disclose that DBSI had structured the offering to give the TIC purchasers an argument to the IRS that they would not have to pay capital gains taxes on the Accountable Reserves." (ECF No. 61-4 at 4.) Thus, the treatment of Accountable Reserves does not appear to have even been settled as a civil tax matter. Defendants acknowledge representing to TIC investors that the IRS treatment of Accountable Reserves is unclear, as "certain reserves, are accountable (i.e., any unused reserves are returned to the Purchasers) and it is likely that the IRS will successfully be able to treat such amounts as taxable "boot," as cash in such a reserve may not constitute property that is like-kind to real estate for purposes of Section 1031 of the Code **although the issue is not completely free from doubt**." (ECF No. 61-4 at 4 citing Belton Town Center PPM, Calfo Decl., Ex. A at 19 (emphasis added)). The United States does not anticipate calling any DBSI investors whose Accountable Reserves were returned.

Additionally, a TIC Investor's tax return has little if any bearing on what an investor believed their Accountable Reserves would and could be used by DBSI for. First, as an initial matter, there is no evidence that DBSI investors are familiar with the taxability of Accountable Reserves or even how they were treated on their own tax returns. It is, of course, possible that a taxpayer hired an accountant or return-preparer to decipher whether boot should be claimed. Second, a taxpayer's (or the taxpayer's accountant/tax return preparer) belief that Accountable Reserves constituted boot or did not constitute boot is not a defense to the crimes charged. Defendants are charged with using Accountable Reserves for purposes other than the enumerated

expenses outlined in PPMs, as well as continuing to raise and use Accountable Reserves knowing DBSI did not have the ability to pay the funds back. Whether DBSI investors claimed boot is simply not relevant, much less "exculpatory."

Further, it is unclear why Defendants need DBSI investors' tax returns. The government has produced Memoranda of Interview for hundreds of DBSI investor victims. Because Defendants have been provided with their statements, they presumably can contact DBSI investors to investigate. *See United States v. Pearson*, 340 F.3d 459, 470 (7th Cir. 2003) (witness "was available to be called as a witness for the defense" so *Brady* was satisfied); *United States v. Salerno*, 868 F.2d 524, 542 (2d Cir. 1989) (*Brady* does not require government to provide grand jury transcript; government informed defense that it may want to interview the witness at issue); *United States v. Hicks*, 848 F.2d 1, 4 (1st Cir. 1988) (defense knew of and had access to witness).

Additionally, assuming the Court allows the line of questioning, Defendants are presumably capable of asking testifying witnesses about their tax treatment of Accountable Reserves. *See United States v. Civella*, 666 F.2d 1122, 1130 (8th Cir. 1981) (finding no Brady violation for failure to disclose returns where the defense was "allowed to interview [the witness] regarding his income tax returns").

Any argument that DBSI investors cannot be trusted to testify honestly is improper; "requests which are designed to generally cast for impeachment material . . . are not material. Such requests are simply speculative inquiries without basis in fact to believe that the information acquired will be significantly helpful." *United States v. Liquid Sugars*, 158 F.R.D. 466, 473 (E.D.Cal. 1994).

Further, the simple fact that evidence could be used to impeach a government witness does not end the materiality inquiry. *United States v. Dumas*, 207 F.3d 11, 16 (1st Cir. 2000) (quoting *United States v. Shelton*, 588 F.2d 1242, 1247, 1248 (9th Cir. 1978). The tax treatment of Accountable Reserves by DBSI investors presents a "collateral tax issue[] that would confuse the jury." *United States v. Almani*, 111 F.3d 705, 716 (9th Cir. 1997) (upholding exclusion of cross-examination regarding whether "witnesses claimed on their tax returns that the money sent to [the defendant] for the promotional items was a necessary business expense"). The Ninth Circuit's reasoning in *Almani*, a prosecution for wire fraud and conspiracy in connection with a fraudulent telemarketing scheme, is persuasive: "The cross-examination might raise questions about the propriety of customers' tax treatment for the payments, but it would not have shown whether [the defendant] and his Employees misrepresented the chances of winning valuable prizes to the customer witnesses." *Id.* Similarly, scrutinizing DBSI investor tax returns will shed no light on Defendants' misuse of Accountable Reserves, nor DBSI's inability to repay Accountable Reserves, which is the focus of the upcoming trial.

Additionally, the scope of the request – tax returns of more than 5,000 DBSI investors - is massive. The Court must weigh the strength of the defendants' materiality showing with the burdensome nature of the request. With respect to another "massive" discovery request in *Marshall*, the Ninth Circuit similarly held that "a preliminary showing of reasonableness and materiality" was necessary "to justify the massive discovery requested." *Id.* at 1356. In *United States v. Mandel*, the Ninth Circuit also found that when the government "has shown that complying with the [Rule 16 discovery] request would be unduly burdensome, it is incumbent on the district court to consider the government interests asserted in light of the materiality shown." 914 F.2d 1215, 1219 (9th Cir. 1990). This is particularly important here when the resources

required to produce the tax returns would include imposing burdens on the civil division of the IRS.

