# EXHIBIT 3

**Volume 22**

**Pages 4737 - 5008**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
VS. ) **NO. 4:25-cr-00003-YGR**
)
SHENG THAO, et al., )
)
Defendants. )
)

Oakland, California
Friday, November 20, 2026

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

CRAIG H. MISSAKIAN
UNITED STATES ATTORNEY
1301 Clay Street
Oakland, California 94612
**BY: ABRAHAM H. FINE**
**MOLLY PRIEDEMAN**
**ASSISTANT UNITED STATES ATTORNEYS**

UNITED STATES ATTORNEY
450 Golden Gate Avenue
San Francisco, California 94102
**BY: LLOYD A. FARNHAM**
**ASSISTANT UNITED STATES ATTORNEY**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By: Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
Official United States Reporter, CSR No. 12219

Q. And why were you doing this comparison -- well, let me ask you about some of columns first.

Unable to locate, what does that column mean?

A. That means I wasn't able to locate it anywhere in Mario Juarez's bank accounts.

Q. Okay. Did that -- were you able -- we talked about this at trial in your testimony, primarily on cross-examination, but were there gaps in the financial records that you had related to Mario Juarez accounts?

A. Yes.

Q. Like what?

Well, did you obtain records from Mexico accounts?

A. No, I did not.

Q. I guess what -- so what did it mean if you were unable to locate a line item?

A. "Unable to locate" column was I was not able to find the item from the expense report on the -- any of the bank accounts that I had in my possession.

Q. And then what does the foreign column mean?

A. That was for the transactions that appeared to be international, from the Santander or other international bank accounts.

Q. And then what is the variance column over there?

A. That's if I -- if I was able to locate -- if I was able to locate a transaction in the bank account but it didn't match --

**A.** It may have been or it may have been after. I -- I really don't know. Sorry.

**Q.** Well, you had identified several incorrect entries in advance of his October 5th interview -- right? -- because I was -- you were going to ask him about that?

**A.** Yes. The amount column and the unable to locate column, those ones were ahead of the interview. I'm not quite certain if the separated, cash, foreign, no records, variance were on the October 5th one. I just don't remember how my spreadsheet looked on October 5th.

**Q.** All right. And how about the "altered" and the "notes," when did you create those and populate those?

**A.** The "notes" column was at the same time as the -- it's hard to -- so the notes column was done at the same time I entered the bank record information. So the date, description, amount, and unable to locate, and the note were all done at the same time.

**Q.** And when did you populate the information that's in the notes column?

**A.** Around the same time that I did it. So as I was going through the bank records, if it -- like, for example, with the Zelle memo, as I was going through the bank records, I would input the note.

**Q.** So in -- in September and -- or so in preparation for the October 5 interview?

the spot-check and then called it -- called it done.

So I -- I couldn't really say what specifically was -- were the expenses that I noticed on Friday night compared to what I noticed on Saturday night.

**Q.** Okay. And the -- we have different information so I'm going to ask you which is correct.

One of reports we got said that you met on the Saturday morning, November 7th, with AUSA Farnham and Special Agent Barclay.

The other report that we got -- and these are both from the Government -- said you meet with the prosecutors, plural, on Saturday.

What's your recollection of who you met with on Saturday, November 7th?

**A.** I -- I -- I'm -- I know AUSA Farnham was there. I don't believe that AUSA Priedeman was there. I don't think that she was there while we were talking about it, but she was -- I believe she was there at some point during the day. I don't think she was there while we were talking about the records.

**Q.** Was there any discussion that day of whether a report of your findings should be prepared?

**A.** No.

**Q.** And did you -- did you prepare -- did you take any kind of notes on this -- and I -- I'm not trying to trick you. Any kind of notes, I'm talking about handwritten, typed, of what

you had found on November 6th and 7th?
A. On November 7th when I was meeting with them, no, I didn't take any notes. We just looked at it and that's as far as it went. I didn't take any notes while I was meeting with them.
Q. Okay. And the "we" to the best of your recollection was --
A. I'm sorry.
Q. -- Mr. Farnham and Ms. Barclay and you?
A. Yes, I believe that was all that was there.
Q. Okay. And -- and were you looking at this what we've been calling the spreadsheet, the reimbursement trial spreadsheet?
A. Yes. Sorry. Yes.
Q. At the time which columns were populated?
A. Wait. I'm sorry. You're saying when we looked at this on Saturday?
Q. Correct. On November 2nd.
A. No. So we looked at the actual -- like I was just showing them examples of what I had seen on Friday night. So I don't even know if my spreadsheet came -- I don't even know if we looked at my spreadsheet.
It would have just -- yeah, there would be no -- so I was just showing them examples of what I had seen from Friday. So I picked one from the reimbursement backup records and then I compared it to the bank -- bank records.
Q. And what was the conclusion of that?

When you looked at it, you shared it with them. Anybody talk about -- anybody said, "Okay. Here's what we're going to do next," or "what are the next steps on this comparison you were doing," after you met with them on November 7th?

**A.** I wouldn't say there was any type of stated plan. We looked at it. It looked like there was that -- the documents were altered, the ones that I had shown. And then that was -- then we -- that was it.

**Q.** So did you say I'm going to keep going with my analysis? I don't -- I'm just having a hard time understanding how does that just end and stop when -- as an IRS-CI and you've got altered bank documents --

**A.** Yeah.

**Q.** -- how does that conversation end?

**A.** Yeah. I don't think we made any type of a stated plan or anything to continue reviewing it. Yeah, that's all I've got.

**Q.** Did you do any more work on this comparison analysis between the night of November 7th that you talked about and then your testimony in this case -- in the trial? Not today's testimony, in the trial when you got called as a witness in the trial.

**A.** No, I don't believe I did.

**Q.** So you -- in writing reports, why didn't you do a report of what you had found with respect to these altered transactions?

**A.** I don't really have an answer for that. I -- I -- I mean, it wasn't a completed product. It was -- at that point I had -- I mean, are we talking about Saturday night, or are we talking about -- when are you -- or do you just mean in general?

**Q.** Really in general. Why not in September when you started looking at it?

Did you look at it at all -- well, I'll not -- let me ask a different question.

In September, when you started looking at it, November 6, 7, between then and when you got called as a witness by the Government in this case, why not memorialize your findings?

**A.** I mean, I -- it wasn't really -- there wasn't a finished product to memorialize.

**Q.** And then I started asking you about in September, you know, why were you doing it, why did it matter.

Why did you do it the weekend of November 6/7? Why did you think it mattered then?

**MR. FARNHAM:** We've already talked about this, Your Honor.

**THE COURT:** I agree. I've heard this already.

**MR. SPRAGUE:** Nothing more from me, Your Honor.

**THE COURT:** I don't know that I'm going to entertain any more. I mean, that is -- you all have now information. You can file your motion if you want to file your motion. But