# EXHIBIT 4

**Volume 20**

**Pages 4279 - 4506**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
VS. ) **NO. 4:25-cr-00003-YGR**
)
SHENG THAO, et al., )
)
Defendants. )
)

Oakland, California
Wednesday, November 18, 2026

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

CRAIG H. MISSAKIAN
UNITED STATES ATTORNEY
1301 Clay Street
Oakland, California 94612
**BY: ABRAHAM H. FINE**
**MOLLY PRIEDEMAN**
**ASSISTANT UNITED STATES ATTORNEYS**

UNITED STATES ATTORNEY
450 Golden Gate Avenue
San Francisco, California 94102
**BY: LLOYD A. FARNHAM**
**ASSISTANT UNITED STATES ATTORNEY**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By: Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
Official United States Reporter, CSR No. 12219

**A.** No.

**Q.** Did you come to that conclusion before Mr. Juarez was asked direct questions about whether he had doctored bank records?

**A.** Yes, I believe so.

**Q.** Okay. How about the questions he was asked about, like, Southwest Airlines having a capital W, other bank record discrepancies like that, when did you start looking into those issues?

**A.** The same -- or sorry. Like, the -- the records were the same as what I had looked at a couple of days prior.

**Q.** And did -- just to pick that example, did you conclude that the Southwest Airlines entries had been falsified?

**A.** Yes. I looked at the real bank records, and I noticed that they were altered.

**Q.** Okay. And did you conclude that before or during or after Mr. Juarez's trial testimony?

**A.** Probably during his testimony.

**Q.** Okay. Okay. You also heard Mr. Juarez testify, I believe, about whether he had filed tax returns since about 2020 or so; is that right?

**A.** Correct.

**Q.** Okay. And is that an issue you had -- well, and you also heard him claim that he had filed for extensions for his tax returns for several years; is that correct?

A. I did hear that, yes.
Q. All right. And was that -- when Mr. Juarez testified about -- gave his testimony about not filing taxes and having filed extensions, was that new information to you?
A. Yes.
Q. So Mr. Juarez pled guilty in January of 2025; correct?
A. Yes.
Q. Had -- had you or any of your colleagues looked into whether he had filed tax returns as of January 9 of 2025, when the last time he had filed tax returns was?
A. No.
Q. Had you looked into whether any of the business entities that we have discussed that he's controlled had filed any tax returns prior to his guilty plea in January of 2025?
A. No.
Q. Had you looked into whether he had paid any income taxes prior to January of 2025?
A. No.
Q. Had you looked in whether he had filed any extensions prior to January of 2025?
A. No. So this wasn't a tax investigation, so I'm actually prohibited from reviewing tax returns, so...
Q. And --
A. So it wouldn't have -- yeah, I wouldn't have been able to.
Q. And you work with the IRS Criminal Investigation Unit;

that, if you wanted to, you could have requested Mr. Juarez's tax returns; correct?

**A.** No. So within -- oh.

**MR. FARNHAM:** I'll withdraw the objection.

**THE COURT:** Okay.

**THE WITNESS:** So, no, I would not be able to just look into his tax returns. There's specific procedures when it comes to IRS criminal investigation.

**BY MR. SPRAGUE:**

**Q.** What are those procedures to obtain a subject's or target's tax returns?

**A.** It depends on the investigation. So if I have a tax investigation open, then I'm able to review the tax returns associated with that case. If it's a nontax investigation, I am not able to review them and there's certain steps that would need to be taken in order for me to review them and to disclose them to the Department of Justice.

**Q.** Did you or any of your colleagues take any of those steps in this case?

**A.** No.

**Q.** Did you -- in your interviews with Mr. Juarez, did you ever ask him whether he had filed taxes through tax year -- for any year through tax year 2025?

