# EXHIBIT 6

**Volume 6**

**Pages 1182 - 1397**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
VS. ) **NO. 4:25-cr-00003-YGR**
)
SHENG THAO, et al., )
)
Defendants. )
)

Oakland, California
Friday, October 23, 2026

**TRANSCRIPT OF PROCEEDINGS (CORRECTED)**

**APPEARANCES:**

For Plaintiff:

CRAIG H. MISSAKIAN
UNITED STATES ATTORNEY
1301 Clay Street
Oakland, California 94612
**BY: ABRAHAM H. FINE**
**MOLLY PRIEDEMAN**
**ASSISTANT UNITED STATES ATTORNEYS**

UNITED STATES ATTORNEY
450 Golden Gate Avenue
San Francisco, California 94102
**BY: LLOYD A. FARNHAM**
**ASSISTANT UNITED STATES ATTORNEY**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By: Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
Official United States Reporter, CSR No. 12219

Q. And agreed to testify for them; correct?
A. Yes. I believe that is his part of the plea agreement.
Q. Okay. Did the Government ever ask Mr. Juarez for any documents -- strike that -- for copies of any of his text messages or iMessages or WhatsApp messages after June of 2024?
A. I was not in all of the meetings with Mr. Juarez, but in the meetings that I was in with him, we did not.
Q. Okay. Are you aware -- I assume if they requested it in a meeting that you weren't for -- and the information came in, you would have been notified about it; correct?
A. Yes, I believe so.
Q. You're familiar with all the important information gathered in this case; right?
A. Yes.
Q. So as far as you're aware, you've never been notified that any of Mr. Juarez's texts or messages since he began cooperating have been received; correct?
A. Well, we have record of his texts and conversations from the other devices and accounts that we searched, so we do have message content relating to Mr. Juarez from after January of 2024.
Q. Fair enough.
But you did some -- up until -- what? -- June?
A. June of 2024.
Q. Okay. And he -- do you have any -- did you ever receive

any information about his texts or messages from after that -- June 2024?

**A.** No.

**Q.** So presumably, the Government never asked for it; correct?

**A.** We never received it. I wasn't in on the meetings, but we never received --

**Q.** I understand --

**A.** -- more messages from him. Yes.

**Q.** I understand you weren't in the meetings.

But they never asked for it or you would have got it; right?

**A.** I think it's fair to say -- I mean, I can't say what they asked for in those meetings, but we never received more message content from Mr. Juarez.

**Q.** You're required -- you're aware that one of the terms of Mr. Juarez's plea agreement requires him to give over any documents they request; right?

**A.** I do believe that is true.

**Q.** So if they had asked for something and he provided it, you would have seen it or known about it at some point?

**A.** I believe that would be true.

**Q.** Have you been made aware or learned of any documents that you received from Mr. Juarez since -- postdating June of 2024?

**A.** We did receive photos from his attorneys.

I'm not aware of anything else we received from Mr. Juarez

at this time.

**Q.** When did you receive photos from his attorneys?

**A.** It may have been in the -- I can't say for sure. I can't say for sure, but it is documented in one of the interview 302s that I was part of.

**Q.** Just the photos, is that all you recall?

**A.** That's all I recall receiving.

**Q.** We've seen some -- you were aware through your investigation that Mr. Juarez was pursuing other real estate deals?

**A.** I've seen messages relating to properties, but I -- I -- as far as saying he was pursuing real estate deals, I do not have that knowledge.

**Q.** Fair enough. You don't know the particulars.

Were you aware that he -- do you remember learning in your investigation that he was interested in a sort of lux- -- building luxury houses in the Oakland Hills?

**A.** I do remember messages about -- about luxury houses in the Oakland Hills.

**Q.** And, in fact, he was attempting earlier -- in 2022, he was attempting to raise money from other people, not my client or his family, but he was attempting to raise $3 million for this project in the Oakland Hills.

Do you recall learning information about that?

