# EXHIBIT 8

**Volume 8**

**Pages 1615 - 1851**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

UNITED STATES OF AMERICA, )
)
Plaintiff, )
)
VS. ) **NO. 4:25-cr-00003-YGR**
)
SHENG THAO, et al., )
)
Defendants. )
)

Oakland, California
Tuesday, October 27, 2026

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

CRAIG H. MISSAKIAN
UNITED STATES ATTORNEY
1301 Clay Street
Oakland, California 94612
**BY: ABRAHAM H. FINE**
**MOLLY PRIEDEMAN**
**ASSISTANT UNITED STATES ATTORNEYS**

UNITED STATES ATTORNEY
450 Golden Gate Avenue
San Francisco, California 94102
**BY: LLOYD A. FARNHAM**
**ASSISTANT UNITED STATES ATTORNEY**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By: Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
Official United States Reporter, CSR No. 12219

A. Yes.

Q. And you spoke to him, I think, at least 16 times; is that correct?

A. That's the number that's been floated out there.

Q. Okay. But these messages, text mails -- messages, the text messages, the e-mails, the Apple Notes, they don't tell us much without context and without more information; is that correct?

A. I mean, I think they say a lot, actually.

Q. But, again, you don't know whether they're true or false?

A. That's the purpose of the investigation.

**MS. HALBERT:** Could we put up on the screen 1865, please.

**BY MR. GOLDROSEN:**

Q. This is your demonstrative that you started to testify about in direct examination.

**MR. GOLDROSEN:** And could we go to page 5. This -- actually, could we go to page 4, I think. Let me get that correct.

And actually, let's -- let me double check that.

(Pause in proceedings.)

**MR. GOLDROSEN:** Let's go to page 3, I'm sorry.

**BY MR. GOLDROSEN:**

Q. So there was some data that you extracted from devices; is that correct?

A. Yes.
Q. And that would be from cell phones, from computers, hard drives, things like that; is that right?
A. Yes.
Q. And for which people did you extract information from devices?
A. We extracted the information from devices that we attributed to Sheng Thao, Andre Jones, Andy Duong, David Duong, yeah.
Q. Is that the entirety of the people from whom you obtained devices that you extracted information from?
A. I believe so, the devices from the search warrants.
Q. Okay. Now, if we could go to page 4, you also obtained information by subpoena of various accounts; is that correct?
A. Search warrants, yes.
Q. Okay. And that would be Apple accounts, Microsoft accounts, Google accounts, Yahoo! accounts; is that correct?
A. Yes.
Q. And the people for whom you obtained information of their accounts via search warrant were the four defendants -- right? -- Jones, David Duong, Andy Duong, Sheng Thao; is that correct?
A. Yes.
Q. And one other person; right? Who was that?
A. I'm sorry?

Q. Who was the fifth person that you obtained --
A. Oh, for digital -- digital search warrants?
Q. Yes.
A. Mario Juarez.
Q. Okay. So there were five people that you obtained search warrants for their digital accounts; that's correct?
A. Yes.
Q. And four people from whom you obtained the actual devices and did extractions; is that correct?
A. Yes.
Q. So there was one person for whom you got digital accounts, but you didn't get information from that person's devices; is that correct?
A. That is correct.
Q. And that one person for whom you did not get information from devices is who?
A. That's Mario Juarez, I believe.
Q. And the reason you get -- let me put it this way.
The reason, with respect to our clients, that you got both the information from their accounts and then actually seized their devices to examine them, is because sometimes there might be information on those devices that is not found on their accounts; is that correct?
A. Yes. I would say that's true.
Q. Okay. That's why you did it. That's why you went ahead

and seized Andre Jones', my client's, phone; is that correct?
A. To search for evidence, yes.
Q. Correct. Because you didn't want to rely just upon what was in his account; is that correct?
A. In his account -- yes.
Q. Okay.
A. I mean --
Q. You got a search warrant for his iCloud account; is that correct?
A. Yes.
Q. You got a search warrant for his e-mails; is that correct?
A. We did not get a search warrant for his e-mails.
Q. Okay. Okay.
Did you ever ask Mario Juarez to provide you with his cell phone?
A. No. That -- I -- in my experience, that's inconsistent with how we treat witnesses.
Q. Is it inconsistent with good investigation?
A. I'm sorry?
Q. Is it inconsistent -- let me put it this way: Is it inconsistent with a thorough investigation of a cooperating client -- a cooperating witness to ask for his cell phone?
A. I'm sorry. Can you repeat that question.
Q. Is it inconsistent with a thorough investigation to have asked Mario Juarez for his cell phone so you could review it?

A. That -- that's inconsistent with how we generally interact with witnesses.

Q. That may be generally, but in this case, Mario Juarez was originally a suspect; is that correct?

A. Yes. And he is a co-conspirator and he pled guilty to that.

Q. Correct. And as part of his plea agreement, he agreed to provide you with any evidence you wanted to ask him for; is that correct?

A. Correct. But the details of this case, as far as the bribery scheme, was all historical. So by June of 2024, it just was irrelevant at that point.

Q. It was irrelevant what was in his cell phone from before June 2024?

A. Yes, because we already had a lot of content.

Q. Did you ask him for any of his iPads?

A. His iPads?

Q. Did you ask Mario Juarez to provide you with any iPads so you could examine what was in his iPad?

A. No, we did not.

Q. Did you ask him to provide you with any of his computers so you could examine what was in his computers?

A. No.

Q. You didn't think there would be any relevant information in those devices to determine his credibility as a cooperator?

A. No. I think we have a pretty good idea of who Mario Juarez is.
Q. So the reason -- let me put it this way: It's not a situation where you asked him for these devices and he refused to give them to you. It's you never asked him for it; is that correct?
A. That's correct.
Q. At the beginning of your testimony, gosh, a week ago Monday, you put up on the screen the so-called "deal points" that Mario Juarez had drafted; is that correct?
A. Yes.
Q. I think that was Exhibit 1808.
And you testified that -- well, let me ask it this way:
You investigated whether those deal points had been sent to anyone else, is that correct, via text or via e-mail; is that correct?
A. Yes.
Q. And I think you indicated that no such deal points were ever sent to Sheng Thao, for example; is that correct?
A. I did not see that message sent to Sheng Thao.
Q. And with respect to my client, Andre Jones, were those deal points that were produced by Mario Juarez, were those ever sent to him, to Andre Jones via text or e-mail or any other method?
A. I did not see evidence of that.