# EXHIBIT 9

**Volume 16**

**Pages 3439 - 3676**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable Yvonne Gonzalez Rogers, Judge

UNITED STATES OF AMERICA, Plaintiff,

vs. **NO. 4:25-cr-00003-YGR**

SHENG THAO, et al., Defendants.

Oakland, California
Thursday, November 12, 2026

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:

CRAIG H. MISSAKIAN
UNITED STATES ATTORNEY
1301 Clay Street
Oakland, California 94612
**BY: ABRAHAM H. FINE**
**MOLLY PRIEDEMAN**
**ASSISTANT UNITED STATES ATTORNEYS**

UNITED STATES ATTORNEY
450 Golden Gate Avenue
San Francisco, California 94102
**BY: LLOYD A. FARNHAM**
**ASSISTANT UNITED STATES ATTORNEY**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

Reported By: Ruth Levine Ekhaus, RMR, RDR, FCRR, CCG
Official United States Reporter, CSR No. 12219

correct?
**A.** I did.
**Q.** You did not get in that ambulance; correct?
**A.** I did not.
**Q.** Okay. You declined medical treatment that day; correct?
**A.** I felt --
**Q.** Did you decline medical treatment that day?
**A.** I told the ambulance that I was not getting in the ambulance with them.
**Q.** Okay. You declined medical treatment on May 3rd; correct?
**A.** Sure.
**Q.** All right. 10 months later, March of 2025, you put out some communications on social media accounts; correct?
**A.** If you show them to me, I'll be able to say.
**Q.** Might it help to refresh your recollection if I show them to you?
**A.** It would.
**Q.** Okay.
**MR. SPRAGUE:** I will hand to the Court and the Government and, with permission, to Mr. Juarez, Your Honor --
**THE COURT:** You may.
**BY MR. SPRAGUE:**
**Q.** Mr. Juarez, you can tell me when you have had a moment to take a look at what's been marked as 5199A.
**A.** (Witness examines document.)

Q. Do you recognize that?

A. I do.

Q. Okay. And do you recognize this as a statement you posted to social media about the incident on May 3rd, 2024, that you posted on or about March 8th of 2025?

A. I did.

**MR. SPRAGUE:** Okay. The Government offer -- the Defense offers 5199A, Your Honor.

**MR. FINE:** No objection.

**THE COURT:** It's admitted.

(Trial Exhibit 5199A received in evidence.)

**MR. SPRAGUE:** If we could publish that, please. And maybe we can zoom in on the text just a little bit.

**BY MR. SPRAGUE:**

Q. All right. You started -- then you wrote [as read]:

"They ambushed me. My face bears the bruises they caused me"; correct?

You wrote that?

A. Yes.

Q. Okay. And you wrote [as read]:

"10 men attacked. Fists crashing into my skull. Boots slamming into my ribs. Every blow meant to erase me."

Correct; you wrote that?

A. I wrote that.

**Q.** And you posted this on social media; correct?
**A.** I did.
**Q.** Okay. All right. And you also sent it to Steven Tavares?
**A.** I sent it to many people, including Steven Tavares.
**Q.** And when you sent it to Steven Tavares, you e-mailed him, calling him by his first name.
Does that sound right?
**A.** I don't remember calling him, but I normally do call him by "Steven."
**Q.** Ask you didn't ask Shawn Wilson to send it to Steven Tavares; correct? You sent to Mr. Tavares directly?
**A.** I sent it to the Chronicle. I sent it to --
**Q.** I question was: You sent it directly to Mr. Tavares?
**A.** I didn't need Shawn to send this message.
**Q.** Okay.
**A.** I posted it on social media myself. I wanted people to know what they had done to me.
**Q.** And you sent it, sir, to Dan Noyes at ABC News; is that right?
**A.** I sent it to Dan and to other reporters.
**Q.** And you sent it to a bunch of people, and you asked them to publish it; right?
**A.** I was making sure that they understood what had done to me that day, and I was angry.
**MR. SPRAGUE:** You can take that down.