### C. The Strong Public Interest in Taxpayer Privacy and Sweeping Nature of the Defendants' Request Outweigh any Possible Use of the Tax Return by the Defense

Even if Defendants succeed in showing that DBSI investor tax returns are material to one of their defenses, the Court should nonetheless find that potential materiality is outweighed by the burdensome nature of their disclosure and concerns for taxpayer privacy.

If the Court were to order the government to produce thousands of DBSI investor tax returns, the government estimates that it would take approximately 10 to 20 minutes to thoroughly review each tax return. This estimate necessarily depends on how easy it is to identify the specific criteria for production. Assuming 10 to 20 minutes of review per tax return (after locating it), it would take between 800 and 1,600 hours to review 5,000 tax returns. Further, the government would be required to devote resources to overseeing the defendants' scanning of any documents. Reviewing DBSI investor tax returns would also require some familiarity with the facts of the case, as well as knowledge of 1031 exchanges and the ability to identify "boot." It is likely that it would take several case agents and assigned prosecutors to appropriately review the tax returns. Due to resource constraints, it is unlikely that the government could have more than one to three individuals reviewing the files at any given time. The Court should consider this burden on the government in determining the need to produce the documents. *See, e.g., United States v. Mandel*, 914 F.2d 1215, 1219 (9th Cir. 1990); *United States v. Budziak*, 697 F.3d 1105, 1111-12 (9th Cir. 2012).

Additionally, and as noted above, federal statute prohibits the IRS from disclosing returns or return information, as those terms are defined in 26 U.S.C. § 6103(b)(1) and (b)(2), unless

disclosure is authorized under a specific provision of Title 26. *Church of Scientology of Cali. v. IRS*, 484 U.S. 9 (1987). When, as here, Defendants seek disclosure in the face of a countervailing public interest favoring protection of the information, the Ninth Circuit has analyzed whether the defendant's need for disclosure of the information outweighs the government or public interest in protecting the information. *See, e.g., United States v. Marshall*, 532 F.2d 1279, 1282 (9th Cir. 1976). In *Marshall*, the Ninth Circuit upheld the District Court's refusal to reveal the identities of government informants, stating that "(m)ere speculation that the informer might possibly be of some assistance is not sufficient to overcome the public interest in the protection of the informer." *Id.* (Alteration in original.) Because Defendants presently contend that they must obtain at least a portion of a DBSI investor's tax return in order to determine whether the return is useful, the taxpayers' privacy interests are implicated with this disclosure request. If the Court does require production of the thousands of tax returns, at a minimum § 6103 requires that the Court review *in camera* each tax return to ensure that the return contains information that would be material to the defense.

**V. Conclusion**

For the forgoing reasons, the United States respectfully requests that Defendants' motion be denied in its entirety.

Respectfully submitted this 9th day of July, 2013.

WENDY J. OLSON
United States Attorney
By:

/s/ George W. Breitsameter
Assistant United States Attorney

/s/ Raymond E. Patricco
Assistant United States Attorney

/s/ Mark L. Williams, Trial Attorney
United States Department of Justice

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that I am an employee of the United States Attorney's Office for the District of Idaho, and that a copy of the foregoing United States' Opposition to Defendants' Motion to Compel Production of TIC Purchaser Tax Return Information was served on all parties named below this 9th day of July, 2013.

___ United States Mail, postage prepaid

___ Hand delivery

___ Facsimile Transmission (fax)

___ Federal Express

____ E-Mail

_x__ ECF Filing

Kira Dale Pfisterer
Hepworth, Janis & Kluksdal, Chtd.
Attorneys at Law
537 West Bannock Street, Suite 200
Post Office Box 2582
Boise, Idaho 83701-2582

Angelo J. Calfo
Patricia Eakes
Calfo, Harrigan, Leyh & Eakes
Attorneys at Law
999 Third Avenue, Suite 4400
Seattle, Washington 98104

Attorneys for Douglas L. Swenson

Jeffery P. Robinson
Schroeter, Goldmark & Bender
Attorneys at Law
810 Third Avenue, Suite 500
Seattle, Washington 98104

David Z. Nevin
Nevin, Benjamin, McKay & Bartlett, LLP
Attorneys at Law
303 West Bannock Street
Post Office Box 2772
Boise, Idaho 83701

Attorneys for Mark A. Ellison

John R. Kormanik
Kormanik, Hallam & Sneed, LLP
Attorneys at Law
206 West Jefferson Street
Boise, Idaho 83702
Attorneys for David D. Swenson

Greg S. Silvey
Attorney at Law
Post Office Box 565
Star, Idaho 83669
Attorney for Jeremy S. Swenson

/s/ George W. Breitsameter