**A.** No.

**Q.** Did you ever ask him to voluntarily provide any of his tax

return information?
A. No.
Q. And so after you heard his testimony that he had not filed taxes and claimed that he had filed extensions, did you take any steps to go find out whether those things were true?
A. No. I wouldn't be authorized to do that.
Q. The Justice Department and the IRS could do that; correct, based on your training and experience?
A. If -- yeah, so there's different -- there's ways in order to do it, yes.
Q. Okay. And neither you nor the prosecution team pursued those ways, to your knowledge; correct?
A. To my knowledge, no.
Q. Okay. And that is true for Mr. Juarez's personal taxes and also for any of those entities that he controlled; fair?
A. Yeah. So I didn't review and I didn't request for that process for his tax returns, his business's tax returns, or the defendants' or their business tax returns. This was a nontax investigation.
Q. Mm-hmm. And as an IRS -- an IRS-CI agent for the last eight years, revenue agent before that, you're -- and I think you testified on direct exam you were involved in investigations relating to potential violations of federal criminal law; fair?
A. Correct.

Q. And failing to file tax returns can be a violation of federal criminal law; correct?
A. If the elements are met, yes.
Q. Okay. And failing to file tax returns in some cases can have significant consequences; fair?
A. I mean, it's a -- it would be a federal crime, yes.
Q. And there could be civil and criminal consequences; correct?
A. Correct.
Q. Even if it's not a crime, there could be significant financial penalties?
A. Correct.
Q. It could be a crime. Even just failing to file could be a crime; correct?
A. Not just. If the elements are met related to that section, it could be a crime, yes.
Q. All right. Okay. Shifting top- -- well, somewhat related but a little bit different topic.
During the investigation you learned that Mr. Juarez had received at least $100,000 from ABC Security toward the end of 2022; correct?
A. Correct.
Q. And you heard Mr. Juarez's testimony on that point; correct?
A. I believe I was here for that portion.

**MR. SPRAGUE:** So not now?

**THE COURT:** Not now.

**THE COURTROOM DEPUTY:** Please rise for the jury.

(The jury enters the courtroom.)

(Proceedings were heard in the presence of the jury.)

**THE COURTROOM DEPUTY:** Thank you. You may be seated.

**THE COURT:** All right. The record will reflect the jury is back with us.

You may proceed.

**MR. SPRAGUE:** Thank you, Your Honor.

**BY MR. SPRAGUE:**

**Q.** Good morning, again, Agent Stegner.

**A.** Good morning.

**Q.** One question about an issue I talked to you about previously, and that is the -- what I was calling the potentially doctored bank statements.

**A.** Yes.

**Q.** Okay. When you did your analyses of those potentially doctored records, did you take notes of your analysis?

**A.** I didn't. It was just a brief trying to look at it. I did not.

**Q.** Okay. Did you do a report of your analysis?

**A.** I did not.

**Q.** Did you discuss your analysis with the prosecution team?

**A.** I believe I did.

Q. When did you discuss them with the prosecution team in relation to when you did the analysis?
A. Probably the following day.
Q. Okay. And that was -- correct me if I'm wrong, but that was -- that was during Mr. Juarez's testimony, while he was on the stand in this case?
A. Yes.
Q. Let me shift gears here, and I would like to ask you some questions about a bank record that you discussed yesterday. And the first one is in evidence. That is Exhibit 1441, I believe admitted.
And if we could -- it is showing on the screen.
**MR. SPRAGUE:** And if we could take a look, just to orient the witness to time, in the upper right.
**BY MR. SPRAGUE:**
Q. Do you see it says October 1, 2022, to October 31, 2022?
A. Yes.
Q. And this is a Ciudad Holdings LLC bank statement from Chase; correct?
A. Correct.
Q. Okay. And you reviewed the Ciudad Holdings LLC bank records from -- provided by Chase in response to a subpoena; correct?
A. Correct.
Q. All right. And now, if we could go down a little bit, in

(Government counsel conferring.)