**A.** No, I do not.

Q. And as a matter of fact, he -- do you remember he reached out to Larry Gallegos about it?
A. I do not recall that.
Q. Okay. What other real estate -- what other evidence did you learn about Mr. Juarez's other possible real estate -- let's say -- pursuits?
A. Real estate pursuits?
Q. In 2022?
A. Real estate pursuits in 2022?
Q. Yeah, or earlier, I guess.
A. Those were not part of our investigation.
Q. Okay.
A. Our investigation was focused on activities related to the mailer and corruption.
Q. I understand.
But did you ever -- did you pursue any leads about -- for example, as we saw on those texts, the Siena -- the Siena Drive residence project, did you ever -- did you ever investigate that at all?
A. No, we can't -- I don't know why we would investigate that.
Q. Fair enough.
The -- did you ask Mr. Juarez about his soliciting investment in the Siena Drive project?
A. No. That was not related to our investigation.

**Q.** So -- you spoke to -- you met with Mr. Juarez 12, 15 times, whatever it is. He is the -- he is the Government's main witness in this case; isn't that fair to say?

**A.** I do not think that's fair to say.

**Q.** Okay.

**A.** He --

**Q.** Are you the main witness?

**A.** I -- I don't know if I feel comfortable characterizing anybody as a main witness.

**Q.** Okay. Well, Mr. Juarez is the only one who's going to testify that he made a deal with my client, my client's father, Ms. Thao, and Mr. Jones to sell homes to the City of Oakland; right?

**A.** Mr. Juarez will be testifying on that issue.

**Q.** He's the first one -- when he walked in the door of the FBI, this -- this is -- was his story. This is what he told you; right?

He said: I have -- I have a case that you can make against the Mayor and some prominent local businessmen. It involves bribery. It involves corruption. It involves money.

**A.** I do not think that's a fair characterization of our first interview with Mario Juarez.

**Q.** Well, let's -- certainly it covered everything, other things, but that was certainly the part that interested you the most; is it not?

A. I mean, I do not character -- I do not agree with the way you characterized his statement at all.
Q. You've -- your team has filed charges against our clients, charged with bribery -- corruption is not a separate charge, but that's essentially the allegation; right?
A. Correct.
Q. You're part of the corruption unit; right?
A. Correct.
Q. That's what you specialize in investigating, corruption?
A. Correct.
Q. This isn't your first rodeo; correct?
A. Correct.
Q. You've testified in other federal corruption trials?
A. No, I've testified in other trials but they were of a different nature.
Q. Okay. You -- is this the first time that you've been sitting at the table with the prosecution during the trial?
A. No, it is not.
Q. Okay. So as I said, this isn't your first rodeo?
A. As I said, that's correct.
Q. Without Mario Juarez, your investigation would have had text messages, phone records, paper and electronic -- paper and electronic, roughly speaking; right?
A. And financial records as well and -- as well as --
Q. Financial records -- that was my bad.

The Government needed a voice, did it not, someone to get on the stand, not just you, but someone who claimed to be on the inside?

**A.** I -- I don't understand that question or agree with it, yeah.

**Q.** Well, you must -- you must understand it if you don't agree it.

**A.** I think -- sorry. If I may.

I think I know what you're trying to imply, but I don't agree with that characterization.

**Q.** You don't agree with the characterization that Mario Juarez is the most important witness in this case?

**A.** I do not agree with that.

I do agree that Mario Juarez is an important witness.

**Q.** Were you present for any of the discussions with my client when he supposedly -- when they supposedly had an agreement to try to bribe the mayor of Oakland.

**A.** I was not present for any of the meetings.

**Q.** Were any of those meetings and discussions with my client recorded in any fashion?

Do you have a recording with my client and Mario Juarez discussing bribing the mayor of Oakland?

**A.** I don't know how to answer that question. We do have -- there are more recordings that exist that haven't been introduced as evidence yet.