**MR. SPRAGUE:** No, we don't, but it's a present-sense impression from the officer what he said.

**THE COURT:** Sustained.

**MR. SPRAGUE:** Okay.

**BY MR. SPRAGUE:**

**Q.** Do you recall the officer saying, "You don't have any bruising"?

**MR. FINE:** Objection. Hearsay.

**THE COURT:** Sustained.

**BY MR. SPRAGUE:**

**Q.** After the altercation on May 3rd, you told OPD that your watch and gold chain were stolen; correct?

**A.** They were stolen and they were found in Andy's Duong's home.

**Q.** You testified the other day that the chain was worth approximately $15,000; correct?

**A.** Yes.

**Q.** Isn't it true you told OPD that the chain was worth $50,000?

**A.** The chain is worth $15,000, not 50,000. If it was misspoken or misstated, I don't understand. But it was about that amount. But, regardless, it's my chain, and he had no right to take it.

**Q.** Did you tell OPD it was worth about $50,000?

**A.** If it was 1 dollar, it's my father's chain.

Q. My -- My question, sir: Did you tell OPD it was worth $50,000?

A. I told $15,000.

Q. You told 15-, 1-5?

A. Yes.

MR. SPRAGUE: Okay. I'd like to play 5112B-1. It's what we discussed at the break, Your Honor. It's -- one, two --

THE COURT: You may.

MR. SPRAGUE: Thank you, Your Honor.

5112B-1.

(Video played but not reported.)

BY MR. SPRAGUE:

Q. So you heard that; right? You told them 50,000; right?

A. I hear myself.

Q. And you heard yourself say 50-, 5-0; right?

A. I also see myself beaten up and confused in the middle of the night, caused by your clients --

THE COURT: You know, the evidence is in. We don't have to belabor it.

BY MR. SPRAGUE:

Q. You also told OPD that your watch was a Rolex worth $40,000; is that right?

A. If it's worth $1 or whatever, it was a gift from my wife.

THE COURT: Answer the question.

**THE WITNESS:** And I am answering it. And I'm --

**THE COURT:** No, that wasn't the question.

**BY MR. SPRAGUE:**

**Q.** Did you tell OPD that the watch was a Rolex worth about $40,000?

**A.** I don't remember.

**Q.** Would it refresh your recollection to hear the audio of what you told OPD?

**A.** Sure. Play the video.

**MR. SPRAGUE:** Okay. Your Honor, I'd like to play 51 -- the next segment there of seven lines.

**THE COURT:** I'll allow it even though it's not technically proper. Go ahead.

**MR. SPRAGUE:** Thank you, Your Honor.

(Video played but not reported.)

**BY MR. SPRAGUE:**

**Q.** But you knew the watch was not actually a Rolex worth $40,000; correct?

**A.** It was a gift from my wife.

**Q.** So you have no idea what it was worth; correct?

**A.** Whatever it was worth, it's mine.

**Q.** Did you have any idea what it was worth when you told OPD it was worth $40,000, sir?

**A.** If it was worth $1 or 40 or 50 or $100,000, it was a gift my wife gave me. And it was the second gift that she gave me

ever, and he had it in his house.
Q. And you knew it was fake; correct?
A. I didn't know that.
Q. You know that now; right?
A. I don't know that today.
Q. Okay. And --
A. Even if it was, it was mine.
**THE COURT:** Stop.
**BY MR. SPRAGUE:**
Q. Sir, there's no question pending.
**THE COURT:** Next question.
**BY MR. SPRAGUE:**
Q. When you met with the Government, you -- you referred to it as a Rolex for the first year and a half or so that you were meeting with them; right?
A. If it was a Casio or a Rolex, I don't care. It was mine.
**THE COURT:** Okay. I think we have enough in the record.
**MR. SPRAGUE:** Fair enough, Your Honor.
**THE WITNESS:** And he stole it.
**THE COURT:** I said we have enough. There's no question pending.
Next question. Next topic.
**BY MR. SPRAGUE:**
Q. Moving on, you and Cecilia Mendez are still very, very

close friends; correct?
A. We are.
Q. And you talk regularly; correct?
A. We stopped talking during this trial now.
Q. Okay. Before this trial, before you stopped talking with her during the trial -- we'll come back to that -- you were talking to her throughout the time you've been cooperating with the Government; correct?
A. I talked to Cecilia because we have businesses, we have a daughter in common, and because she is one of my best friends and a business partner.
Q. And you talked to Ms. Mendez on October 26th, 2026, right before she was scheduled to meet with the Justice Department later that day; correct?
A. I did.
Q. And you talked to Ms. Mendez the morning of October 28th, 2026, the morning she was going to testify here in this case; correct?
A. I did.
Q. And you have spoken with Ms. -- with Ms. Mendez after her trial testimony; correct?
A. I did.
Q. You testified that Ms. Mendez initially attended board meetings for Evolutionary Homes to take notes; correct?
A. She did.