**MR. FARNHAM:** Nothing further, Your Honor. Thank you.

**THE COURT:** All right. Mr. Schenk, any recross, limited in scope?

**MR. SCHENK:** Thank you.

**RECROSS-EXAMINATION**

**BY MR. SCHENK:**

**Q.** Good afternoon, Agent Stegner.
**A.** Good afternoon.
**Q.** I just have a few follow-up questions for you.
I'd like to start with your discussion with Mr. Farnham regarding the different types of tax investigations.
Do you remember that --
**A.** Yes.
**Q.** -- line of questioning?
What is an invite letter?
Are you familiar with that term?
**A.** Yes.
**Q.** What is that?
**A.** So the Assistant U.S. Attorneys will -- sometimes will send a formal invite letter to a special agent with IRS Criminal Investigation by way of the Department -- Department of Justice Tax Division. And it's just to try to formally get a -- an IRS-CI special agent onto the case for tax.
**Q.** And once the Assistant U.S. Attorney or prosecutor sends

you an invite letter, what does that do to your ability to obtain tax returns?
A. I'm not able to obtain the tax returns until it's been approved through the proper channels. And then once it's approved, I'm able to review tax return information.
Q. So if that process had been followed here, you would have been able to obtain tax returns; is that correct?
A. If we thought it was relevant to the case, then the process could have been -- could have been completed.
Q. And I heard your testimony that you didn't see a reason to open a tax investigation; is that right?
A. Yes.
Q. And is it also your testimony that you just -- you didn't think it was relevant; is that right?
A. Yeah. I mean, I joined the case for -- to trace funds related to the public corruption scheme. I didn't see -- I think maybe we -- I mean, we had discussions about it, but, you know, at the end of it all, it didn't seem relevant to expand the investigation into tax.
Q. Your focus was tracing the financial records, the flow of the money, and you didn't, as you say, see a need to expand beyond; is that right?
A. Yeah. My focus was tracing the money that was related to the public corruption case.
Q. You also said that the -- the original people that you

were looking at were -- were five, the four defendants in the case, and Mario Juarez; is that right?

**A.** Yes.

**Q.** Were you here in court when Mr. Juarez said that he had not filed his tax returns since sometime around COVID?

**A.** Yes.

**Q.** And did that change your analysis about whether a tax investigation was now, I think, in your words, whether there was a reason to open it?

**A.** No.

**Q.** So even after Mr. Juarez testified about that, you did not go back to your office and decide to open a tax investigation?

**A.** No. That's -- I mean -- no.

**Q.** Okay.

**A.** No. Failing to file can be like a civil or a criminal issue. But no, I didn't -- I didn't go back to my office and open it.

**Q.** Right.

And you covered the different potential punishments or penalties with Mr. Sprague; is that right?

Do you remember that line of questioning for failing to file?

**A.** Yes.

**Q.** In addition to following the formal channels that you and I just talked about through the invite letter from the

prosecutors, you also in this case could have asked Mr. Juarez for his tax returns; is that right?
A. Yes.
Q. And that wasn't done; is that correct?
A. No.
Q. I want to spend just a minute talking about your statement that you didn't see it necessary to open as a tax case.
You said that you've been an agent for eight years; is that right?
A. Yes.
Q. And were a revenue agent before that, so you were still working for IRS, but not doing criminal investigations; is that right?
A. Correct.
Q. In your experience doing criminal investigations, you have certainly seen instances in which fraud and tax -- by "fraud" I mean financial fraud -- let's say a mail fraud charge or a wire fraud charge, a -- what's known as a Title 18 charge.
Are you familiar with that?
A. Yes.
Q. So you've seen fraud charges brought together or investigated at the same time as tax charges; is that right?
**MR. FARNHAM:** Objection. Relevance.
**MR. SCHENK:** Your Honor, the witness testified that she did not see it was necessary.

**THE COURT:** All right. Let's get to the point.

**MR. SCHENK:** I will.

**THE COURT:** Overruled.

**BY MR. SCHENK:**

**Q.** So there are instances in which you bring both Title 18 charges, that is, financial fraud, and Title 26 tax charges; is that right?