Q. And who -- and who -- who tasked her to take those notes?
A. I did.
Q. You did, okay.
But you never saw any notes she took during the board meetings; is that right?
A. I saw notes.
Q. You saw notes that she took?
A. Yes.
Q. Where -- where did you see those notes that she took?
A. On the e-mails and communicate -- on her notebook.
Q. And did you provide those to the Government?
A. She didn't give them to me. I read them.
Q. You -- and when did you read the notes that she was taking of the Evolutionary Homes' board meetings?
A. After the meetings will come out, and there will be notes.
Q. And they were circulated to whom?
A. She kept them.
Q. So she saw them. She kept them.
You saw them; is that right?
A. I saw some of the notes.
Q. Who else saw any of the notes?
A. I -- you got to ask her. I don't know who else she showed it to, but she showed it to me.
Q. So as far as you know, the only two people who saw them are you and Ms. Mendez?

A. Yes.
Q. Okay. Did the Government ever ask you to get those notes and provide them?
A. They were not my notes.
Q. Okay. You testified that you did not know Ms. Mendez was recording Evolutionary Homes' board meetings at the time the board meetings were taking place; correct?
A. I -- I told the Government that I didn't know that they were recording them. If I had known, I would have told Cecilia not to record them.
Q. Okay. And it wasn't just you told the Government, you testified in this case that you didn't know they were being recorded at the time they were taking place; correct?
A. That's correct.
Q. Okay. And as you mentioned, you also told the Government that Ms. Mendez was recording audio of these meetings unbeknownst to you; right?
A. Correct.
Q. Hadn't Ms. Mendez informed you that she was recording these meetings, at least by early December 2023?
A. I don't remember the dates.
Q. So it's possible she told you in December 2023 that she was recording Evolutionary Homes' board meetings?
A. I didn't know until very recently. Government played the -- one recording, and I was shocked to hear my voice.

Q. Okay. So very recently, when did you learn for the first time she had recorded any part of any Evolutionary Homes' board meeting?
A. Government played some recordings for me. Must have been in the last two or three months, and --
Q. Okay.
A. -- they were pretty shocking to hear my voice.
Q. Okay. So well into 2026 is the first time you knew she was recording any of the board meetings; correct?
A. That I heard the recordings of those particular board meetings, yes.
Q. That wasn't my question.
A. I asked --
Q. It was not until well into 2026 that you first learned that Cecilia Mendez had recorded any portion of any Evolutionary Homes' board meeting; right?
A. Yes.
Q. Okay.
A. She's not supposed to be recording.
Q. Okay.
Isn't it true that she texted you that she had made recordings of one or more of these board meetings, and she texted you that in December of 2023?
A. I don't remember that text. But she could have texted me.
Q. And told you as early as December 2023 that she was

recording Evolutionary Homes' board meetings?
A. What I understood is that she was recording notes of the board meetings.
Q. And you knew that at the time that she was recording the meetings to be able to take notes?
A. The notes, recording the notes. It's a record of everything that is taking place during the board meeting.
Q. Is that an audio recording or handwritten or typed?
A. What I understand is that she was putting the notes together. Recording the meetings is -- that's usually what is -- the person who is assigned to a board meeting is the recorder, basically, recording the notes. The minutes are being put together.
Q. Did you know she was audio recording the Evolutionary Homes' board meetings or any of them until well into 2026?
A. For the fifth time, I didn't know.
Q. Okay.
A. I heard the Government play it for me.
Q. You answered it. You answered it. We're good.
All right. You attended, Mr. Juarez, an Evolutionary Homes board meeting on November 13th of 2023; correct?
A. I don't have a reason to disbelieve your date.
Q. Okay. I don't think we'll get any objection to -- to that you were there on November 13th of 2023.
We can show a transcript, but -- all right.

At the end of the meeting that day, about November 13th, 2023, when other people left, it was just you and Ms. Mendez there together, packing up to leave. She told you she had been recording the board meeting, didn't she?

A. I don't remember she told me that day or any other date, but I don't remember that.

Q. Okay.

A. It would have been very inappropriate for Cecilia to record those meetings, and I would have acted differently on those meetings.