**A.** Yes.

**Q.** And in this case, you learned here in court by watching Mr. Juarez testify that he had been defrauding the Duongs; is that right?

**A.** I think his testimony was like he took -- that he took a certain amount of money, yes.

**Q.** His testimony -- and then that is what you and I spoke about yesterday, and then you went back to your office and did additional investigation into that idea; correct?

**A.** Yes.

**Q.** So you learned here about some financial fraud.

Did you decide that then it was ripe, then it was time to begin looking into the tax side of the case because there was financial fraud?

**A.** No. I haven't looked into it, no.

**Q.** I want to spend just a minute talking about the way that you categorize payments.

Mr. Farnham asked you some questions about that and you

**A.** Yes.

**Q.** Did you present a summary exhibit for what Mario Juarez did with the $750,000?

**A.** No.

**MR. SPRAGUE:** Nothing further, Your Honor.

**THE COURT:** Mr. Tsai, limited in scope.

**RECROSS-EXAMINATION**

**BY MR. TSAI:**

**Q.** Agent Stegner, I wanted to ask you a few questions about your testimony in response to questions about the issue of a tax investigation pertaining to Mario Juarez.

I think you testified on recross-examination that discussions had occurred whether to look into tax issues with respect to Mario Juarez and a decision was made not to; is that correct?

**A.** It was for the entire -- all of the defendants.

**Q.** Okay. Following the testimony provided by Mario Juarez were discussions -- did discussions occur about that issue of whether to pursue an investigation of Mario Juarez and tax issues?

**A.** No.

**Q.** You were asked about the issue -- and I think this happened on cross-examination maybe, but recross-examination about an investigation or a charge, maybe, under Title 26 related to filing a tax return.

Is it also the case, as a special agent with IRS-CI, that there is a statute that your agency investigates related to income tax evasion?
**A.** Yes.
**Q.** And that is a separate criminal statute from filing a tax return; is that right?
**A.** Yes.
**Q.** In this case, even prior to the testimony --
**A.** Yes. Sorry. Go ahead.
**Q.** It is a criminal offense and it is separate; is that right?
**A.** Yes.
**Q.** Okay.
**A.** Yes.
**Q.** Okay. Prior to the testimony of Mr. Juarez, is it the case that you attempted to calculate Mr. Juarez's taxable income based on the records you had in your investigation?
**A.** No, not his taxable income, no. I was trying to just do a general summation of his bank records.
**Q.** Following the testimony of Mario Juarez in this trial, have you examined the records available to you as the financial investigator into his taxable income?
**A.** During the trial, no.
**Q.** Now, that Mario Juarez has testified, have you considered whether to open a criminal investigation related to income tax

evasion as it relates to Mario Juarez?

**MR. FARNHAM:** Objection. Relevance. 403.

**THE COURT:** You can answer.

**THE WITNESS:** I haven't made a determination on that, no.

**MR. TSAI:** No more questions. Thank you.

**THE COURT:** All right. Mr. Farnham.

Limited in scope.

**FURTHER REDIRECT EXAMINATION**

**BY MR. FARNHAM:**

**Q.** One question based on what Mr. Goldrosen asked you. He asked you some hypotheticals on how perhaps there could have been some cash payments or reimbursements or rebalancing for such -- for the rent payments that Andre Jones made during the time frame we're talking about.

Did you actually see any evidence of the things that he hypothesized, meaning contributions, increased expenditures, cash payments that were made by Sheng Thao to compensate for his rent payments?

**MR. GOLDROSEN:** Objection. Compound and vague.

**THE COURT:** Okay. Let's --

**MR. FARNHAM:** I'll make it a couple of questions.

**THE COURT:** Okay. Thanks.

**BY MR. FARNHAM:**

**Q.** He asked you about whether there could have been cash