Q. And you said you had no idea until well into 2026 that she was doing that; right?

A. Yes.

Q. Okay. So you're saying she did not tell you, then, November 18th of 2023, that she was recording the board meeting?

A. My understanding is that I first learned of these recordings on -- when the Government played them for me.

**MR. SPRAGUE:** Okay. Your Honor, we would like to play the clip but publish the English translation of that half-page that is -- let me identify these for the record.

**THE COURT:** The Government doesn't object to the translation?

**MR. FINE:** No, Your Honor.

**THE COURT:** You may.

**MR. SPRAGUE:** Okay. The translation is 991AT-1. And someone will tell me if we have a recording of this.

It's 991A, actually. And if we could zoom in on that.

(Audio played but not reported.)

**MR. SPRAGUE:** If we can show the English translation, please, zoomed in.

**BY MR. SPRAGUE:**

**Q.** Okay. So that -- you heard that recording was in Spanish; correct?

**A.** I heard a recording from a device that appears to be obscured. From the listening of it --

**Q.** Okay.

**A.** -- it's very clear that someone is hiding something.

**Q.** Yeah, someone is packing up after a meeting, it appears; is that fair --

**A.** No.

**Q.** Okay. And the -- we have the English translation that is not in dispute here. You say [as read]:

"He accepted the $750,000."

Right?

Ms. Mendez says [as read]:

"What did he accept?"

You say [as read]:

"The $750,000."

Ms. Mendez says [as read]:

"How did he accept it?"

You say [as read]:

"He told me, 'Give me the $750,000.'"

Ms. Mendez [as read]:

"Oh, really? Mm-hmm, yeah. And I have it recorded."

And then there's some indiscernible -- and noise.

And she says [as read]:

"Let me turn it off."

And you say [as read]:

"He just called."

And Cecilia Mendez says [as read]:

"It's just that it's still recording."

Do you see that?

**A.** I see it.

**Q.** You didn't say right there, "What do you mean, you have it recorded, and it's still recording?"; right?

**A.** I said I'm getting a phone call, and I took the phone call.

**MR. SPRAGUE:** Okay. Okay. I think we can skip this piece and perhaps that piece.

**BY MR. SPRAGUE:**

**Q.** Mr. Juarez, who is Carlos Johnson?

**A.** So he's my personal assistant in Mexico.

**Q.** And in September 2023, you prepared an expense report for

reimbursement from Evolutionary Homes; correct?
A. He prepared it.
Q. Okay. He prepared it.
And you're aware of it because you know he prepared it; right?
A. What's that?
Q. You aware of it because you know he prepared it?
A. Carlos would prepare all the reports and my financials and personal expenditures, arrange for my travels and all those things.
Q. And that report included expenses allegedly incurred in Mexico; correct?
A. Yes.
Q. And in September 2023, you texted Cecilia Mendez and Carlos Johnson about this expense report; correct?
A. I don't disagree with you.
Q. And you texted them or messaged them about the rent amount for Evolutionary Homes' facility in Mexico, told them to falsely increase expenses; correct?
A. I may have said that, yes.
Q. Okay. And you told Ms. Mendez and Mr. Johnson that you wanted to modify the rents and raise other expenses; correct?
A. Probably said that.
Q. And as one example, you had Ms. Mendez raise the monthly rent in the report to $18,200 a month for the facility; is that

right?
**A.** I think it was that -- that amount is correct.
**Q.** Okay. And you knew that this inflated rent amount was going to be presented to Evolutionary Homes for payment; right?
**A.** No, I think that that amount is correct because it didn't include the IVA, which is Mexico tax. They charge you for every transaction, and it didn't include some of the common charges that are associated. So it needed to be increased.
That's what I believe. But it may be that I have said that -- inflate some other stuff, and I don't disagree with that.
**Q.** Okay.
**A.** But in this particular instance, I think you're incorrect.
**MR. SPRAGUE:** And -- okay. Let's take a look at Exhibit 732.
And if we could zoom in on "Current Debts," please, on the left -- on the left of the three columns.
**BY MR. SPRAGUE:**
**Q.** And these were expenses that you and Mr. Johnson and Ms. Mendez listed as current debts.
Yes?
**A.** I don't know if this was a budget or an actual document for payment. It looks to me more like a budgetary document.
**Q.** Okay. We're looking at a column titled "Current Debts"; correct?